**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| BADER FARMS, INC. and<br>BILL BADER<br><br>Plaintiffs,<br><br>v.<br><br>MONSANTO CO.<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1:16-cv-00299<br><br>JURY TRIAL DEMANDED<br>ON ALL COUNTS |

**NOTICE OF REMOVAL**

PLEASE TAKE NOTICE that Defendant Monsanto Company ("Monsanto") hereby submits this Notice of Removal of the above-captioned action from the 35th Judicial Circuit Court for the County of Dunklin, Missouri, to the United States District Court for the Eastern District of Missouri, Southeastern Division, pursuant to 28 U.S.C. §§ 1331, 1441(a), and 1367(a). This Court has original federal question jurisdiction under 28 U.S.C. § 1331, because the Petition presents substantial federal questions as well as claims that are completely preempted by federal law. This court has supplemental jurisdiction, under 28 U.S.C. § 1367(a), over any claims over which it does not have original federal question jurisdiction, because they form part of the same case or controversy as those claims over which the court has original jurisdiction. As this Court has original federal question jurisdiction under 28 U.S.C. § 1331, the action is removable under 28 U.S.C. § 1441(a). In support of removal, Monsanto states as follows:

# INTRODUCTION

Plaintiffs allege that their crops were damaged by the herbicide dicamba when it drifted onto their property after neighboring farmers illegally applied it over the top of Roundup Ready 2 Xtend™ soybeans ("Xtend soybeans") and Bollgard II® XtendFlex™ cotton seeds ("Xtend cotton seeds") (collectively, "Xtend seeds") sold by Monsanto. According to the Petition, even though Monsanto did not manufacture, formulate, distribute, sell, or apply the dicamba that allegedly damaged Plaintiffs' crops, Monsanto is nonetheless liable for the resulting damage because, *inter alia*, Monsanto allegedly concealed material information from federal regulators, which prevented them from fulfilling their regulatory duties to protect Plaintiffs from the alleged harms. In addition, although the Petition acknowledges, in certain paragraphs, that glyphosate herbicides could be used with Xtend seeds, it also appears to allege, in other paragraphs, that Monsanto is liable because it sold the federally-deregulated Xtend seeds in the absence of any existing, federally-approved herbicide that could have been used with the seeds.

Although the Petition purports to plead only state common law claims, those claims raise substantial federal questions over which this Court has original jurisdiction. First, Plaintiffs' fraudulent concealment claim requires a determination of whether federal regulators failed to fulfill their regulatory duties in connection with the deregulation of Xtend seeds and the use of herbicides with those crops. Second, to the extent that Plaintiffs' product design claims are predicated on a contention that there were no alternative EPA-approved herbicides available to farmers for use with Xtend soybeans and Xtend cotton seeds at the time they were introduced, those claims raise questions regarding the scope of federal agency actions and determinations. Because Plaintiffs' claims raise one or more substantial federal questions, this Court has original federal question jurisdiction pursuant to 28 U.S.C. §1331.

This Court also has original federal question jurisdiction because the Petition asserts claims that are completely preempted by federal law. Complete preemption requires the combination of (1) regular defensive preemption of the state law claim, and (2) an available federal avenue for seeking the relief requested. Both are present here. First, the Plant Protection Act expressly preempts the asserted state law duty not to sell Xtend soybeans and Xtend cotton seeds following their deregulation by the U.S. Department of Agriculture's ("USDA") Animal and Plant Health Inspection Service ("APHIS").[1] In addition, APHIS's decision to deregulate the seed and permit its dissemination within the United States impliedly preempts the asserted state law duty not to sell Xtend seeds. Second, federal law provides Plaintiffs with a federal avenue to pursue a ruling preventing the dissemination of Xtend seeds. Because certain of Plaintiffs' claims are completely preempted, this Court has original jurisdiction under 28 U.S.C. § 1331.

## FACTUAL BACKGROUND

### I. FEDERAL REGULATION OF GENETICALLY ENGINEERED CROPS AND THE SALE, USE AND LABELING OF HERBICIDES

#### A. Overview

1. Federal policy governing biotechnology directs federal regulators to pursue "a balance between regulation adequate to ensure health and environmental safety while maintaining sufficient regulatory flexibility to avoid impeding the growth of [the biotechnology] industry." Coordinated Framework for Regulation of Biotechnology, 51 Fed. Reg. 23,302-01, 23,302-03 (June 26, 1986) (hereinafter "Coordinated Framework").

[1] The alleged duty not to sell Xtend seeds underlies Plaintiffs' (1) strict liability design defect claim; (2) negligent design and marketing claim; and (3) implied warranty of merchantability claim.

2. The federal regulatory scheme is designed to achieve "national consistency" in the regulation of genetically engineered ("GE") biotechnology. Proposal for a Coordinated Framework for Regulation of Biotechnology, 49 Fed. Reg. 50,856-1, 50,857. It implements a federal "regulatory process [that] adequately considers health and environmental safety consequences of the products and processes of the new biotechnology" using "the best available scientific facts," to ensure that "regulatory decisions can be made in a socially responsible manner, protecting human health and the environment, allowing U.S. producers to remain competitive and, most importantly, assuring that everyone will reap the benefits of this exciting biological revolution." *Id.*

3. Thus, "[t]he policy of the United States Government is to seek regulatory approaches that protect health and the environment while reducing regulatory burdens and avoiding unjustifiably inhibiting innovation, stigmatizing new technologies, or creating trade barriers." Emerging Technologies Interagency Policy Coordination Committee, National Strategy for Modernizing the Regulatory System for Biotechnology Products at 4 (Sept. 2016) (hereinafter "National Biotechnology Strategy").[2]

4. The federal government regulates GE crops as described in the Coordinated Framework for the Regulation of Biotechnology published by the Office of Science and Technology Policy, Executive Office of the President, which "describes the comprehensive Federal regulatory policy for ensuring the safety of biotechnology research and products." Coordinated Framework, 51 Fed. Reg. at 23,302.

