UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| BADER FARMS, INC. and | ) | |
| BILL BADER | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:16-CV-299 SNLJ |
| | ) | |
| MONSANTO CO., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This case comes before the Court on defendant's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) (#6). Plaintiffs oppose this motion on several grounds.

### I. Factual Background

As alleged in plaintiffs' complaint, plaintiffs are engaged in a massive peach growing business and have a very successful orchard in Dunklin County, Missouri. Defendant is a global agrochemical and agricultural biotechnology corporation, well known for its development of genetically engineered ("GE") seeds in addition to its development of herbicides. At issue in this case is the commercial release and sale of two of defendant's GE seeds, Roundup Ready 2 Xtend soybeans ("Xtend soybeans") and Bollgard II XtendFlex cotton seeds ("Xtend cotton"). The seeds were subject to federal regulation by the Animal and Plant Health Inspection Service ("APHIS"), and following an investigation of their safety, they were deregulated, which allowed them to be sold.

Xtend cotton seeds were first sold in 2015, and Xtend soybean seeds were first sold in 2016.

The sales occurred, however, before the Environmental Protection Agency approved the seeds' corresponding weed-killing herbicide, XtendiMax, for commercial release. Plaintiffs allege that defendant violated standard industry practice and committed a number of tortious acts by releasing its new GE seeds without such an existing, approved herbicide on the market as a "complete crop system." The foreseeable result of this negligent act, plaintiffs contend, was that third-party farmers were enticed to spray dicamba – a generic herbicide – onto their new GE seed crops to curb inevitable weed growth, ignoring product warning labels for the GE seeds as well as prohibitions under federal and state law. Further, because dicamba "drifts" onto surrounding properties, the spraying and drift of dicamba caused millions of dollars in damage to plaintiffs' peach orchards.

The Xtend seeds are unusual because they are resistant to the herbicide dicamba, so that dicamba will not harm the Xtend seed crops. Dicamba has been manufactured and marketed since 1967 by several companies, but not Monsanto. Before 2015, dicamba was not often used by American farmers in-crop because it is a "highly volatile" herbicide that "is prone to drift" onto surrounding properties. Drift is a term used to denote the airborne movement of herbicide spray particles to non-target or neighboring sites, sometimes miles away. Also, dicamba is a selective herbicide, meaning that it is used to kill broadleaf weeds, as opposed to eradicating plants in the grass family. But

dicamba is toxic to all broadleaf plants such as fruits, nuts, vegetables, and notably, cotton and soybeans that are not genetically engineered to withstand it.

As this Court understands, dicamba historically has been used during the "burndown" period, meaning it was applied before the planting of seeds as a pre-season weed control option. When applied in the burndown period, dicamba's drift problem is not as pronounced as it is when applied "over the top" of crops, but in general, dicamba has not been used over the top of crops after crop emergence. With the development of dicamba-resistant seeds to produce crops, spraying dicamba over the top has become an option – albeit an unlawful one – for farmers to use as a weed-killing herbicide. Unfortunately, the volatility and drift problems of older formulations of dicamba are no less present, as is the case here.

Apparently, defendant's new dicamba technology, XtendiMax, just recently approved, will not share the same drift problems as old dicamba. If applied correctly, XtendiMax will kill broadleaf weeds on the fields of dicamba-resistant crops and will not drift onto the property of neighboring landowners. Plaintiffs allege that defendant invested over a billion dollars into the development of XtendiMax because of the rise of "super weeds" that are resistant to Roundup, another Monsanto herbicide. Roundup, which contains glyphosate, is a non-selective herbicide, meaning it can kill most plants. Dicamba can be used in conjunction with Roundup, and together, these two herbicides will kill most weeds, increasing the yield of the farmer's crops. But plaintiffs allege that due to old dicamba's volatility and drifting, it can serve as a vehicle that transports Roundup miles away, possibly causing great damage to many types of plants.

Plaintiffs acknowledge that at all relevant times of this lawsuit – 2015 and 2016 – it was a violation of state and federal law to use old dicamba on the seeds. Additionally, plaintiffs acknowledge that the use of dicamba on the seeds was "off-label" and expressly prohibited by product use labels on the bags containing the GE seeds. Finally, plaintiffs concede that the defendant did not manufacture, distribute, sell, or apply the dicamba sprayed by the third-party farmers on their crops that drifted onto plaintiff's property.

Nonetheless, as noted, plaintiffs claim they were harmed by defendant's release of the Xtend seeds because it was foreseeable that third-party farmers who purchased the seeds would illegally spray older formulations of dicamba onto their own crops to kill weeds, and that dicamba drifted onto plaintiff's property, causing millions of dollars of damages. Plaintiffs proceed with nine state-law claims, including: (1) strict liability – defective design; (2) strict liability – failure to warn; (3) negligent design and marketing; (4) negligent failure to warn; (5) negligent training; (6) breach of implied warranty of merchantability; (7) fraudulent concealment; (8) unjust enrichment; and (9) punitive damages.

