**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| **BADER FARMS, INC. and** | ) | |
| **BILL BADER** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **MDL No. 1:18md2820-SNLJ** |
| | ) | |
| **v.** | ) | **Case No. 1:16cv299-SNLJ** |
| | ) | |
| **MONSANTO CO. and** | ) | |
| **BASF CORP.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM and ORDER

This matter is before the Court on defendants' motions for summary judgment [#218, #221]. The *Bader* plaintiffs claim their peach orchard was destroyed beginning in 2015 after defendants Monsanto Company (a company that sells crop seed and herbicide) and BASF Corporation (a company that sells herbicide) conspired to develop and market dicamba-tolerant seeds and dicamba-based herbicides. Plaintiffs claim both defendants conspired to create an "ecological disaster," where Monsanto released its dicamba-tolerant seed in 2015 and 2016 with no corresponding dicamba herbicide. As a result, farmers illegally sprayed an old formulation of dicamba herbicide that was unapproved for in-crop, over-the-top, use and was "volatile," or prone to drift. Drifting dicamba would cause damage to neighboring, non-tolerant crops, forcing neighboring farmers to plant Monsanto's dicamba-tolerant seed defensively, and that increased demand for both defendants' new dicamba herbicide during the 2017 growing season.

Numerous lawsuits have been filed against defendants based on these

1

circumstances, and the cases filed in federal court have been consolidated into the *In re Dicamba Herbicides* Multi-District Litigation,1:18-MD-2820-SNLJ (E.D. Mo.) (the "MDL"). The present case was filed on November 23, 2016 and was consolidated into the MDL. Numerous MDL plaintiffs have joined the Master Crop Damage complaint, which focuses on soybean growers in several states. The *Bader* plaintiffs, although part of the MDL, did not join in the Master Crop Damage Complaint; the *Bader* case is following its own Case Management Order and is set for trial in January 2020. Defendants have filed separate motions for summary judgment.

## I.    Legal Standard

Pursuant to Federal Rule of Civil Procedure 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 467 (1962). The burden is on the moving party. *City of Mt. Pleasant, Iowa v. Assoc. Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In ruling on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of

any inferences that logically can be drawn from those facts. *Buller v. Buechler*, 706 F.2d 844, 846 (8th Cir. 1983). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207, 210 (8th Cir. 1976).

## II.    Discussion

The Court will address the defendants' motions together.

### A.  Causation

"In all tort cases, the plaintiff must prove that each defendant's conduct was an actual cause, also known as cause-in-fact, of the plaintiff's injury." *City of St. Louis v. Benjamin Moore & Co.*, 226 S.W.3d 110, 113 (Mo. *banc* 2007). "Once actual causation has been established, the issue becomes one of legal cause—also known as proximate cause—that is, whether the defendant should be held liable because the harm is the reasonable and probable consequence of the defendant's conduct." *Id.*

Defendants argue that they are entitled to summary judgment because plaintiffs lack the necessary evidence to make a submissible case on the issue of causation. This Court has considered defendants' causation arguments in this case and in the MDL. "As this Court explained, causation could be established if it is proved that Monsanto marketed and sold its dicamba-resistant seed to third-party farmers knowing that they would spray dicamba that may harm nearby, non-resistant crops." *In re Dicamba Herbicides Litig.*, 359 F. Supp. 3d 711, 720 (E.D. Mo. 2019) (the "February MDL Order").

#### 1.  2015 and 2016 claims

First, with respect to plaintiffs' 2015 and 2016 claims, Monsanto argues that it did not sell a dicamba herbicide and thus cannot be held responsible for damages caused by

dicamba herbicide. Plaintiffs' claims for those years, though, are based on Monsanto's sale of the dicamba-tolerant ("DT") soybean and cotton seeds ("Xtend seeds"), not its herbicide.  Nonetheless, defendant Monsanto contends that plaintiffs cannot show even a single application of dicamba made to an Xtend crop affected their peach trees in 2015 or 2016.

Defendants also suggest that plaintiffs must show analytical testing to prove dicamba caused their damage.  Defendants admit, however, that it is pointless to test for the presence of off-target dicamba because it is undetectable at the off-target movement concentrations involved here.  Indeed, one of Monsanto's own researchers commented that "…the absence of [dicamba] residue is not proof that drift did not occur."

Plaintiffs' expert, Dr. Ford Baldwin, opines that plaintiffs suffered damage from off-target movement of dicamba that was applied to Xtend seeds in 2015 and 2016. Although defendants contend this Court should discount or exclude Baldwin's opinions for various reasons, those arguments were made in defendants' motion to exclude Baldwin's testimony and have been rejected by this Court. [#275.]  Although defendants also argue that plaintiffs have no other evidence to support these claims, Bill Bader testified, for example, that he saw and smelled his neighbors spraying dicamba on Xtend cotton in 2015. This and other evidence present a disputed issue of fact, however, and must be decided by the jury.