5. The Coordinated Framework explains the regulatory roles for the three federal agencies with primary responsibility for regulating GE crops: USDA's APHIS, the Environmental

---

[2] Available at https://www.whitehouse.gov/sites/default/files/microsites/ostp/biotech_national_strategy_final.pdf.

Protection Agency ("EPA"), and the Food and Drug Administration ("FDA"). Coordinated Framework, 51 Fed. Reg. 23,302-01.

6. The Coordinated Framework has been a fixture of biotechnology policy for each administration since its inception, and was most recently reiterated in the *National Biotechnology Strategy*.

**B. APHIS's Control over the Introduction of GE Plants**

7. APHIS regulates the introduction and dissemination of GE crops under the Federal Plant Protection Act ("PPA") and a detailed GE-specific regulatory regime.[3]

8. In the PPA, Congress determined that "biological control is often a desirable, low-risk means of ridding crops and other plants of plant pests and noxious weeds, and its use should be facilitated by the Department of Agriculture, other Federal agencies, and States whenever feasible." 7 U.S.C. § 7701 (1) and (2).

9. In addition, Congress determined that "the smooth movement of enterable plants, plant products, biological control organisms, or other articles into, out of, or within the United States is vital to the United States' economy and should be facilitated to the extent possible." 7 U.S.C. § 7701(5).

10. APHIS regulates GE crops pursuant to its authority to regulate the "movement in interstate commerce" of all "plant pests" in the United States. *See* 7 U.S.C. §§ 7712, 7711.

11. A "plant pest" is defined to include "any living stage of any [bacterium] that can directly or indirectly injure, cause damage to, or cause disease in any plant or plant product." 7 U.S.C. § 7702(14). *See also* 7 C.F.R. § 340.1 (defining "plant pest" as "Any living stage (including active

[3] In 1987, APHIS promulgated its biotechnology regulations (7 C.F.R. § 340) under the authority of the PPA and the Plant Quarantine Act to address potential risks that certain GE organisms might present as plant pests. The regulations refer to such GE organisms as "regulated articles." 7 C.F.R § 340.2 (2016).

and dormant forms) of … bacteria…which can directly or indirectly injure or cause disease or damage in or to any plants or parts thereof….").

12. Under federal regulations, *genus agrobacterium* "are included as organisms that may be or may contain plant pests, and are regulated if they meet the definition of plant pest in §340.1." 7 C.F.R. §340.2(a)).

13. Almost all GE crops, including Xtend cotton seeds and Xtend soybeans, are created using *agrobacterium*, making them potential "plant pests" under 7 U.S.C. § 7702.

14. APHIS's regulations define these GE crops as presumptive "plant pests" and prohibit their release in the environment without APHIS's approval. 7 C.F.R. §§ 340.0(a) & n. 1, 340.1.

15. The PPA grants APHIS discretion to "issue such regulations and orders as the Secretary considers necessary to carry out this chapter," 7 U.S.C. § 7754, mandates that regulatory decisions "shall be based on sound science," 7 U.S.C. § 7701(4), and also expressly provides that APHIS may "remove from regulation" plant pests that do not merit further regulation (such as GE crops posing no plant pest risks), 7 U.S.C. § 7711(c).

16. The APHIS regulations codified at 7 C.F.R. §§ 340 *et seq*. were amended in 1993 to provide a procedure for the deregulation of any GE plants that are unlikely to present a plant pest risk. Under 7 C.F.R. § 340.6, any person may submit a petition to the Administrator seeking a determination that an article should not be regulated under the statute.

17. A petition for determination of deregulated status must be accompanied by detailed information regarding the regulated article. The petition must include, *inter alia*, "a full statement explaining the factual grounds why the organism should not be regulated under 7 CFR part 340," "copies of scientific literature, copies of unpublished studies, when available, and data from tests performed upon which to base a determination," a "[d]escription of the biology of the

nonmodified recipient plant and information necessary to identify the recipient plant in the narrowest taxonomic grouping applicable," "[a] detailed description of the differences in genotype between the regulated article and nonmodified recipient organism," a "detailed description of the phenotype of the regulated article," "[f]ield test reports for all trials conducted under permit or notification procedures, involving the regulated article," including "analysis regarding all deleterious effects on plants, nontarget organisms, or the environment." 7 C.F.R. § 340.6(b) and (c) (2016).

18. The petitioner also must include "information known to the petitioner which would be unfavorable to a petition." *Id.*

19. After a completed petition is filed, APHIS must publish a notice in the Federal Register inviting public comment on the petition. 7 C.F.R. § 340.6(d)(2). APHIS must also announce in the Federal Register all preliminary decisions to extend determinations of nonregulated status thirty days before the decisions become final. 7 C.F.R. § 340.6(e)(3).

20. APHIS continues to regulate GE crops unless and until it determines, through scientific analysis, that they are unlikely to pose a plant pest risk. *See* 7 C.F.R. § 340.6.

### C. EPA Control over the Distribution, Use and Labeling of Herbicides

21. EPA regulates the sale, distribution and use of pesticides (including herbicides) on both GE and non-GE crops. In doing so, EPA considers potential environmental impacts and food safety issues, under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), and the Federal Food, Drug and Cosmetic Act ("FFDCA"). *See* 7 U.S.C. §§ 136a(c)(5), 136(bb), 136a, 136j(a)(1), and 21 U.S.C. § 346a.

22. FIFRA prohibits the sale and distribution of any pesticide that it not registered under FIFRA. 7 U.S.C. § 136a(a).

23. Before EPA can register a pesticide, there must be sufficient data demonstrating that it will not pose unreasonable risks to human health or the environment when used according to label directions. The Administrator cannot register a pesticide without concluding, *inter alia*, that when used consistent with the label and "in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5).