## II. Legal Standard

The purpose of a Rule 12(b)(6) motion to dismiss for failure to state a claim is to test the sufficiency of a complaint so as to eliminate those actions "which are fatally flawed in their legal premises and deigned to fail, thereby sparing litigants the burden of unnecessary pretrial and trial activity." *Young v. City of St. Charles*, 244 F.3d 623, 627 (8th Cir. 2001) (citing *Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989)). "To survive a motion to dismiss, a claim must be facially plausible, meaning that the 'factual content. . .

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Cole v. Homier Dist. Co., Inc.*, 599 F.3d 856, 861 (8th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Court must "accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party." *Id.* (quoting *Coons v. Mineta*, 410 F.3d 1036, 1039 (8th Cir. 2005)).

When reviewing a Rule 12(b)(6) motion, if documents outside the pleadings are presented and not excluded, the motion must be treated as a motion for summary judgment. Fed.R.Civ.Pro. 12(d). However, "Rule 12(b)(6) motions are not automatically converted into motions for summary judgment simply because one party submits additional matters in support of or [in] opposition to the motion." *Gorgo v. Best Buy Co., Inc.,* 760 F.3d 787, 791 (8th Cir.2014) (citation omitted). Documents that are necessarily embraced by the pleadings are not matters outside the pleadings for purposes of Rule 12(d). *Id.* "Documents necessarily embraced by the pleadings include documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading" and may be considered in a motion to dismiss. *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012). Further, "any error in a district court's failure to treat a motion for judgment on the pleadings as one for summary judgment 'is harmless if the nonmoving party had an adequate opportunity to respond to the motion and material facts were neither disputed nor missing from the record.'" *Surgical Synergies, Inc. v. Genesee Associates, Inc.,* 432 F.3d 870,

873 (8th Cir.2005) quoting *Kerr v. Fed. Emergency Mgmt. Agency,* 113 F.3d 884, 885 (8th Cir.1997) (internal citations omitted).

### III. Proximate Causation and Foreseeability

Proximate causation is a common element to all of plaintiffs' claims. To prevail, plaintiffs must establish that defendant's actions proximately caused plaintiffs' injury. Proximate causation is found when the defect in a product is the "cause or act of which the injury was the natural and probable consequence." *Pitman v. Ameristep Corp.*, Case No. 2:14-CV-85 ERW, 2016 WL 5373530, at *6 (E.D. Mo. Sept. 26, 2016) (citing *Hargis v. Lankford*, 372 S.W.3d 82, 87 (Mo. App. 2012)). Generally, whether proximate causation exists is a question for the jury. *Tompkins v. Cervantes*, 917 S.W.2d 186, 190 (Mo. App. 1996). However, a court may decide whether proximate causation exists as a matter of law "when the evidence reveals the existence of an intervening cause which eclipses the role the defendant's conduct played in the plaintiff's injury." *Id.* "When negligence appears merely to have brought about a condition of affairs or a situation in which another and entirely independent and efficient agency intervenes to cause the injury, the latter is deemed the direct and proximate cause and the former only the indirect or remote cause." *Dix v. Motor Mkt., Inc.*, 540 S.W.2d 927, 933 (Mo. App. 1976) (citing *Duke v. Missouri Pac. R. Co.*, 303 S.W.2d 613, 617 (Mo. banc 1957)).

The mere presence of an intervening act does not insulate the defendant from liability. *Buchholz v. Mosby-Year Book, Inc.*, 969 S.W.2d 860, 862 (Mo. App. 1998). Instead, to cut off liability for the initial negligent act as a matter of law, the intervening act must rise to the level of a superseding cause. A superseding cause is a "new and

6

independent force which so interrupts the chain of events initiated by defendant's negligence as to become the responsible, direct, proximate cause of the injury." *Vann v. Town Topic, Inc.*, 780 S.W.2d 659, 661 (Mo. App. 1989) (internal citation omitted). "For an intervening act to relieve the original tortfeasor from liability, the act cannot be a foreseeable consequence of the original act of negligence." *Buchholz*, 969 S.W.2d at 862. Thus, foreseeability is a key component in the determination of whether an intervening act constitutes a superseding act, relieving the defendant of liability.

Even intervening criminal acts may be foreseeable in the proximate causation analysis. A defendant "is not invariably excused from liability when the chain of causation includes a criminal act." *Finocchio v. Mahler*, 37 S.W.3d 300, 303 (Mo. App. 2000) (citing *Virginia D. v. Madesco Inv. Corp.*, 648 S.W.2d 881 (Mo. banc 1983)). However, "[a]lthough criminal conduct can hardly be said to be unforeseeable in this day and age, there remains consensus that liability should not be lightly assessed when the injury would not have happened but for criminal conduct." *Id.*

In the case at hand, even if Monsanto was negligent in its release of the GE seeds without a corresponding herbicide, it appears that its conduct was simply too attenuated to establish proximate cause. Instead, plaintiffs' injuries stem directly from an intervening and superseding cause – the unforeseeable independent acts by the third-party farmers who unlawfully sprayed dicamba on their crops. Again, this is not a case in which a plaintiff's use or a third-party's use of a defendant's defective product caused damage to plaintiff, because Monsanto did not manufacture, sell or apply the dicamba.