Next, defendants argue that they should be relieved of liability for damages incurred in 2015 and 2016 because any application of dicamba to an Xtend crop in those years was unlawful.  To be sure, as this Court held in its February MDL Order, such use of dicamba would constitute an intervening and superseding cause of plaintiffs' alleged harm unless plaintiffs prove "Monsanto marketed and sold its dicamba-resistant seed to

third-party farmers knowing that they would spray dicamba that may harm nearby, non-resistant crops." 359 F. Supp. 3d at 720. Defendants argue that plaintiffs have not met this requirement, and that they are entitled to summary judgment. Plaintiffs respond that it was foreseeable that growers would spray older formulations of dicamba on Xtend seeds before new dicamba formulations were on the market. In support, plaintiffs argue that the defendants knew such spraying would occur, and that such knowledge is evident from their own documents. For example, in 2013, Monsanto addressed the question of how to promote the Xtend system to farmers resistant to purchasing Xtend seeds, and a suggested response was that Xtend offered "protection from your neighbor." Similarly, plaintiffs submit evidence that BASF employed a "defensive planting" strategy and that BASF scaled up its production of "old dicamba" when Xtend was released. And, as this Court previously observed, why else would defendants sell dicamba-resistant seed if not to encourage the use of dicamba over the top? This hotly-contested matter is thus inappropriate for summary judgment.

### 2. 2017 and 2018

As for 2017 and 2018 claims, defendants argue that plaintiffs lack evidence to prove defendants' particular chemicals were the source of their damage. First, Monsanto argues that plaintiffs' claims fail because their expert, Dr. Ford Baldwin, must be excluded. But this Court denied the motion to exclude Dr. Baldwin's opinions. Second, Monsanto argues that plaintiffs cannot prove their orchards were exposed to Monsanto's dicamba-based herbicide, XtendiMax. Plaintiffs suggest they do not need to prove it was XtendiMax that harmed their orchards. This Court reiterates its ruling in its May 8, 2018 Order:

> The fact that Monsanto did not manufacture, distribute, or sell the old dicamba herbicide that actually caused the [2016] damage is irrelevant—it is not part of the causal link under plaintiffs' theory of the claim.

*In re Dicamba Herbicides Litig.*, 1:16-CV-299-SNLJ, 2018 WL 2117633, at *2 (E.D. Mo. May 8, 2018) (the "*Bader* May 8 Order"). Again, the key to both the pre-XtendiMax and Engenia and post-XtendiMax and Engenia claims is not the herbicide, it's the Xtend seeds.

### B. Preemption

The Supremacy Clause of the United States Constitution makes federal law "the supreme Law of the Land; …any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., Art. VI, cl. 2. It is "Congress rather than the courts that preempts state law." *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (quotation omitted). Where Congress has enacted an express preemption provision, courts should "not invoke any presumption against pre-emption but instead focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Puerto Rico v. Franklin California Tax-Free Tr.*, 136 S. Ct. 1938, 1946 (2016) (internal quotation omitted).

Defendants argue that plaintiffs' 2015 and 2016 claims are expressly and impliedly preempted by the federal Plant Protection Act ("PPA"). "Congress enacted the PPA in 2000 to protect against harms to 'the agriculture, environment, and economy of the United States' caused by 'plant pests' and 'noxious weeds,' while facilitating commerce in non-dangerous plants. *Atay v. County of Maui*, 842 F.3d 688, 700 (9th Cir. 2016) (quoting 7 U.S.C. § 7701(1), (3), (5)). The PPA, *inter alia*, prohibits the movement of plant pests except with a permit. 7 U.S.C. § 7711(a). Further, the PPA authorizes the

Secretary of Agriculture and the United States Animal and Plant Health Inspection Service ("APHIS"), to prohibit or restrict the movement in interstate commerce of plants and other products as "necessary to prevent the introduction…or the dissemination of a plant pest or noxious weed within the United States." *Id.* § 7712(a); *see also id.* § 7712(f). As the *Atay* court stated,

> A "plant pest" is defined as any of eight types of listed organisms that "can directly or indirectly injure, cause damage to, or cause disease in any plant or plant product." *Id.* § 7702(14). … However, "a genetically modified organism is regulated as a plant pest if it is created using an organism that is itself a plant pest," [*Ctr. for Food Safety v. Vilsack*, 718 F.3d 829, 835 (9th Cir. 2016)] (citing 7 C.F.R. § 340.1), or if APHIS "has reason to believe [that it] is a plant pest," 7 C.F.R. § 340.1; *Vilsack*, 718 F.3d at 835, 840. Such GE plants are called "regulated articles" or "presumptive plant pests." *Id.* at 833; *see* 7 C.F.R. § 340.0(a) & n.1; *id.* § 340.1 (definition of "regulated article"); *id.* § 340.2 (groups of organisms that are or contain plant pests).
>
> Such GE plants are regulated as plant pests "until the agency concludes on the basis of scientific evidence that the modified plant is not a 'plant pest.'" *Vilsack*, 718 F.3d at 835. Accordingly, with narrow exceptions, APHIS's regulations prohibit the introduction—including the movement through the United States and "use ... outside the constraints of physical confinement that are found in a laboratory, contained greenhouse, ... or other contained structure," 7 C.F.R. § 340.1—of regulated articles without APHIS's permission. *Id.* § 340.0(a).