24. FIFRA requires registrants to submit to the Administrator any factual information regarding unreasonable adverse effects on the environment obtained after registration. 7 U.S.C. § 126d(a)(2).

25. If it appears that the pesticide is causing unreasonable adverse effects on the environment when used in accordance with widespread and commonly recognized practice, the Administrator may issue a notice of intent to cancel its registration, or hold a hearing to determine whether or not its registration should be cancelled or its classification changed. 7 U.S.C. § 136d(b).

26. FIFRA permits states to regulate the sale or use of any federally-registered pesticide in the State, "but only if and to the extent the regulation does not permit any sale or use prohibited by [FIFRA]." 7 U.S.C. § 136v(a).

27. At the same time, FIFRA prohibits a state from imposing "any requirements for labeling or packaging [pesticides] in addition to or different from those required under [FIFRA]." 7 U.S.C. § 136v(b).

28. FIFRA makes it unlawful for any person "to use any registered pesticide in a manner inconsistent with its labeling," to knowingly falsify any part of any application for registration, for a registrant to fail to file reports required by FIFRA, or "to falsify all or part of any information relating to the testing of any pesticide." 7 U.S.C. § 136j(a)(2)(G), (M), (N), and (Q).

29. FIFRA vests the federal district courts with jurisdiction to specifically enforce, and to prevent and restrain violations of the statute. 7 U.S.C. § 136n(c).

30. FIFRA also provides: "In the case of actual controversy as to the validity of any order issued by the Administrator following a public hearing, any person who will be adversely affected by such order and who had been a party to the proceedings may obtain judicial review by filing in the United States court of appeals for the circuit wherein such person resides…within 60 days after the entry of such order, a petition praying that the order be set aside in whole or in part." 7 U.S.C. § 136n(b).

## II. APHIS's DEREGULATION OF XTEND SOYBEANS AND XTEND COTTON SEEDS

31. On July 6, 2010 Monsanto submitted a petition seeking a determination of nonregulated status of MON 87708 soybean. Monsanto Petition 10-188-01p. A Federal Register notice sought public comments on the petition on July 13, 2012. Monsanto Co.; Availability of Petition for Determination of Nonregulated Status of Soybean Genetically Engineered for Herbicide Tolerance, 77 Fed. Reg. 41,356 (July 13, 2012).

32. On July 2, 2012 Monsanto submitted a petition seeking a determination of nonregulated status of MON 88701 cotton. Monsanto Petition 12-185-01p. A Federal Register notice sought public comments on the petition on February 27, 2013. Monsanto Co.; Availability of Petition for Determination of Nonregulated Status of Dicamba and Glufosinate Tolerant Cotton, 78 Fed. Reg. 13,308-01 (Feb. 27, 2013).

33. 7 C.F.R. § 340.6 requires APHIS to respond to petitioners who request a determination of the regulated status of a GE organism, including GE plants, such as MON 87708 soybean and MON 88701 cotton, and to make a determination of whether the GE organism is likely to pose a plant pest risk.

34. If APHIS determines, based on its plant pest risk assessment, that the GE organism is unlikely to pose a plant pest risk, APHIS has no legal basis to continue to regulate that GE organism and must deregulate it. *See* APHIS Record of Decision re: Monsanto Petitions 10-188-01p and 12-185-01p at 6 (Jan. 14, 2015) ("Record of Decision");[4] *Ctr. for Food Safety v. Vilsack*, 718 F.3d 829, 840 (9th Cir. 2013).

35. APHIS prepared plant pest risk assessments to assess the plant pest risk for each plant variety pursuant to the PPA. Record of Decision at 4. APHIS also elected to prepare an Environmental Impact Statement (EIS). *Id*. at 4-5. APHIS published a Notice of Intent in the Federal Register to prepare the EIS for the two petitions and sought public input during a comment period from May 16 to July 17, 2013. *Id*. at 5.

36. On August 11, 2014, APHIS published the Plant Pest Risk Assessment and the draft Environmental Impact Study for review and comment. *See* Environmental Impact Statements; Notice of Availability, 79 Fed. Reg. 46,799-01 (Aug. 11, 2014); *see also* Record of Decision at 5. Initially, the public was given 45 days to submit comments, but the comment period was later extended to provide 61 days for public comment. Record of Decision at 5.

37. APHIS received 4,693 public submissions to the Draft Environmental Impact Statement. 935 opposed and 3,708 supported regulatory determinations of nonregulated status for both petitions. APHIS also held a virtual public meeting on September 11, 2014, during which public participants provided verbal comments. As reported in APHIS's Record of Decision, "[t]hose opposed to deregulation cited herbicide drift potential, persistence of dicamba in the environment, toxicity of dicamba, herbicide misapplication, and risks to organic crop certifications as concerns." *Id*.

[4] Available at: https://www.aphis.usda.gov/brs/aphisdocs/dicamba_feis_rod.pdf

38. APHIS responded to all public comments received, and on December 12, 2014, published a Notice in the Federal Register of the availability of the Final Environmental Impact Statement to the public. Environmental Impact Statement; Notice of Availability, 79 Fed. Reg. 73,890-01 (Dec. 12, 2014); *see also* Record of Decision at 9.

39. The 30-day review period required under NEPA (*see* 40 C.F.R. § 1506.10(b)(2)) closed on January 12, 2015. Record of Decision at 9. APHIS received 29 total submissions from the public on the FEIS, none of which supported deregulation. *Id*. Several comments "voiced concerns about the potential for injury to non-target plants resulting from the volatility and drift of dicamba that would be applied to MON 87708 soybean and MON 88701 cotton." *Id*.

40. On January 14, 2015, APHIS determined from its Plant Pest Risk Assessments that MON 87708 soybean and MON 88701 cotton were unlikely to pose a plant pest risk, and granted the petitions for nonregulated status, effective January 20, 2015. *See generally*, Record of Decision.