And it is not as if plaintiffs otherwise have no remedy, because obviously they have a cause of action against the farmers, themselves, for unlawfully applying dicamba.

To the extent that the third-party farmers' unlawful conduct was at all foreseeable because dicamba was an available herbicide and the new GE seeds were dicamba-resistant, that foreseeability was wholly negated by the GE seeds' product warning labels, prominently highlighted on all bags of cotton and soybeans sold. The product warning label on the cotton seeds appeared as follows:

> **NOTICE: DO NOT APPLY DICAMBA HERBICIDE IN-CROP TO BOLLGARD II XTENDFLEX COTTON IN 2015.** IT IS A VIOLATION OF FEDERAL AND STATE LAW TO MAKE AN IN-CROP APPLICATION OF ANY DICAMBA HERBICIDE ON BOLLGARD II XTENDFLEX COTTON UNLESS THE PRODUCT LABEL SPECIFICALLY AUTHORIZES THAT USE. YOU SHOULD NOT MAKE AND MONSANTO DOES NOT AUTHORIZE MAKING AN IN-CROP APPLICATION OF ANY DICAMBA HERBICIDE TO BOLLGARD II XTENDFLEX COTTON IN 2015. REFER TO THE MONSANTO TECHNOLOGY GUIDE FOR DETAIL AND RECCOMENDATIONS ON USING APPROVED ROUNDUP AND LIBERTY BRANDED AGRICULTURAL HERBICIDES ON BOLLGARD II XTENDFLEX COTTON.

Similarly, the product warning label on the soybean seeds stated:

> **ROUNDUP READY 2 XTEND SOYBEANS CONTAIN MON 87708 and MON 89788**. As of November 1, 2015 no dicamba herbicide product has been approved for commercial in-crop use with Roundup Ready 2 Xtend Soybeans. DO NOT APPLY DICAMBA HERBICIDE IN-CROP TO ROUNDUP READY 2 XTEND SOYBEANS IN 2016 unless you use a dicamba herbicide product that is specifically labeled for that use in the location where you intend to make the application. IT IS A VIOLATION OF FEDERAL AND STATE LAW TO MAKE AN IN-CROP APPLICATION OF ANY DICAMBA HERBICIDE PRODUCT ON ROUNDUP READY 2 XTEND SOYBEANS UNLESS THE PRODUCT LABELING SPECIFICALLY AUTHORIZES THAT USE. Contact the U.S. EPA and your state pesticide regulatory agency with any questions

about the approval status of dicamba herbicide products for in-crop use
with Roundup Ready 2 Xtend Soybeans.

Not only do the labels expressly forbid in bold print the application of dicamba to the GE seed crops, they also make clear that to do so is a violation of federal and state law. In view of these warnings and prohibitions, it was not foreseeable that the farmers would resort to the unlawful use of dicamba. Plaintiffs do not question the authenticity of the warning labels, and ironically, plaintiffs, themselves, rely in part on the labels to prove that Monsanto knew of the possibility that farmers might use dicamba. Their reasoning is that if Monsanto had no concern about dicamba use, the warning labels would not have been necessary. But plaintiffs then ignore that the very purpose of the warnings was to alleviate that concern – to assure that farmers would be fully informed that dicamba use was prohibited and was unlawful. Indeed, plaintiffs' only response to Monsanto's use of the warning labels is a cursory, one-phrase declaration that "the adequacy of the warning is for the jury."

In fact, however, the adequacy of a warning, like proximate cause itself, may be determined as a matter of law if the facts and circumstances warrant it. And if in fact, there is no other evidence pertaining to the warnings given here, then it is the Court's duty to determine whether a reasonable jury would have a legally sufficient basis to find that the warning was not adequate. In the absence of any other evidence on the issue, it is this Court's opinion that the warning was adequate as a matter of law, at least for the purpose of negating plaintiffs' claim that the release of GE seeds was the proximate cause of the damage to plaintiffs' orchards.

That said, a final ruling on this issue is not appropriate until plaintiffs are given an opportunity to respond further. Pursuant to Rule 12(d), this Court will treat the defendants' motion to dismiss as a motion for summary judgment. The parties are granted an additional 21 days to present any other material that is pertinent to the adequacy of the warning labels including additional briefing on the issue.

So ordered this 10th day of April, 2017.

                                              STEPHEN N. LIMBAUGH, JR.
                                              UNITED STATES DISTRICT JUDGE