*Atay*, 842 F.3d at 700–01. The Administrator of APHIS may be petitioned to deregulate GE seeds, but only after a strenuous investigation process and only based on sound science. 7 C.F.R. § 340.6. Any person may petition the Administrator that an article should not be regulated by APHIS. 7 C.F.R. § 340.6. "To succeed in such a petition, an applicant must demonstrate, through an extensive evaluation process involving data collected from APHIS-authorized field tests and other experiments, that the regulated article is no more likely to cause plant pest harms than its non-GE counterpart." *Atay*, 842

F.3d at 701 (citing *Vilsack*, 718 F.3d at 835; 7 C.F.R. § 340.6(c)). "Nonregulated status, or deregulated status, in effect, allows for the commercialization and sale of that product. The two seeds at issue in this case were formally deregulated by APHIS." *Bader Farms, Inc. v. Monsanto Co.*, 1:16-CV-299 SNLJ, 2017 WL 633815, at *1–2 (E.D. Mo. Feb. 16, 2017).

> The PPA's express preemption provision states
>
> (b) Regulation of interstate commerce
>     (1) In general
> Except as provided in paragraph (2), no State or political subdivision of a State may regulate the movement in interstate commerce of any article, means of conveyance, plant, biological control organism, plant pest, noxious weed, or plant product in order to control a plant pest or noxious weed, eradicate a plant pest or noxious weed, or prevent the introduction or dissemination of a biological control organism, plant pest, or noxious weed, if the Secretary has issued a regulation or order to prevent the dissemination of the biological control organism, plant pest, or noxious weed within the United States.
>     (2) Exceptions
>         (A) Regulations consistent with Federal regulations
> A State or a political subdivision of a State may impose prohibitions or restrictions upon the movement in interstate commerce of articles, means of conveyance, plants, biological control organisms, plant pests, noxious weeds, or plant products that are consistent with and do not exceed the regulations or orders issued by the Secretary.

7 U.S.C.A. § 7756. Thus, state law is preempted by the PPA when three conditions are met: (1) the state law would "regulate the movement in interstate commerce of" an "article, …plant,…[or] plant pest;" (2) the state law is imposed "in order to control…eradicate…or prevent the introduction or dissemination of a…plant pest;" and (3) the Secretary has "issued a regulation or order to prevent the dissemination of the …plant pest…within the United States." 7 U.S.C. § 7756(b)(1). Monsanto argues that the plaintiffs' state-law claims would impose prohibitions or restrictions on Monsanto's

ability to sell Xtend seeds under state law that are not "consistent with" and "exceed" APHIS's expert determination authorizing sale of Xtend seeds in interstate commerce.

Few courts have considered the PPA's preemption provision. In *Atay*, the Ninth Circuit considered an ordinance enacted by the County of Maui, Hawaii, which banned the cultivation and testing of genetically engineered ("GE") plants. 842 F.3d at 692. The plants in question were federally regulated by APHIS at the time. The court found (1) that the ordinance regulated "movement in interstate commerce" by "banning all testing, planting, or cultivation of GE plants to prevent their introduction or dissemination;" (2) that the ordinance "seeks to control GE plants;" and (3) that "APHIS has issued regulations in order to prevent the dissemination of the class of plant pests at issue, GE crops." *Id.* at 701-02. The ordinance was thus held to be expressly preempted by the PPA "to the extent that it seeks to ban GE plants that APHIS regulates as plant pests." *Id.* at 703.

The *Atay* court observed, however, that "strict regulation applies to all plant pests…up until the point they are deregulated, at which point they fall outside of the preemption clause and APHIS's jurisdiction under the PPA." *Id.* at 703. The *Atay* court thus held that "the PPA does not impliedly preempt the Ordinance in its application to GE crops that APHIS has deregulated. The regulation of commercialized crops, both of GE and traditional varieties, remains within the authority of state and local governments." *Id.* at 705.