41. In its Record of Decision, APHIS stated that "growers may continue to rely on glyphosate, other EPA-approved herbicides, and other non-chemical methods to manage weeds in soybeans and cotton." Record of Decision at 19. *See also id*. at 12 (following deregulation "growers would be able to plant MON 87708 soybean and MON 88701 cotton, but would not be able to make applications of dicamba other than currently approved by the EPA unless a new registration is granted.").

42. APHIS's Final Environmental Impact Statement explains: "MON 88701 cotton also contains a … gene … to confer resistance to glufosinate. … Glufosinate application rates and timings on MON 88701 cotton would be equivalent to existing uses approved for glufosinate-resistant cotton. Glufosinate applications for broad spectrum weed control would continue to be allowed from emergence though early bloom growth stage." APHIS, Final Environmental

Impact Statement re: Monsanto Petitions 10-188-01p and 12-185-01p for Determinations of Nonregulated Status for Dicamba-Resistant Soybeans and Cotton Varieties at 5 (December 2014).[5]

43. At the time Monsanto introduced Bollgard II® XtendFlex™ cotton, there were several federally-approved herbicides that farmers could use with the crop to control weeds, including Roundup PowerMax®, Liberty®[2], Warrant®, Cotoran® 4L, Gramoxone® SL, Direx® 4L, and Rowel®. In addition, dicamba and 2,4-D were both federally-approved herbicides for use in burndown before planting of Bollgard II® XtendFlex™ cotton seed.

44. At the time Monsanto introduced Roundup Ready 2 Xtend™ soybeans, there were several federally-approved herbicides that farmers could use with the crop to control weeds, including Roundup PowerMax®, Gramoxone® SL, Warrant®, Rowel®, Rowel® FX, Fierce®, Valor®, Authority® Maxx, and Cobra®. In addition, dicamba was federally approved for use in burndown before planting Roundup Ready 2 Xtend™ soybean seed.

45. APHIS noted that concerns regarding "[a]ny direct and indirect impacts associated with the potential increased use of dicamba, glufosinate or other herbicides on MON 87708 soybean and MON 88701 cotton" were not a basis for it to deny the petitions for deregulation and prevent the dissemination of the Xtend seeds, "because the authority to regulate and address the impacts of pesticide use [with the seeds] resides with EPA under FIFRA," rather than APHIS. Record of Decision at 10.

46. APHIS's Determination of Nonregulated Status for Monsanto Company MON 88701 Cotton states:

---

[5] Available at: https://www.aphis.usda.gov/brs/aphisdocs/dicamba_feis.pdf

> Based on my full and complete review and consideration of all the scientific and environmental data, analyses and information, the input from the public involvement process, the conclusions of the PPRA, the FEIS and its Record of Decision, and my knowledge and experience as the APHIS Deputy Administrator for Biotechnology Regulatory Services, I have determined and decided that that this Determination of nonregulated status for MON 88701 cotton is the most scientifically sound and appropriate regulatory decision.

APHIS, Determination of Nonregulated Status for Monsanto Company MON 88701 Cotton at 3 (Jan. 14, 2015).[6]

47. APHIS's Determination of Nonregulated Status for Monsanto Company MON 87708 Soybeans states:

> Based on my full and complete review and consideration of all the scientific and environmental data, analyses and information, the input from the public involvement process, the conclusions of the PPRA, the FEIS and its Record of Decision, and my knowledge and experience as the APHIS Deputy Administrator for Biotechnology Regulatory Services, I have determined and decided that that this Determination of nonregulated status for MON 87708 soybean is the most scientifically sound and appropriate regulatory decision.

APHIS, Determination of Nonregulated Status for Monsanto Company MON 87708 Soybean at 3 (Jan. 14, 2015).[7]

## III. ALLEGATIONS OF THE PETITION

48. Plaintiffs' Petition presents a direct challenge to the actions of two federal regulatory agencies, the U.S. Department of Agriculture's Animal and Plant Health Inspection Service (in deregulating Xtend soybeans and Xtend cotton seeds), and the U.S. Environmental Protection Agency (in failing to prevent illegal use of herbicides with those seeds).

[6] Available at: https://www.aphis.usda.gov/brs/aphisdocs/12_18501p_det.pdf

[7] Available at: https://www.aphis.usda.gov/brs/aphisdocs/10_18801p_det.pdf

49. Plaintiffs specifically allege that Monsanto concealed information from these federal regulators, which caused them to fail to perform their federal regulatory duties. Pet. at ¶¶ 166, 364-370.

50. Count VII of the Petition specifically alleges that Monsanto withheld information from federal regulators and Congress about the danger that farmers would illegally use off-label herbicides with the Xtend crops, intended that they would "act in ignorance in carrying out their … oversight responsibilities." Pet. at ¶¶ 362-371.

51. Plaintiffs contend that, as a result of their ignorance, these federal "regulatory and legislative bodies were unable to perform their task to protect the public… and Plaintiffs were directly harmed…." Pet. at ¶ 370.

52. Plaintiffs also allege that "Monsanto violated … legal standards by releasing their (sic) new GM soybean and cotton seeds without an existing, approved herbicide or a corresponding herbicide on the market." Pet. at ¶ 29.

53. At the same time, the Petition acknowledges that both Xtend soybeans and Xtend cotton seeds are glyphosate-resistant. *See* Pet. at ¶¶ 11, 156. Thus, farmers could continue to use glyphosate herbicides, such as Monsanto's Roundup herbicide, for weed control with the Xtend soybeans and Xtend cotton. *See* Pet. at ¶¶ 11, 57, 59, 64, and 156.

54. Nevertheless, Plaintiffs also repeatedly claim that there was a "lack of any safe herbicide" to use with Xtend soybeans and cotton. Pet. at ¶ 316. *See also* Pet. at ¶¶ 13, 29, 109, 323, 332, 356.