Plaintiffs argue that their claims are not preempted, then, because the Xtend seeds have been "deregulated" and are thus not subject to the PPA under *Atay*, 842 F.3d at 703, 705. Defendants respond that whether the PPA's express preemption provision preempts state regulation of federally deregulated plants was not raised in *Atay* and any "musings"

on the topic are pure *dicta*. The Ninth Circuit (the only circuit to address the PPA's

preemption clause) was clear, however, that deregulated plant pests "fall outside of the

preemption clause." *Id.* at 703. Defendants further argue that the preemption clause

requires only that the "Secretary has issued a regulation or order to prevent

dissemination" and that plaintiffs do not dispute such an order "has issued." Defendants

contend that it does not matter that the plant pest was subsequently deregulated. This

Court determines, however, consistent with the Ninth Circuit "musings," that this effect

of the PPA order <u>permitting</u> dissemination of the Xtend seeds necessarily is to negate the

previous order <u>preventing</u> dissemination. Accordingly, the plaintiffs' claims are neither

expressly or impliedly preempted, consistent with the Ninth Circuit's analysis in *Atay*,

842 F.3d at 702-05.

### C. Joint Venture

Plaintiffs' Count X asserts that Monsanto and BASF are "jointly liable for all

claims" because they were "joint venturers in the development and commercialization of

the Xtend Crop System." Defendants contend that plaintiffs' joint venture liability theory

cannot withstand summary judgment because plaintiffs cannot identify a written

agreement between Monsanto and BASF that establishes a joint venture.

A joint venture is "an association of two or more persons to carry out a single

business enterprise for profit." *Ritter v. BJC Barnes Jewish Christian Health Sys*., 987

S.W.2d 377, 387 (Mo. App. 1999). The elements of a joint venture are (1) "an express or

implied agreement among members of the association," (2) "a common purpose to be

carried out by the members," (3) "a community of pecuniary interest in that purpose,"

and (4) an "equal voice" among all members "in determining the direction of the

enterprise." *Id.* In other words, a joint venture is a partnership that is limited to a single

business purpose. *See Jeff-Cole Quarries, Inc. v. Bell*, 454 S.W.2d 5, 14-15 (Mo. 1970). With respect to corporations, however, Missouri courts have declined to imply a joint venture "where the evidence indicates that the parties created a different business form." *Ritter*, 987 S.W.2d at 387; *Rosenfeld v. Brooks*, 895 S.W.2d 132, 135 (Mo. App. 1995). Regardless, "[i]ndications of a joint venture include: actively participating and sharing in the profits, all parties having joint and several control, and having a duty to share the losses." *Ritter*, 987 S.W.2d at 387 (citing *Jeff-Cole Quarries*, 454 S.W.2d at 16)

BASF and Monsanto entered into multiple agreements pertaining to the development and commercialization of their dicamba tolerant ("DT") system. In 2010, Monsanto and BASF SE entered into an Umbrella Agreement which formed a joint governing body called the Alliance Management Team ("AMT") with equal representation from both parties and alternating chairmanship. Later, Monsanto and BASF Corp. entered into the March 8, 2011 Dicamba Tolerance System Agreement ("DTSA"), the June 9, 2014 Amended & Restated Dicamba Tolerance System Agreement ("ARDTSA"), and the October 2014 Letter Agreement. Plaintiffs contend that these agreements support that a joint venture was intended by the parties for the purpose of creating and selling a DT system of seed and herbicide.

Some BASF documents also refer explicitly to the arrangement as a "joint venture." A 2015 invoice from BASF to Monsanto, for example, sought $349,922.51 for "the Dicamba Joint Venture." Other documents, such as a BASF presentation to the EPA and others stated that "BASF and Monsanto are engaged in a joint venture."

Defendants say those statements are irrelevant and that the question of whether the ARDTSA creates a joint venture between BASF Corp. and Monsanto should be decided within the four corners of the contracts alone. To that end, defendants point out that the

ARDTSA states that the parties intend to operate as independent contractors and disclaims any intent to create a partnership. Moreover, defendants argue that the ARDTSA's merger clause states that it is the whole agreement with respect to subject matter and displaces other oral or written agreements.

Regardless of the ARDTSA's disclaimer of a partnership or joint venture, "the question here is whether the evidence shows, by facts and circumstances, that one was in fact created." *Jeff-Cole Quarries, Inc.*, 454 S.W.2d at 16. "The required intent necessary to find a partnership existed is not the intent to form a partnership, but the intent to enter a relationship which in law constitutes a partnership." *Morley v. Square, Inc.*, 4:10CV2243 SNLJ, 2016 WL 1615676, at *7 (E.D. Mo. Apr. 22, 2016) (quoting *Hillme v. Chastain*, 75 S.W.3d 315, 317 (Mo. App. S.D. 2002)) (internal quotation omitted). None of the cases defendants cite stands for the proposition that they seem to urge; that is, because the defendants' written agreements are not labeled "joint venture," or expressly disclaim joint venture, no joint venture exists. Although defendants, relying on *Riley v. A.K. Logistics, Inc.*, 1:15-CV-00069-JAR, 2017 WL 2501138, at *10 (E.D. Mo. June 9, 2017), argue that an express disclaimer of partnership or joint venture is "fatal" to plaintiffs' joint venture claims, this Court did not end its analysis with the existence of the disclaimer. Rather, the Court looked to the terms of the contract before determining that the plaintiff there had failed to create a genuine factual dispute as to a joint-venture theory. 2017 WL 2501138 at *10-11.