55. Plaintiffs claim that Monsanto's alleged release of the Xtend seeds without an approved herbicide caused off-label herbicide use of dicamba that violated "federal and state law," Pet. at ¶ 116, and that this "illegal spraying was not only likely, but inevitable" Pet. at ¶ 363.

56. Thus, Plaintiffs contend that the federally-deregulated Xtend soybeans and cotton seeds should have been withheld from the market to prevent individuals from illegally using an unapproved herbicide (dicamba) with the seeds. Pet. at ¶¶ 316, 332.

## SUBSTANTIVE REQUIREMENTS FOR REMOVAL

57. This action is removable to federal court under 28 U.S.C. § 1441(a), because this Court has original federal question jurisdiction under 28 U.S.C. § 1331.

58. The Court has original federal question jurisdiction because the Petition presents substantial federal questions as well as claims that are completely preempted by federal law.

### I. THE PETITION PRESENTS SUBSTANTIAL AND DISPUTED QUESTIONS OF FEDERAL LAW.

59. Federal district courts "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.

60. Under the "substantial federal question" doctrine, federal question jurisdiction exists when a "state-law claim necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg*., 545 U.S. 308, 314 (2005). *See also Pet Quarters, Inc. v. Depository Trust & Clearing Corp*., 559 F.3d 772, 779 (8th Cir. 2009) (district courts have jurisdiction under 28 U.S.C. §1331 where "(1) the right to relief under state law depends on the resolution of a substantial, disputed federal question, and (2) the exercise of jurisdiction will not disrupt the balance between federal and state jurisdiction adopted by Congress").

61. "If even one claim in the complaint involves a substantial federal question, the entire matter may be removed." *Pet Quarters, Inc.*, 559 F.3d at 779 (citing *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 9 (2003)).

62. "[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

### A. Plaintiffs' Claim that Monsanto Prevented Federal Regulators from Fulfilling Their Regulatory Duties Presents a Substantial Federal Question.

63. Count VII of the Petition alleges that Monsanto intentionally concealed from federal regulatory bodies information regarding the likelihood that dicamba would be applied illegally over the top of Xtend seeds and cause damage to non-target crops. Pet. at ¶¶ 362-371.

64. The Petition asserts that, as a result of Monsanto's alleged concealment, the federal regulatory bodies were unable to perform their regulatory duties and protect the public, including Plaintiffs, from the harms alleged in the Petition. Pet. at ¶ 370.

65. To prevail on this claim, Plaintiffs must prove, *inter alia*, that federal regulators failed to perform their federal regulatory duties.

66. The duties of the involved federal regulatory bodies, APHIS and EPA, are established by federal law. *See, e.g.*, 7 U.S.C. § 7702 *et seq*. (describing APHIS's duties to regulate plant pest risks); 7 C.F.R. § 340.6 (describing requirements for APHIS's deregulation of regulated articles, such as GE seed); 7 U.S.C. § 136a *et seq*. (describing duties of the EPA Administrator to regulate the registration, distribution, labeling, sale and use of pesticides).

67. Whether federal regulatory bodies fulfilled their duties with respect to the entities they regulate is "inherently federal in character." *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001) ("[T]he relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law.").

68. The question of whether USDA, APHIS and EPA fulfilled their regulatory duties as they pertain to the deregulation of Xtend seeds and the use of herbicides with those seeds is a substantial federal issue raised by the Petition that is actually disputed in this litigation.

69. This court's exercise of jurisdiction over the issue will not disrupt the balance between federal and state jurisdiction adopted by Congress; challenges to federal agency action are routinely decided in federal court. *See, e.g., Hamilton v. Gonzales*, 485 F.3d 564, 569 (10th Cir. 2007) ("Moreover, the general jurisdiction statutes confer original jurisdiction over challenges to agency actions to the district courts, or to the Federal Circuit."); *Gallo Cattle Co. v. U.S. Dept. of Agriculture*, 159 F.3d 1194, 1198 (9th Cir. 1998) ("a federal court has jurisdiction pursuant to 28 U.S.C. § 1331 over challenges to agency action as claims arising under federal law, unless a statue expressly precludes review."). The federal interest in the availability of a federal forum to resolve disputes regarding the actions of federal regulators is strong. *See Bender v. Jordan*, 623 F.3d 1128, 1130-31 (D.C. Cir. 2010).

70. Thus, Plaintiffs' contention that federal regulatory bodies failed to fulfill their regulatory duties raises a substantial federal question, supporting original jurisdiction in the federal district courts. *See, e.g., Grable*, 545 U.S. at 314-15 (state law claim challenging the compatibility of federal agency's action with federal statute supported removal); *Pet Quarters, Inc.*, 559 F.3d at 779 (a claim presents a substantial federal question if it directly implicates actions taken by federal regulators and would control resolution of other cases); *Central Iowa Power Coop. v. Midwest Indep. Transmission Sys. Operator, Inc.*, 561 F.3d 904, 915 (8th Cir. 2009) ("Claims that require a court to second-guess the reasonableness of FERC [Federal Energy Regulatory Commission]-filed rates require the resolution of a substantial federal question.").

### B. Any Claim that Xtend Seeds Were Sold without an Accompanying Federally-Approved Herbicide Would Present a Substantial Federal Question.