To further distance themselves as joint venturers, and dispel the allegations that there was joint control or "equal voice," defendants characterize the ARDTSA as a "licensing and supply" agreement. Plaintiffs counter that the ARDTSA was in fact an amendment of a Project Agreement under the parties' pre-existing Umbrella Agreement.

12

Under the Umbrella Agreement, according to plaintiffs, the parties agreed to contribute assets, including intellectual property and know-how to the joint development and commercialization of agricultural products in areas including seed treatment and weed control. Defendants, though, contend that the Umbrella Agreement is irrelevant to this dispute because the DTSA and ARDTSA both contain merger clauses. However, the parties do not appear to dispute that BASF and Monsanto entered into many agreements pertaining to the DT project, and that each agreement pertains to its own subject matter— that is, the project was complex and involved numerous stand-alone agreements, and some of those agreements refer to each other.

Under the DTSA, in addition to certain obligations to grant reciprocal licenses, share access to regulatory data, and supply materials (including dicamba herbicide and dicamba-tolerant seed), the parties agreed Monsanto would make DT Systems Payments to BASF, which they call "value share payments." The DTSA also established joint working groups, through which Monsanto and BASF jointly pursued development, regulatory, and commercialization efforts pertaining to their DT System. Among other things, the Regulatory Working Group coordinated registration of herbicides for use in the DT system; the Development Working Group coordinated field trials and developed label recommendations and research studies; and the Commercialization Working Group evaluated operational considerations including forecasts for seed volume and chemistry volume, developed and coordinated a communications strategy, and developed and coordinated the commercial launch strategy.

On June 9, 2014, Monsanto and BASF entered into the ARDTSA. The ARDTSA contains all the same definitions as the DTSA for "Commercial Launch," "DT System," and "Losses." The ARDTSA, like the DTSA, defines the DT System to include BASF's

Clarity, BASF's "old dicamba" brand. The ARDTSA modifies the value share payments provided in the DTSA, basing them only on traited acres ("Traited Acres Payments"). Pursuant to their various agreements, Monsanto and BASF coordinated the strategy and schedule for commercialization of the dicamba tolerant cropping system—including DT seed and dicamba formulations—through the Commercialization Working Group, which in turn reported to the Alliance Management Team ("AMT"), which was established in the Umbrella Agreement. As discussed above, the AMT includes equal representation and alternating chairmanship. From March 2010 until the eve of the product launch, Monsanto and BASF continued to collaborate on and discuss aspects of the dicamba tolerant crop system at meetings of the AMT under the protocols set forth in the Umbrella Agreement. In total, there were at least 17 meetings of the AMT in which the aspects of the dicamba tolerant crop system were discussed. Under these circumstances, plaintiffs have at least established a question of fact regarding joint control.

Defendants next contend that their value share payments are "fixed-fee payments," which are not "profit-sharing" and so do not support a "community of pecuniary interest." For example, in *Riley*, one party received a "fixed per-delivery fee" for each successful delivery if the delivering party's bid was competitive enough, an arrangement this Court held was not profit sharing. 2017 WL 2501138 at *9. Defendants argue that BASF receives a similar fixed fee. Moreover, defendants point out that the DTSA/ARDTSA state neither company has profit-sharing rights as to sales of the other's dicamba herbicides.

Plaintiffs insist that the value share payments here are in fact shared profits. In particular, Monsanto agreed to pay BASF payments based on the number of acres planted with "traited" seeds—that is, BASF received a portion of the profits from Monsanto's

sale of Xtend seeds that it developed with BASF's help. Plaintiffs add that BASF is entitled to payments for traited acres even in the event no low-volatility dicamba formulation was ever registered for sale. This does not appear to the Court to be a "fixed-fee" arrangement one would find with, for example, a subcontractor or a supplier. Unlike in *Riley*, BASF passively reaps the rewards for sales of Xtend seeds. Nonetheless, defendants describe these payments as "royalties," and they argue that they do not constitute shared profits because they were owed to BASF whether or not Monsanto made any profit at all. On the other hand, plaintiffs point out that the "value share payments" were structured so that payments would increase as use of Xtend seed increased—in contrast to a fixed, guaranteed payment regardless of market penetration or sales volume. Clearly, the defendants intended to share in the revenue derived from sales of Xtend seeds created as part of the DT project, which may be an indirect way of sharing profits. Such an arrangement may not be enough ultimately to show that the parties intended a joint venture. In *Jones v. St. Charles County*, for example, a concession agreement provided the county would receive nine percent of the gross receipts each month. 181 S.W.3d 197, 201 (Mo. App. E.D. 2005). The court held that such an arrangement, combined with no obligation to share any losses or control, meant there was no joint venture. *Id.* Here, the record is not developed enough for the Court to determine that the value share payments do not constitute a mechanism for sharing profits. This Court must review the facts in a light most favorable to plaintiffs and give plaintiffs the benefit of any inferences that logically can be drawn from those facts. *Buller*, 706 F.2d at 846. Plaintiffs have at least raised an issue of fact with regard to the defendants' intention to share in the profits of their DT project.