71. Throughout the Petition and in support of nearly every cause of action asserted, Plaintiffs allege that farmers illegally used dicamba over the top of Xtend Seeds because Monsanto sold the seeds without an accompanying federally-approved herbicide that could be used legally with the seeds to control weeds. *See, e.g.*, Pet. at ¶ 13 ("when Defendant Monsanto distributed and sold its GM soybean and cotton seeds to farmers…[it] did so without releasing a corresponding herbicide"); ¶ 29 ("Monsanto violated …legal standards by releasing their [sic] new GM soybean and cotton seeds without an existing, approved herbicide or a corresponding herbicide on the market"); ¶ 109 ("it is completely contrary to standard industry practice to release a new seed without the simultaneous availability of a corresponding herbicide – whether that corresponding herbicide already exists or is a new product"); ¶ 121 ("in 2015, Defendant Monsanto pushed its Xtend seeds onto the market … with full knowledge that there was no corresponding herbicide available for in-crop use"); ¶ 316 ("Xtend cotton and soybean seeds were in a defective condition…because no safe herbicide was marketed by Defendant Monsanto or any other company. Thus, the Xtend products were defective due to the lack of any safe herbicide"); ¶ 323 ("no safe herbicide was marketed by Defendant Monsanto or any other company"); ¶ 332 ("Monsanto failed to use ordinary care in the design and marketing of Xtend cotton and soybean seeds because no safe herbicide was marketed by Defendant Monsanto or any other company" and "Xtend products were defective due to the lack of any safe herbicide"); and ¶ 356 ("the seeds could not be used in the ordinary course of farming in a safe manner without a corresponding herbicide").

72. At the same time, the Petition clearly acknowledges that both Xtend soybeans and Xtend cotton seeds are glyphosate-resistant, Pet. at ¶¶ 11, 156, and thus, farmers could continue to use

glyphosate herbicides, such as Monsanto's Roundup herbicide, for weed control with the Xtend soybeans and Xtend cotton. *See* Pet. at ¶¶ 11, 57, 59, 64, and 156 ("Xtend soybeans are genetically modified to allegedly tolerate exposure to the herbicides dicamba and glyphosate, also known as Roundup.").[8]

73. Thus, while it appears that Plaintiffs are contending only that there was no federally-approved dicamba herbicide available for use over the top of Xtend seeds, the broad wording of certain allegations of the Petition leave open the possibility that Plaintiffs may also claim that there were no federally-approved herbicides available for use with Xtend seeds ***at all***.

74. To the extent Plaintiffs contend that there were no federally-approved herbicides available for use with Xtend seeds at all, their claims raise a substantial federal question that is actually disputed in this litigation.

## II. PLAINTIFFS ASSERT CLAIMS THAT ARE COMPLETELY PREEMPTED.

75. This Court also has original jurisdiction over this lawsuit because Plaintiffs assert that Xtend seeds should not have been sold following their deregulation by APHIS – a claim that is completely preempted by federal law.

76. Complete preemption requires, in addition to regular defensive preemption, "the availability of a replacement federal right of action which supersede[s] the state law claim." *Johnson v. MFA Petroleum Co.*, 701 F.3d 243, 250 (8th Cir. 2012). Federal law must preempt the state law version of the claim, and replace it with a federal avenue for its pursuit.

77. Where both requirements are met, the claim is completely preempted, and the federal court has jurisdiction because, even though pled as a state law claim, the claim is one that must

[8] That fact was also noted by APHIS in its Record of Decision issued in connection with its deregulation of the Xtend seeds. *See supra* at ¶41.

be pursued under federal law. *See also Beneficial Nat'l Bank*, 539 U.S. at 8 ("[A] state claim may be removed to federal court …when a federal statute wholly displaces the state-law cause of action through complete pre-emption. When the federal statute completely pre-empts the state-law cause of action, a claim which comes within the scope of that cause of action, even if pleaded in terms of state law, is in reality based on federal law.").

78. Both requirements for complete preemption are satisfied here with respect to one of the duties asserted by Plaintiffs – the alleged state law duty not to sell Xtend seeds. Federal law preempts such a state law duty, and a federal statute provides Plaintiffs with a federal avenue to pursue the relief requested.

## A. A State Law Duty Not to Sell GE Seeds Deregulated by APHIS Is Preempted By Federal Law

### 1. Express Preemption under the Plant Protection Act

79. The federal Plant Protection Act reflects a congressional determination that the regulation of GE seeds is a national issue that warrants a uniform, national approach. Thus, the PPA contains an express preemption provision. It provides:

> Except as provided in paragraph (2), no State or political subdivision of a State may regulate the movement in interstate commerce of any article, means of conveyance, plant, biological control organism, plant pest, noxious weed, or plant product in order to control a plant pest or noxious weed, eradicate a plant pest or noxious weed, or prevent the introduction or dissemination of a biological control organism, plant pest or noxious weed, if the Secretary has issued a regulation or order to prevent the dissemination of the biological control organism, plant pest, or noxious weed within the United States.
>
> (2) Exceptions
>
> (A) Regulations consistent with Federal regulations.
>
> A State …may impose prohibitions or restrictions upon the movement in interstate commerce of articles, means of conveyance, plants, biological control organisms, plant pests,

> noxious weeds, or plant products that are consistent with and do not exceed the regulations or orders issued by the Secretary.
>
> (B) Special Need
>
> A State or political subdivision of a State may impose prohibitions or restrictions upon the movement in interstate commerce of articles, means of conveyance, plants, plant products, biological control organisms, plant pests, or noxious weeds that are in addition to the prohibitions or restrictions imposed by the Secretary, if the State or political subdivision of a State demonstrates to the Secretary and the Secretary finds that there is a special need for additional prohibitions or restrictions based on sound scientific data or a thorough risk assessment.

7 U.S.C. § 7756 (b).

80. Three conditions must be met for a state law duty to be preempted: (1) it must regulate the "movement in interstate commerce of any … plant … [or] plant pest"; (2) it must be intended to "control…eradicate…or prevent the introduction or dissemination of a … plant pest, or noxious weed;" and (3) the Secretary must have "issued a regulation or order to prevent the dissemination of the biological control organism, plant pest or noxious weed within the United States." 7 U.S.C. § 7756 (b)(1).

81. The alleged state law duty not to sell Xtend seeds meets all three requirements for federal preemption to apply.

82. First, the alleged state law duty would regulate the movement in interstate commerce of a plant or plant pest. *See Atay v. County of Maui*, 842 F.3d 688, 701 (9th Cir. 2016) ("Under the PPA, 'movement' is defined broadly and expressly includes a plant's 'release into the environment….").