As for shared losses, plaintiffs point to the October 2014 Letter Agreement, which states that BASF and Monsanto equally share the costs associated with the dicamba residue testing, which are projected to exceed $2.6 million. Subsequently, as discussed above, BASF invoiced Monsanto for $349,922.51 for the "Dicamba Joint Venture." On the other hand, the ARDTSA provides that Monsanto and BASF shall indemnify each other for intellectual property violations and torts of gross negligence or willful misconduct. Defendants claim such an indemnity provision is inconsistent with joint ventures because joint ventures result in joint and several liability, and the indemnification provisions seek to make each party liable for its own specified misconduct. Regardless, the requirement of "shared losses" is not a strict one under Missouri law, *Morley*, 2016 WL 1615676, at *8, and the defendants' attempt to clarify who is responsible for certain legal claims is not dispositive under these facts. The evidence here generates at least a question of fact as to whether the parties shared losses sufficiently to constitute a joint venture.

Although it is a close call, the evidence supplied by plaintiffs, though disputed by the defendants, shows there is at least a question regarding whether the defendants shared control and a "community of pecuniary interests" related to the DT project despite the defendants' stated intention not to form a "partnership." The matter of whether the defendants were engaged in a joint venture must be left to the jury. *See, e.g.*, *In re Genetically Modified Rice Litig.*, 666 F. Supp. 2d 1004, 1028 (E.D. Mo. 2009), *adhered to on reconsideration*, 4:06MD1811 CDP, 2011 WL 5024548 (E.D. Mo. Oct. 21, 2011) (reserving joint venture question for jury even where express agreements between defendants showed companies were operating under their express corporate forms). As a

result, the Court declines to grant summary judgment to defendants on the question of whether they were engaged in a joint venture.

### D. Conspiracy

To establish a conspiracy, plaintiffs must show the following elements: (1) two or more persons; (2) with an unlawful objective; (3) after a meeting of the minds; (4) committed at least one act in furtherance of the conspiracy; and (5) plaintiff was thereby damaged. *W. Blue Print Co., LLC v. Roberts*, 367 S.W.3d 7, 22 (Mo. *banc* 2012).

Defendants argue that they are entitled to summary judgment on plaintiffs' conspiracy claims because, they say, plaintiffs cannot establish that there was a "meeting of the minds." Defendants of course admit that they agreed to enter into business arrangements, but they insist such arrangements were lawful. The Missouri Supreme Court articulates that a meeting of the minds is "a unity of purpose or a common design and understanding." *Oak Bluff Partners, Inc. v. Meyer*, 3 S.W.3d 777, 781 (Mo. *banc* 1999). Plaintiffs contend that because the defendants' business dealings were designed to unlawfully harm third parties to increase defendants' profits, the defendants' meeting of the minds became a conspiracy. In support, plaintiffs cite *American Bank of St. Paul v. TD Bank, N.A.*, 713 F.3d 455 (8th Cir. 2013). There, the court addressed a situation in which a borrower was committing fraud to obtain loans from Mercantile Bank. *Id*.at 460–61. The bank became concerned about the borrower's ability to repay the loans, investigated, and had reason to doubt the borrower's ability to repay. *Id*. Rather than foreclose on the loans, Mercantile chose to forbear and participate in another funding arrangement for the borrower that resulted in repayment of some of the outstanding loans to Mercantile and left American Bank bearing the largest portion of the risk. *Id*.at 461. The borrower defaulted and American sued the borrower and Mercantile alleging

conspiracy. *Id.* The American Bank court found a meeting of the minds between Mercantile and the borrower based on circumstantial evidence, including participation in the questionable loan, ignoring employee concerns about the propriety of the business transaction, and entering into a questionable forbearance agreement while the co-conspirator borrower sought funding elsewhere. *Id.* 465-66.