83. Second, the asserted state law duty is intended to prevent the introduction of a plant pest; the Petition contends that Monsanto had a duty not to sell Xtend seeds because they can cause harm to other plants.[9]

84. Third, the Secretary has "issued a regulation or order preventing the dissemination of [Xtend seeds] within the United States." *See* 7 C.F.R. § 340.0(a) (prohibiting introduction of regulated articles without approval); and 7 C.F.R. § 340.1 (defining "regulated article" to include "[a]ny organism which has been altered or produced through genetic engineering…"). *See also Atay*, 842 F.3d at 703 (**"**Third, APHIS has issued regulations in order to prevent the dissemination of the class of plant pests at issue, GE Crops.") (citing 7 C.F.R. Part 340).[10]

85. The fact that APHIS subsequently issued another order allowing the dissemination of Xtend seeds does not change the analysis. By its express terms, the preemption provision continues to limit state regulation even after a potential plant pest is deregulated by APHIS. This is made clear by the reference to both "plants" and "plant pests" in the first sentence of the preemption provision and in both of its exceptions. 7 U.S.C. § 7756(b). If there were no preemption after an article is deregulated by APHIS, inclusion of "plants" in the first sentence and in the exceptions would be illogical.

86. Because all three requirements for preemption under the statute are met, Plaintiffs' claim that Xtend seeds should not have been sold following their deregulation by APHIS is expressly preempted by federal law. 7 U.S.C. § 7756(b).

---

[9] A "plant pest" is defined as "any living stage of any of the following that can directly or indirectly injure, cause damage to, or cause disease in any plant or plant product … (D) a bacterium." 7 U.S.C. §7702(14).

[10] If the Secretary had not issued a regulation preventing the dissemination of Xtend, Monsanto would not have been required to petition for deregulated status before selling the seed.

**B. APHIS's Deregulation of Xtend Impliedly Preempts Plaintiffs' Claim that Monsanto Had a Duty Not to Sell Xtend Seeds.**

87. Plaintiffs' claim that Monsanto had a duty not to sell Xtend seeds after they were deregulated by APHIS is also impliedly preempted by APHIS's decision to deregulate the seeds.

88. "Congress' inclusion of an express pre-emption clause 'does *not* bar the ordinary working of conflict preemption principles.'" *Sprietsma v. Mercury Marine*, 537 U.S. 51, 64 (2002) (emphasis in original) (quoting *Geier v. Am. Honda Motor Co., Inc*., 529 U.S. 861, 869 (2000)).

89. A state law duty is impliedly preempted if it actually conflicts with federal law or if federal law so thoroughly occupies a legislative field that it is unreasonable to infer that Congress intended supplemental state or local regulation. *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992).

90. Congress assigned to the U.S. Department of Agriculture the role of determining whether GE seeds should be withheld from the market on the basis of their potential to cause harm to other plants directly or indirectly, while also assigning to EPA the responsibility of regulating the use of herbicides with GE and non-GE plants.

91. Within this regulatory context, APHIS expressly considered and decided "what types of direct and indirect injury or damage to plants and plant products" APHIS should consider in determining whether to regulate a given article. *See* Plant Pest Regulations; Review of Current Provisions, 61 Fed. Reg. 50,767-01, 50,767 (Sept. 27, 1996) ("[W]e are soliciting public comment on the criteria used to determine whether an organism is a plant pest; what types of direct and indirect injury or damage to plants and plant products should be regulated….").

92. After considering the goals and structure of the federal regulatory approach, APHIS determined that potential harms from herbicides that could be used with GE seeds was not a

basis on which to prevent their dissemination and, thus, ruled that these potential harms were not "plant pest harms."

93. As APHIS has explained, herbicide use is not a reason to withhold GE seeds from the market, because "[herbicide] application does not result from [the seed] itself, but rather from independent human action." Brief of Federal Appellees at *29-30, *Center for Food Safety v. Vilsack*, 2012 WL 2313232 (9th Cir. June 6, 2012) (No. 12-15052); *id*. at 30 ("APHIS has consistently interpreted the statute in this way. It has not considered increased herbicide use to be a plant pest harm in its analyses of other genetically engineered herbicide resistant crops.").

94. APHIS's considered expert decision is consistent not only with Congress's chosen federal regulatory approach, but also with the law in Missouri (as shown in Defendant's Motion to Dismiss filed contemporaneously herewith), and the views of other courts. As the Ninth Circuit has explained: "Moreover, the RRA [Roundup Ready Alfalfa] plant itself does not cause the harm produced by herbicides. It is the application of herbicides to fields of RRA, not the RRA plant, that results in such harm." *Vilsack*, 718 F.3d at 841.

95. As APHIS also recognized, withholding valuable biotechnology from the market in an effort to prevent the harmful use of herbicides with it would frustrate the careful balance struck by Congress when it directed, instead, that potential herbicide-related harms be regulated separately by EPA. *See* Brief of Federal Appellees at *31, *Vilsack* ("The use of glyphosate is regulated, not by APHIS, but by EPA under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. §§ 136 *et seq*. *See* Coordinated Framework, 51 Fed. Reg. at 23302.").

96. Any asserted state law duty to withhold Xtend seeds from the market because they allegedly cause harm to other plants as a result of associated herbicide use would conflict directly with APHIS's contrary conclusion and frustrate Congress's determination that decisions

regarding the introduction of GE seeds should be made independently from decisions regarding the proper regulation of herbicide use.

97. APHIS's decision that Xtend seeds should not be regulated – *i.e.*, withheld from the market – on the basis of potential harms from herbicide that might be used with the seed forecloses a contrary determination under state law.

98. APHIS devoted considerable time and resources to determining whether Xtend seeds should continue to be regulated.[11] Congress could not have intended that such a long and expensive federal regulatory process could be made entirely irrelevant by subsequent state action.