Defendants contend plaintiffs cite no evidence in support of their argument that defendants agreed to engage in unlawful conduct. Plaintiffs do cite to evidence. It is not overwhelming, but it at least creates the question of fact plaintiffs need to defeat summary judgment on this point. Plaintiffs point to evidence that Monsanto representatives warned others at Monsanto, in 2010, that widespread use of dicamba was incompatible with Midwestern agriculture due to its potential to cause widespread crop damage. Dr. Fold Baldwin asked Monsanto representatives in 2013 how they would manage off-target issues with dicamba, and the answer was that everyone would have to plant Xtend crop. Similarly, in a 2016 "Strategic Update" regarding Engenia, BASF listed "Defensive Planting" as part of BASF's "Potential Market Opportunity." Plaintiffs suggest that BASF further knew that early release of Xtend seeds would drive up demand for Clarity, the "old" formulation of dicamba, before new, low-volatility dicamba was approved. As a result, BASF scaled up production of Clarity in 2015. Documents also suggest that BASF knew that although dicamba would not be labeled for use on Xtend seed in 2015, that "there is a concern about growers being tempted to use dicamba illegally." Indeed, Clarity sales went from $60 million in 2014 and 2015 to $100 million in 2016.[1] Finally, plaintiffs argue that both Monsanto and BASF established corporate

---

[1] The parties dispute whether BASF actually profited from these sales. BASF says that its own sales went down and that private label sales went up. Additionally, defendants

positions blaming applicators for off-target damage, and that discussions regarding a defense strategy began in 2010. Plaintiffs contend that from these facts, a jury could reasonably find that Monsanto and BASF entered into a conspiracy to increase profits stemming from an "ecological disaster" of their own making.

As for defendants' contention that plaintiffs' conspiracy claim fails because plaintiffs cannot show that one of their dicamba products caused their harm, plaintiffs have been clear that their theory is that the sale of Xtend seeds caused their harm. As discussed above, this is a matter for the jury.

Finally, BASF contends that it cannot have conspirator liability because Monsanto, not BASF, decided when to release the seed. This argument is a red herring. The evidence creates at least a question of fact that the defendants, with an unlawful objective and after a meeting of the minds, committed at least one act in furtherance of the conspiracy, and that plaintiffs were thereby damaged. *See W. Blue Print Co.*, 367 S.W.3d at 22. No element of conspiracy requires that BASF had control over the timing of the launch of Xtend seed. "Every member of the conspiracy need not have actually committed the unlawful act supporting liability." *Brock v. McClure*, 404 S.W.3d 416, 421 (Mo. App. W.D. 2013) (citing *Oak Bluff Partners, Inc*., 3 S.W.3d at 780–81). "Instead, each tortfeasor is jointly and severally liable and each defendant is made responsible for the acts of the other done in pursuance of the common design." *Id.* (internal quotation omitted). Summary judgment is denied as to the plaintiffs' conspiracy claim.

---

argue that Clarity sales increased due to higher visibility for conventional use due to the launch of the DT trait—not that Clarity was being used illegally.

### E.  Design Defect

Monsanto argues it is entitled to summary judgment on Counts I (strict liability-design defect) and III (negligent design) because plaintiffs have failed to designate a design expert.

Under Missouri law, to prevail in a products liability action under a theory of defective design, plaintiffs must demonstrate

> (1) the defendants sold the product in the course of their business, (2) the product was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use, (3) the product was used in a manner reasonably anticipated, and (4) [plaintiffs were] injured as a direct result of such defective condition as existed when the product was sold.

*Menz v. New Holland N. Am., Inc.*, 507 F.3d 1107, 1114 (8th Cir. 2007)

The parties agree that Missouri law requires expert testimony in a design defect case where the design at issue is "sufficiently technical and complex to be outside the common knowledge or experience of a jury." *Davidson v. Besser Co.*, 70 F. Supp. 2d 1020, 1023 (E.D. Mo. 1999).  In *Davidson*, for instance, the court excluded the proffered design expert's testimony regarding the safety features of a concrete block-making machine.  *Id.* Thus the plaintiff did not have legally sufficient evidence to support his case, and summary judgment was granted to defendant.  *Id.*

Plaintiffs contend that the jury is capable of answering questions presented pertaining to the alleged design defect without the benefit of an expert opinion, and, regardless, plaintiffs' expert Dr. Ford Baldwin can easily supply an expert opinion as an herbicide expert.  Defendant responds that Baldwin was not disclosed as a design expert.  Although defendant acknowledges that Baldwin's report concludes that Engenia and Monsanto are too volatile, they say such testimony does not constitute a design defect

opinion. Defendant further argues that Baldwin is not even qualified to give a design defect opinion because he has never designed dicamba herbicides.

The "defective" item in this case, though, is not just dicamba herbicide—it is the Xtend Crop System, which plaintiffs allege was defective and unreasonably dangerous due to defendants' inability to provide a safe herbicide. Even to the extent use of defendants' dicamba-based products involved application error or misuse, plaintiffs allege such error or misuse was reasonably anticipated, rendering the products defective. Plaintiffs' case depends not on the specifics of how to chemically design an appropriate herbicide; rather, it depends on their argument that there was no safe way to use the Xtend seeds with any dicamba product. Baldwin provides such testimony for plaintiffs. Although he was not formally designated as a design defect expert, he was, of course, designated as a causation expert. His testimony on dicamba volatility overlaps altogether on the design defect issues, and there is no prejudice to defendants by allowing him to testify on design defect.