99. The asserted state law duty prohibiting the sale of Xtend seeds is impliedly preempted by federal law and federal agency action.[12]

### C. Plaintiff Has a Federal Avenue to Pursue Regulation of Xtend

100. A finding of complete preemption requires, in addition to regular preemption of the state law claim, that there be a replacement federal avenue for the plaintiff's claim.

---

[11] APHIS prepared a 60-page Plant Pest Risk Assessment for Xtend soybeans and a 41-page Plant Pest Risk Assessment for Xtend cotton seeds. *See* APHIS Final PPRA for Petition 10-188-01p (Jan. 2015); APHIS Final PPRA for Petition 12-185-01p (Apr. 2014). APHIS issued both Plant Pest Risk Assessments for public review and comment. Record of Decision at 5. APHIS also elected to prepare an Environmental Impact Statement. APHIS issued its draft Environmental Impact Statement for review and comment and published a notice in the Federal Register announcing its availability on August 11, 2014. Environmental Impact Statements, 79 Fed. Reg. 46,799-01. APHIS received 4,693 public submissions to the draft Environmental Impact Statement docket. Record of Decision at 5. In addition, APHIS held a virtual public meeting on September 11, 2014 where it received additional public comments. *Id*. Those opposed to deregulation cited concerns regarding herbicide drift, among other concerns. *Id.* APHIS reviewed and evaluated all of the public comments received and prepared formal responses to them as part of drafting its 301-page final Environmental Impact Statement. *Id*.

[12] Monsanto respectfully submits that the Ninth Circuit's holding in *Atay*, *supra*, finding that federal law did not impliedly preempt a local ordinance prohibiting the planting of deregulated GE crops in Maui, is not controlling here. The state law duty at issue in *Atay* – a duty not to plant deregulated GE crops in Maui – is materially different from the state law duty alleged here – a duty not to sell a deregulated GE seed at all. The ordinance at issue in *Atay* regulated *planting* in a limited area of the state; it did not completely prohibit *sale* of the deregulated seed.

101. A federal avenue is available for Plaintiffs to pursue their contention that Xtend seeds should not be sold. Under 7 U.S.C. § 7711(c)(2), "[a]ny person may petition the Secretary to add a plant pest to, or remove a plant pest from, the regulations issued by the Secretary under paragraph (1)." Challenges to final actions by the Secretary are properly pursued through the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq*. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 159-160 (2010) ("If and when the agency were to issue a partial deregulation order, any party aggrieved by that order could bring a separate suit under the Administrative Procedure Act to challenge the particular deregulation attempted."). Thus, federal law provides an alternative federal forum in which Plaintiffs must pursue their claim that Xtend seeds should not be sold.

102. Moreover, if the State of Missouri wished to impose additional restrictions on the dissemination of Xtend seeds, the PPA provides a federal avenue to achieve that end. The preemption provision of the PPA includes two exceptions. The second provides that a state may impose prohibitions and restrictions "that are in addition to the prohibitions or restrictions" imposed by federal law, "if the State … demonstrates to the Secretary and the Secretary finds that there is a special need for additional prohibitions or restrictions…." 7 U.S.C. § 7756(b).

103. Because federal law preempts the alleged state law duty not to market Xtend seeds, and federal law provides Plaintiffs with an alternative federal forum in which to pursue their claim that the seeds should not be sold, the claim is completely preempted by federal law, and this Court has federal question jurisdiction over Plaintiffs' claims.

## PROCEDURAL REQUIREMENTS FOR REMOVAL

104. Monsanto has satisfied all procedural requirements for removal.

105. On November 23, 2016, Plaintiffs filed their Petition captioned *Bader Farms, Inc., et al. v. Monsanto Company*, in the Thirty-Fifth Judicial Circuit for the County of Dunklin, Missouri, case number 16DU-CC00111 ("State Court Action"), which is attached as Exhibit A.

106. Defendant Monsanto was served on December 1, 2016. Because this Notice of Removal is filed within 30 days of the date of service, this Notice of Removal is timely under 28 U.S.C. § 1446(b).

107. Venue is proper in this Court pursuant to 28 U.S.C. § 1446(a). The Circuit Court of Dunklin County, Missouri is located within the Southeastern Division of the Eastern District of Missouri, see 28 U.S.C. § 105(a), and venue for this action is proper in this Court under 28 U.S.C. §1441 because the Eastern District of Missouri, Southern Division, is the "district and division embracing the place where such action is pending."

108. Pursuant to E.D. Mo. L.R. 2.03, the complete state file is attached as composite Exhibit B.

109. A copy of this Notice of Removal is being served upon counsel for Plaintiffs and a copy is being contemporaneously filed in the State Court Action.

## CONCLUSION

This Court has original federal question jurisdiction under 28 U.S.C. §1331, because the Petition presents one or more substantial federal questions as well as claims that are completely preempted by federal law, and thus this action is properly removed under 28 U.S.C. §1441(a). This Court also has supplemental jurisdiction, under 28 U.S.C. §1367(a), over all claims asserted over which it does not have original federal question jurisdiction. All substantive and procedural requirements for removal are satisfied.

Dated: 30 December 2016

Respectfully Submitted,

THOMPSON COBURN LLP

By: __/s/ A. Elizabeth Blackwell______
A. Elizabeth Blackwell, #50270MO
John R. Musgrave, #20359MO
Jeffrey A. Masson, #60244MO
Daniel C. Cox, #38902MO
Jan Paul Miller, #58112MO
One US Bank Plaza
St. Louis, Missouri 63101
314-552-6000
FAX 314-552-7000

***Attorneys for Defendant Monsanto Company***

**CERTIFICATE OF SERVICE**

I hereby certify that on December 30, 2016, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system to all counsel of record.

/s/ A. Elizabeth Blackwell_________