### F. Failure to Warn

The determinative issue in a failure-to-warn claim is "whether the information accompanying the product effectively communicates …the dangers that inhere in the product during normal use and the dangerous consequences that can or will result from misuse or abnormal use of the product." *Nesselrode v. Executive Beechcraft, Inc.*, 707 S.W.2d 371, 382 (Mo. *banc* 1986). Plaintiffs plead that defendants did not provide adequate warning of the dangers inherent in their products and that plaintiffs were damaged as a result of that failure to warn. This failure to warn claim is not directed so much to product labeling as it is to defendants' marketing materials and communications

and contacts with farmers. The substance of the claim, then, is that defendants failed to warn of the risks of off-target damage to other farmers.

Plaintiffs must show proximate cause by showing "that a warning would have altered the behavior of the individuals involved…." *Moore v. Ford Motor Co.*, 332 S.W.3d 749, 762 (Mo. *banc* 2011) (internal quotation omitted); *Tune v. Synergy Gas Corp.*, 883 S.W.2d 10, 14 (Mo. *banc* 1994). "To satisfy this burden, Missouri, like several other states, aids plaintiffs in proving this second part of causation by presuming that a warning will be heeded." *Moore*, 332 S.W.3d at 762 (internal quotation omitted). But that "heeding presumption" requires a preliminary inquiry into whether adequate information is available without a warning. *Id.*

In that regard, defendants argue that plaintiffs cannot show that Xtend seed users did not already know about the dangers inherent to using dicamba, and that expert testimony is required for that purpose. It is apparent, however, that plaintiffs' expert Baldwin will provide testimony from which the jury can conclude farmers spraying dicamba in-crop did not understand the danger to others. This Court is satisfied that plaintiffs have sufficient evidence such that the jury will have "guidance and [will not be] left to speculation and conjecture," as required by the Missouri Supreme Court. *Tune*, 883 S.W.2d at 14.

### G. Negligent Training

In Missouri, negligent training is a variant of ordinary negligence. Thus, to prevail on their negligent training claims, plaintiffs must show "(1) a legal duty on the part of the defendant to use ordinary care to protect the plaintiff against unreasonable risks of harm; (2) a breach of that duty; (3) a proximate cause between the breach and the resulting injury; (4) actual damages to the plaintiff's person or property." *Braxton v. DKMZ*

*Trucking, Inc*., 4:13cv1335 JCH, 2013 WL 6592771, at \*3-4 (E.D. Mo. Dec. 16, 2013)

(citing *Hoover's Dairy, Inc. v. Mid–America Dairymen, Inc*., 700 S.W.2d 426, 431 (Mo.

*banc* 1984)).

Defendants argue that plaintiffs cannot prove any employee was negligently trained nor that such a failure to train caused any crop loss. Plaintiffs respond with a number of disputed facts that they say support that the defendants' employees were not properly trained. For example, plaintiffs contend Monsanto sales employee Greg Starling acknowledges it was his responsibility to prevent off-label spraying, but he took no steps to do so even though he knew it was occurring. Plaintiffs further contend BASF employee Dan Westberg witnessed what was probably Engenia being sprayed improperly, and he did nothing to stop or educate the applicator. Plaintiffs contend these and other facts could allow a reasonable jury to conclude that the employees had not been properly trained and that the employees' indifference caused plaintiffs' harm. This Court agrees.

### H. Punitive Damages

The test for whether punitive damages are allowed in Missouri is a strict one. *Ford v. GACS, Inc.*, 265 F.3d 670, 677 (8th Cir. 2001). The plaintiff must show, by clear and convincing evidence, that "the defendant showed a complete indifference to or conscious disregard for the safety of others." *Id.* at 678 (internal quotation omitted); *Rodriguez v. Suzuki Motor Corp*., 936 S.W.2d 104, 111 (Mo. *banc* 1996). Defendants contend that the EPA approval, the package label warnings, the training sessions, and other actions, and also remedial efforts following reports of potential dicamba symptomology, preclude a showing of complete indifference or conscious disregard. But plaintiffs set forth evidence that defendants were aware of the serious risk that their DT

Xtend system would inflict damage to non-DT crops.  In any event, this Court, though well aware of the high standard of clear and convincing evidence, is not now in a position to determine as a matter of law that plaintiffs cannot make a submissible case for punitive damages.

Accordingly,

IT IS HEREBY ORDERED that the defendants' motions for summary judgment [#218, #221] are DENIED.

So ordered this  31st  day of December, 2019.

STEPHEN N. LIMBAUGH, JR.
UNITED STATES DISTRICT JUDGE