**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| BADER FARMS, INC., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:16-cv-00299 |
| | ) | |
| MONSANTO CO., *et al.*, | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendant. | ) | |

**PLAINTIFF'S OPPOSITION TO BASF CORPORATION'S ALTERNATIVE**
**<u>MOTION FOR NEW TRIAL</u>[1]**

---

[1] This brief is submitted in 13-point font for text and 12-point font for footnotes at the Court's request.  It is 68 pages in 12-point font for text and 10-point font for footnotes.

## <u>TABLE OF CONTENTS</u>

Page

LEGAL STANDARD ................................................................................................. 1

I.   THE COURT'S RULINGS ON THE ADMISSION OR EXCLUSION OF
     EXPERT WITNESSES AT TRIAL WAS PROPER................................................ 3

     A.   The Court's Orders Permitting Dr. Baldwin's Testimony Were Correct ..... 3

          1.   Dr. Baldwin Used Appropriate Scientific Methods In Forming
               His Opinion. ........................................................................................ 5

               a.   Dr. Baldwin did not form his opinion before investigating. .............. 5

               b.   Dr. Baldwin conducted a thorough investigation that spanned
                    years ................................................................................................ 8

               c.   Dr. Baldwin Properly Ruled Out and Ruled In Causes.................... 17

          2.   Dr. Baldwin is Qualified to Render All the Opinions He Rendered. .... 18

          3.   Dr. Baldwin is imminently qualified to testify about volatility,
               atmospheric loading, and long-range transport of dicamba ................. 20

     B.   The Court's Order To Exclude BASF's Three Undisclosed Witnesses Was
          Correct ........................................................................................................ 23

          1.   The Court Did Not Abuse Its Discretion And Did Not "Punish"
               BASF ................................................................................................. 26

          2.   The Exclusion Of These Witnesses Did Not Prejudice BASF ............. 30

II.  THERE WAS NO ERROR IN ADMITTING REPORTS OF DICAMBA
     DAMAGE......................................................................................................... 32

     A.   Other Claims Evidence Was Not Inadmissible Hearsay............................. 32

     B.   The Court Properly Admitted Exhibit Pltf-2019 Under Fed. R. Evid. 703  36

     C.   There Is Absolutely No Justification For A New Trial................................ 40

III. THE COURT PROPERLY INSTRUCTED THE JURY CONSISTENT WITH
     MISSOURI LAW............................................................................................... 42

A.  It Was Proper To Instruct The Jury Regarding The Dicamba-Tolerant System ....................................................................................... 43

    1.  BASF's Reliance *Benjamin Moore* and *Sperry* Is Misplaced .............. 45

B.  Jury Instruction No. 11 Correctly Instructed the Jury on Damages. ........... 48

    1.  Businesses in Missouri May Properly Recover Damages for Lost Profits. .......................................................................................... 48

    2.  MAI 4.01 Was The Appropriate Damage Instruction ........................... 54

C.  The Joint Venture Instruction (Instruction 16) Was Free Of Error. ............ 55

    1.  The Joint Venture Correctly Applied Missouri Law ............................. 55

    2.  "Shared Pecuniary Interest" Correctly States The Law ......................... 57

    3.  The Preponderance Of The Evidence Standard Applies ....................... 58

D.  Instruction 17 Correctly Instructed On Civil Conspiracy ........................... 59

IV.  JOINT VENTURER LIABILITY FOR PUNITIVE DAMAGES IS THE LAW IN MISSOURI: ANYTHING ELSE IS ERROR ................................................. 61

V.  THE JURY'S PUNITIVE DAMAGES AWARD IS SUPPORTED BY THE EVIDENCE ................................................................................................. 66

A.  BASF's Due Process Rights Were Not Violated By Imposition Of Punitive Damages .................................................................................. 66

B.  The Jury's $250 Million Punitive Award Is Appropriate Given The Reprehensibility Of The Conduct And The Amount Needed To Punish And Deter .................................................................................. 67

VI.  THE VERDICT WAS NOT AGAINST THE WEIGHT OF THE EVIDENCE ................................................................................................. 72

A.  Weight Of The Evidence ............................................................................. 74

B.  Evidentiary Rulings .................................................................................... 75

C.  The Weight Of The Evidence Supports The Jury Verdict ........................... 75

1.  Joint Venture and Conspiracy ............................................................... 75

2.  Negligent Design and Negligent Failure to Warn ................................. 75

3.  Compensatory Damages ......................................................................... 75

4.  Punitive Damages ................................................................................... 76

VII.    THERE IS NO CUMULATIVE PREJUDICE ..................................................... 76

A.    None Of The So-Called Errors Cited By BASF Are Error, And Even If
They Were, There Was No Prejudice ........................................................... 78

1.  Dr. Baldwin Is An Expert ....................................................................... 78

2.  BASF's Late Identified Experts Were Properly Excluded .................... 78

3.  Evidence Of Other Claims Was Proper ................................................. 78

4.  The Court Properly Instructed The Jury As to Damages, Joint Venture,
and Conspiracy ....................................................................................... 78

5.  The Court Properly Reversed the Ruling On Joint Punitive Damages .. 78

VIII.    CONCLUSION ............................................................................................. 78

# TABLE OF AUTHORITIES

**Cases**                                                                        **Page**

*A.D. v. Credit One Bank, N.A.*,
885 F.3d 1054 (7th Cir. 2018) ........................................................ 56

*Adams v. Toyota Motor Corp.*,
867 F.3d 903 (8th Cir. 2017) .......................................................... 34

*Am. Modern Home Ins. Co. v. Thomas*,
413 F. Supp. 3d 921 (E.D. Mo. 2019) ............................................. 75

*Ameristar Jet Charter v. Dodson Int'l Parts, Inc.*,
155 S.W.3d at 54 ............................................................................ 52

*Anthony v. Ward*,
336 Fed.Appx. 311 (4th Cir.2009) .................................................. 76

*Bachtel v. Taser Int'l, Inc.*,
2013 WL 317538 (E.D. Mo. Jan. 28, 2013) .................................... 35

*Banks v. Koehring Co.*,
538 F.2d 176 (8th Cir. 1976) .......................................................... 67

*Barnes v. Arkansas-Missouri Power Co.*,
281 S.W. 93 (Mo. App. 1926) .................................................48-49, 51

*Beckett v. Kiepe*,
369 S.W.2d 258 (Mo. App. 1963) ................................................... 50

*Benjamin Moore & Co. v. City of St. Louis*,
226 S.W.3d 110 (Mo. 2007) ...................................................... 45, 47

*Bizzle v. McKesson Corp.*,
961 F.2d 719 (8th Cir. 1992) .......................................................... 43

*Blanks v. Fluor Corp.*,
450 S.W.3d 308 (Mo. Ct. App. 2014) ...............................62-65, 68, 70

*Blue v. Rose*,
786 F.2d 349 (8th Cir. 1986) .......................................................... 64

*Bradshaw v. FFE Transp. Servs.*,
715 F.3d 1104 (8th Cir. 2013) ........................................................... 42

*Brooks v. Brooks*,
208 S.W.3d 279 (Mo. 1948) ................................................................ 59

*Burris v. Gulf Underwriters Ins. Co.*,
787 F.3d 875 (8th Cir. 2015) ............................................................... 75

*Carlson v. K-Mart*,
979 S.W.2d 145 (Mo. banc 1988) ....................................................... 52

*Castillo v. City and County of San Francisco*,
2006 WL 618589 (N.D. Cal. Mar. 9, 2006) ................................. 24, 30

*Chrysler Corp. v. Todorovich*,
580 P.2d 1123 (Wyo.1978) ................................................................. 71

*City of Kennett v. Akers*,
564 S.W.2d 41 (Mo. 1978) .................................................................. 55

*Cripe v. Henkel Corp.*,
858 F.3d 1110 (7th Cir. 2017) ............................................................ 28

*Cutcliff v. Reuter*,
889 F.3d 491 (8th Cir. 2018) .............................................................. 59

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993) ........................................................................ 5, 6

*Dejana v. Marine Tech., Inc.*,
No. 4:11-CV-1690-JAR, 2013 WL 6768407 ............................... 10, 16

*Dep't of Natural Resources v. Ebbing*,
28 N.E.3d 682 (Ohio Ct. App. 2015) ................................................. 76

*Drabik v. Stanley-Bostitch, Inc.*,
997 F.2d 496 (8th Cir. 1993) .............................................................. 34

*Ellison v. O'Reilly Automotive Stores, Inc.*,
463 S.W.3d 426 (Mo. App. W.D. 2015) ............................................. 70

*Enstein v. Di Mase*,
2017 WL 3129812 (W.D. Mo. July 21, 2017) ............................................................ 60

*Esoteric, LLC v. One (1) 2000 Eighty–Five Foot Azimut Motor Yacht Named M/V STAR ONE*,
478 Fed.Appx. 639 (11th Cir.2012) ........................................................................ 76

*Estate of Thompson v. Kawasaki Heavy Indus.*,
291 F.R.D. 297 (N.D. Iowa 2013) ........................................................... 33, 35, 42

*Faught v. Washam*,
329 S.W.2d 588 (Mo. 1959) .................................................................................. 76

*First Sec. Bank v. Union Pac. R.R. Co.*,
152 F.3d 877 (8th Cir. 1998) ................................................................................ 34

*Flanigan v. Burlington Northern Inc.*,
632 F.2d 880 (8th Cir.1980) ................................................................................. 43

*Gateway Foam Insulators, Inc. v. Jokerst Paving & Contracting, Inc.*,
279 S.W.3d 179 (Mo. banc 2009) ......................................................................... 54

*Gee v. Payne*,
939 S.W.2d 383 (Mo. App. 1997) ......................................................................... 53

*Gilliland v. Novartis Pharm. Corp.*,
34 F. Supp. 3d 960 (S.D. Iowa 2014) ................................................................... 16

*Gray v. Bicknell*,
86 F.3d 1472 (8th Cir. 1996) ................................................................................ 73

*Green v. Study*,
286 S.W.3d 236 (Mo. App. 2009) ......................................................................... 52

*Greig v. Botros*,
525 Fed.Appx. 781 (10th Cir.2013) ...................................................................... 76

*Harrington v. Sunbeam Prods.*,
No. 4:07-CV-1957 CAS, 2009 WL 701994 (E.D. Mo. Mar. 13, 2009) ...................... 9

*Haynes v. Hawkeye Security Insurance Co.*,
579 S.W.2d 693 (Mo. App. 1979) ......................................................................... 61

*Hendler v. United States,*
952 F.2d 1364 (Fed.Cir.1991) ................................................... 77

*Hogan Logistics, Inc. v. Davis Transfer Co., Inc.,*
No. 4:16-cv-1541 CAS, 2018 WL 3475532 (E.D. Mo. July 19, 2018) .......................... 74

*In re Genetically Modified Rice Litigation,*
2010 WL 4643265 (E.D. Mo. Nov. 9, 2010) ................................. 51

*In re Paoli R.R. Yard PCB Litig.,*
35 F.3d 717 (3d Cir.1994) ..................................................... 17

*Inacom Corp. v. Sears, Roebuck & Co.,*
254 F.3d 683 (8th Cir. 2001) ................................................. 56

*Jacobs Mfg. Co. v. Sam Brown Co.,*
19 F.3d 1259 (8th Cir. 1994) ................................................. 75

*Jerden v. Amstutz,*
430 F.3d 1231 (9th Cir.2005) ................................................. 76

*Johnson v. Mead Johnson & Co., LLC,*
754 F.3d 557 (8th Cir. 2014) ............................................ 3, 6, 8, 16, 17

*Keller Farms, Inc. v. McGarity Flying Serv., LLC,*
944 F.3d 975 (8th Cir. 2019) ............................................ 1, 2 51

*Keller Farms Inc. v. Stewart,*
No. 16-cv-265, 2018 WL 10322058 (E.D. Mo. Dec. 13, 2018) ................................ 73, 74

*Kendel v. Local 17–A United Food & Commercial Workers,*
512 Fed.Appx. 472 (6th Cir.2013) ........................................... 76

*King v. Davis,*
980 F.2d 1236 (8th Cir. 1992) ............................................... 74

*King v. Sw. Foodservice Excellence, LLC,*
No. 17-cv-2551, 2019 WL 6115138 (E.D. Mo. Nov. 18, 2019) ................................ 73, 75

Lauzon v. Seneco Prods.,
270 F.3d 681 (8th Cir. 2001) ................................................. 16

*Leichihman v. Pickwick Int'l,*
814 F.2d 1263 (8th Cir. 1987) ........................................................................ 73

*Lewellen v. Franklin,*
441 S.W.3d 136 (Mo. 2014) ..................................................................... 71, 72

*Lynn v. TNT Logistics N. Am. Inc.,*
275 S.W.3d 304 (Mo. App. W.D. 2008) ......................................................... 70

*Malek v. Federal Ins. Co.,*
994 F.2d 49 (2d Cir.1993) ............................................................................... 76

*Manus v. Am. Airlines, Inc.,*
314 F.3d 968 (8th Cir. 2003) ......................................................................... 74

*Martin v. Survivair Respirators, Inc.,*
298 S.W3d 23 (Mo. Ct. App. 2009) ............................................................... 44

*May v. Nationstar Mortg., LLC,*
852 F.3d 806 (8th Cir. 2017) ...................................................................... 2, 70

*Mayhall v. Berman & Rabin, P.A.,*
Case No. 4:13CV00175 AGF, 2013 WL 4496279 (E.D. Mo., Aug. 21, 2013) .......... 23, 26

*McKee v Reuter,*
No. 16-cv-207, 2019 WL 6250845 (E.D. Mo. Nov. 22, 2019) ........................ 74

*Middleton v. Ropern,*
455 F.3d 838 (8th Cir. 2006) ......................................................................... 76

*Mignone v. Missouri Dep't of Corr.,*
546 S.W.3d 23 (Mo. Ct. App. 2018) .............................................................. 70

*Mitchell v. Volkswagenwerk, AG,*
669 F.2d 1199 (8th Cir. 1982) ....................................................................... 71

*Moore v. Ford Motor Co.,*
No. ED-92770, 2009 WL 4932736 (Mo. Ct. App. Dec. 22, 2009),
*aff'd in part,* 332 S.W.3d 749 (2011) ............................................................ 77

*Morley v. Square, Inc.,*
4:10-CV-2243-SNLJ, 2016 WL 1615676 (E.D. Mo. Apr. 22, 2016) ............ 58, 59

*Musser v. Gentiva Health Svcs.*,
356 F.3d 751 (7th Cir. 2004) ................................................................. 26, 31

*Myers v. Karchmer*,
313 S.W.2d 697 (Mo. 1958) ...................................................................... 49

*Myers v. Moffett*,
312 S.W.2d 59 (Mo. 1958) .................................................................. 76, 77

*Olson v. Ford Motor Co.*,
410 F.Supp.2d 855 (D.N.D. 2006) ............................................................. 35

*Orthoarm, Inc. v. Forestadent USA, Inc.*,
No. 4:06-CV-730-CAS, 2008 WL 4681385 (E.D. Mo. Oct. 21, 2008) ........................... 73

*Pac. Mut. Life Ins. Co. v. Haslip*,
499 U.S. 1, 20 (1991) ............................................................................ 66

*Poage v. Crane Co.*,
523 S.W.3d 496 (Mo. Ct. App. 2017) ................................................... 68, 70, 72

*Ritter v. BJC Barnes Jewish Christian Health Sys.*,
987 S.W.2d 377 (Mo. App. 1999) .............................................................. 57

*Robinson v. Newell Window Furnishings, Inc.*,
No. 4:10CV1176 JCH, 2012 WL 3043014 (E.D. Mo. July 25, 2012) .............................. 3

*Rotert v. Peabody Coal Co.*,
513 S.W.2d 667 (Mo. App. 1974) .............................................................. 54

*Ryan v. McDonough Power Equip., Inc.*,
734 F.2d 385 (8th Cir. 1984) ................................................................... 74

*Sanford v. Crittenden Memorial Hospital*,
141 F.3d 882 (8th Cir. 1998) .................................................................... 2

*Seitz v. Lemay Bank and Tr. Co.*,
959 S.W.2d 458 (Mo. 1998) ..................................................................... 61

*Shady Valley Park & Pool v. Fred Weber, Inc.*,
913 S.W.2d 28 (Mo. App. 1995) ....................................................... 52, 53, 54

*Smith v. Firestone Tire & Rubber Co.*, |
755 F.2d 129 (8th Cir. 1985) ........................................................................... 36

*Smith Moore & Co. J.L. v. Mason Realty & Inv., Inc.*,
817 S.W.2d 530 (Mo. App. E.D.1991) ............................................................. 53

*Sperry v. Bauermeister, Inc.*,
804 F. Supp. 1134 (E.D. Mo. 1992), aff'd, 4 F.3d 596 (8th Cir. 1993) ..................... 45, 47

*State ex rel. Hall v. Cook,*
400 S.W.2d 39 (Mo. 1966) ............................................................................. 64

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
538 U.S. 408 (2003) ................................................................................ 66, 68

*Thi v. Schneider Nat'l Carriers, Inc.*,
2005 WL 1703116 (W.D. Mo. July 18, 2005) ................................................... 55

*Thompson v. City of Chi.*,
722 F.3d 963 (7th Cir.2013) ........................................................................... 76

*Trickey v. Kaman Indus. Techs. Corp.*,
705 F.3d 788 (8th Cir. 2013) .................................................................. 1, 32, 73

*United States v. Robinson*,
301 F.3d 923 (8th Cir. 2002) .......................................................................... 76

*United States v. Walker*,
470 F.3d 1271 (8th Cir. 2006) ................................................................... 40, 42

*United States v. Woods*,
321 F.3d 361 (3rd Cir. 2003) ....................................................................... 32

*U.S. S.E.C. v. Infinity Group Co.,*
212 F.3d 180 (3d Cir.2000) ........................................................................... 76

*Vanderberg v. Petco Animal Supplies Stores, Inc.*,
906 F.3d 698 (8th Cir. 2018) ............................................... 23, 26, 27, 29, 31

*Volume Services, Inc., v. C.F. Murphy & Associates, Inc.*,
656 S.W.2d 785 (Mo. App. 1983) .................................................................... 53

*Ward v. Target Corp.*,
2014 WL 251210 (D. Conn. June 4, 2014) .......................................................... 8

*White v. Pence,*
961 F.2d 776 (8th Cir. 1992) ............................................................................. 73

*White v. United States*,
No. 4:15CV1252 SNLJ, 2019 WL 1518286 (E.D. Mo. Apr. 8, 2019) ............................... 1


**Other**

Fed. R. Civ. P. 51(c)(1) ..................................................................................... 1

Fed. R. Civ. P. 51(d)(2) ..................................................................................... 2

Fed. R. Civ. P. 59(a) ................................................................................... 72, 73

Fed. R. Evid. 703 ........................................................................ 6, 32, 36, 37, 39

M.A.I. 19.01 .................................................................................................. 52

Rule 70.02(b) ................................................................................................. 60

BASF fails to articulate any error—much less prejudicial error—resulting in a miscarriage of justice deserving of a new trial.

### *Legal Standard*

The district court may order a new trial "where it is convinced that the verdict was unsupported by the evidence" or that "prejudicial error was committed during the trial." *White v. United States*, No. 4:15CV1252 SNLJ, 2019 WL 1518286, at *1 (E.D. Mo. Apr. 8, 2019) (citing *Hannah v. Haskins*, 612 F.2d 373, 376 (8th Cir. 1980)). A new trial should only be granted to "avoid a miscarriage of justice." *Id.; Keller Farms, Inc. v. McGarity Flying Serv., LLC*, 944 F.3d 975, 984 (8th Cir. 2019) (new trial motions "are generally disfavored and will be granted only where a serious miscarriage of justice may have occurred.").

With respect to legal errors, a "'miscarriage of justice' does not result whenever there are inaccuracies or errors at trial; instead, the party seeking a new trial must demonstrate that there was prejudicial error." *Trickey v. Kaman Indus. Techs. Corp.*, 705 F.3d 788, 807 (8th Cir. 2013) (affirming denial of new trial motion). Errors in evidentiary rulings are prejudicial "only where the error likely affected the jury's verdict." *Id.* (citing *Diesel Machinery, Inc. v. B.R. Lee Industries, Inc*., 418 F.3d 820, 833 (8th Cir. 2005)).

Regarding complaints of instructional error, "A party who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection." Fed. R. Civ. P. 51(c)(1). When followed by litigants, Rule 51 affords the district court the opportunity to correct a defective instruction

and helps "to prevent litigants from ensuring a new trial in the event of an adverse verdict by covertly relying on the error." *May v. Nationstar Mortg., LLC*, 852 F.3d 806, 819-20 (8th Cir. 2017) (quoting *Mo. Pac. R.R. Co. v. Star City Gravel Co.*, 592 F.2d 455, 459 (8th Cir. 1979)).   Rule 51 requires a specific objection to a jury instruction before the jury retires, otherwise "a litigant waives the right on appeal to object to a jury instruction on those grounds." *Id.* (quoting *Dupre v. Fru–Con Eng'g Inc.*, 112 F.3d 329, 333 (8th Cir. 1997).

In the absence of a distinct objection, a court will only review for plain error. *See* Fed. R. Civ. P. 51(d)(2); *May*, 852 F.3d at 820 (citing *Rolscreen Co. v. Pella Prods. of St. Louis, Inc.*, 64 F.3d 1202, 1211 (8th Cir. 1995).   Plain-error review is narrow and "confined to the exceptional case in which error has seriously affected the fairness, integrity, or public reputation of the judicial proceedings."   *May*, 852 F.3d at 820 (citing *Slidell, Inc. v. Millennium Inorganic Chems., Inc.*, 460 F.3d 1047, 1054 (8th Cir. 2006)).

"Where the basis of the motion for a new trial is that the jury's verdict is against the weight of the evidence, the district court's denial of the motion is virtually unassailable on appeal." *Keller Farms,* 944 F.3d at 984 (quoting *Keenan v. Computer Assocs. Int'l, Inc.*, 13 F. 3d 1266, 1269 (8th Cir. 1994).   Reviewing courts consider "the evidence most favorably to the verdict." *Id.* (quoting *Batiste-Davis v. Lincare, Inc.*, 526 F.3d 377, 381 (8th Cir. 2008)).   "The authority to grant a new trial... is confided almost entirely to the exercise of discretion on the part of the trial court." *Sanford v. Crittenden Memorial Hospital*, 141 F.3d 882, 884 (8th Cir. 1998).

# I.   THE COURT'S RULINGS ON THE ADMISSION OR EXCLUSION OF EXPERT WITNESSES AT TRIAL WAS PROPER.

## A.   The Court's Orders Permitting Dr. Baldwin's Testimony Were Correct.

BASF's raising of hypothetical alternate causes that it claims Dr. Baldwin should have considered or challenging his credentials and credibility does not meet the standard for a new trial.  Evidence sufficient to establish that no reasonable jury could have found that dicamba caused or contributed to cause the harm to Bader Farms' orchards must have been brought forth by BASF in the trial record.  It is not sufficient for BASF to simply reiterate the same opinions of causation that it did (or did not) present to the jury.

Plaintiff presented voluminous evidence regarding the off-target movement of dicamba and resulting damage to Bader Farms.  The only alternate cause Defendants' experts claimed could have accounted for the scope of the damage to Bader Farms was Armillaria root rot.  At most, the jury was presented with two conflicting theories of causation and it chose between them. *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 564 (8th Cir. 2014) (where experts can reasonably differ, "the jury not the trial court, should be the one to decide among the conflicting views of different experts." (internal quotation and citation omitted).

In the Eighth Circuit, the decision of whether to admit expert testimony lies within "the broad discretion of the trial court." *Robinson v. Newell Window Furnishings, Inc.*, No. 4:10CV1176 JCH, 2012 WL 3043014, *2 (E.D. Mo. July 25, 2012).  In this case, the Court had multiple opportunities to assess the relevance and reliability of Dr. Ford Baldwin's expert testimony, as BASF admits in its Memorandum in Support of Alternative

Motion for New Trial.  Doc. 582 ("BASF Mem."), p. 2, fn. 1.  The Court's decision to permit Dr. Baldwin's testimony in all respects was the right result. [2]

By now, the Court is very familiar with Dr. Baldwin's extensive and distinguished background as a weed scientist.  The Court has seen firsthand Dr. Baldwin's ability to explain the complexities of the scientific phenomenon related to volatility and off-target movement of dicamba and address how the herbicide interacts under real world conditions. With 45 years of experience working with a variety of crops, the depth of his knowledge and skill is not a surprise.  At trial, Dr. Baldwin also demonstrated to the jury the depth of his knowledge of all relevant scientific studies on dicamba – new and older formulations – and the current state of the science with respect to dicamba.  2/6/2020 Trial Tr. 1367:14-1376:1 (Baldwin).[3]  Dr. Baldwin's testimony, as well as his expert reports submitted before trial, make it clear that studying and expounding on the effects of volatility, temperature inversions, and long-range transport of dicamba is something weed scientists routinely do. *Id.* (volatility studies of many weed scientists), 1346:17-1347:10 (temperature inversion studies by Dr. Kevin Bradley), 1347:11-23 (temperature inversion studies by Dr. Jason Norsworthy), 1345:1-18 (dicamba volatilizes 72-96 hours); *see also* B-981 (EPA document containing volatility studies by weed scientists).

---

[2] The Court has already ruled on all of the issues BASF raises in its motion for new trial.  *See* Doc. 275, Order denying Defendants' joint motion to exclude Dr. Baldwin.

[3] Exhibit 1 is a compilation of all cited Trial Transcript pages in chronological order, attached. Exhibit 2 is a compilation of all cited Plaintiff's Trial Exhibits in order of Exhibit number.  Exhibit 3 is a compilation of all cited BASF Trial Exhibits.  For certain large Exhibits, only the first and cited pages are included.

It is undisputed that bioindicator crops, such as soybeans, are used to determine effects of herbicides on other crops.  The evidence in this case showed that Defendants, academics, and even the EPA all use this method.  Contrary to BASF's assertions, herbicide experts routinely testify regarding a variety of crops and what role, if any, causes other than herbicides might play in the damage at issue.  In fact, Dr. Baldwin previously testified as an expert witness for BASF in a case involving tomatoes and another involving cotton even though he is not a "tomato expert" or a "cotton expert." *Id.* at 1255:14-1256:9. His role in those cases was to determine what effect herbicides were playing in those lawsuits. *Id.* at 1256:12-14.  That is the same role he assumed in this case.

## 1.    Dr. Baldwin Used Appropriate Scientific Methods In Forming His Opinion.

### a.   Dr. Baldwin did not form his opinion before investigating.

Dr. Baldwin used sound, scientific methodology in forming his conclusions about the cause of the damage to Bader Farms' orchards.  He did not, as BASF claims, form his opinion before conducting an inspection of Bader Farms.  BASF's argument that Dr. Baldwin first formed his opinion and then sought facts to support it is nothing more than a repackaging of the April 2017 Affidavit argument raised in Defendants' *Daubert* briefing and motions *in limine*.  The Court ruled that if Defendants wished to challenge Dr. Baldwin's credibility or methodology, they were free to do so on cross examination at trial. Doc. 275, p. 7.

At trial, Dr. Baldwin was cross examined extensively by defense counsel on this issue and his testimony was crystal clear.  He testified that, when he inspected the orchards

in February 2017, he followed his usual methodology as extensively as he could and formed his early opinion.  2/6/2020 Trial Tr. 1384:15-1385:1 (Baldwin).  Dr. Baldwin offered testimony about the visual observations he made, including about the drift patterns and differences in fruiting wood, that led him to the conclusion that dicamba sprayed over Xtend crops caused the damage to Bader Farms' orchards.  *Id.* at 1387:2-24, 1388:9-21; *see also id.* at 1304:10-1306:21.  Dr. Baldwin also testified he relied on conversations with Dr. Bradley regarding Dr. Bradley's 2016 observations at Bader Farms, discussions with Bill Bader about his observations, as well as Dr. Baldwin's own observations from inspecting soybean fields near Bader Farms.  *Id.* at 1388:9-21; 2/7/2020 Trial Tr. 1497:21-1498:12, 1498:16-19 (Baldwin).  All of this is not only permissible, but it is an entirely appropriate basis for an expert's opinions and testimony.  *Johnson*,  754 F.3d at 561 (quoting FRE 703 that an expert's opinion should be based on "'facts or data in the case that the expert has been made aware of or personally observed.'").  Fed. R. Evid. 703 permits an expert to base his opinion on information "that the expert has been made aware of or personally observed."  Unlike a lay witness, experts are "permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observations." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993).

Dr. Baldwin admitted that in February 2017, there were aspects of his methodology that he was unable to employ.  Despite that, however, he found sufficient evidence to conclude that Bader Farms had been exposed to dicamba sprayed over Xtend crops. 2/7/2020 Trial Tr. 1508:3-25 (Baldwin).

BASF's claim that Dr. Baldwin didn't rule out other potential causes in February 2017 is not true.  Defense counsel offered up a number of possible causes, including other herbicides, heat, cold, and many others.  Dr. Baldwin testified that before he drafted the 2017 Affidavit, he knew what herbicides Bader Farms was using.  2/6/2020 Trial Tr. 1390:7 (Baldwin).  He also testified that heat is not something that he would have ruled out in February.  *Id.* at 1392:13-20.  On re-direct, Dr. Baldwin explained why herbicides like 2,4-D, for instance, could not have caused the damage to Bader Farms, and thus, were easy to rule out.  "You couldn't have had a major 2,4-D event on Bader Farms year after year without massive cotton injury in the same area.  And I'm not aware of a single cotton complaint."  2/7/2020 Trial Tr. 1503:3-15 (Baldwin).  Dr. Baldwin also testified that 2,4-D is labeled for use in peaches, "but the cotton by itself completely destroys the 2,4-D argument in my opinion."  *Id.* at 1503:24-1504:2. Dr. Baldwin also testified that he was able to rule out glyphosate and glufosinate without the need for testing: "symptomology is going to tell you that they're there."  *Id.* at 1504:3-12.

Also, with respect to 2017, and Defendants' criticisms of his opinions, Dr. Baldwin testified, "…if I had been wrong in my conclusions from the 2017 visit, then I wouldn't have seen auxin symptoms and all of the other things I observed in subsequent visits.  If I'd have been wrong, then I just would have been wrong…" *Id.* at 1508:3-11.

Dr. Baldwin is a qualified expert.  He knows plants and the effect of dicamba on sensitive plants.  As he testified in one of his depositions before trial,

> …peaches are plants.  I mean, herbicides affect plants…all the things you develop in your experience over the years – you know, there's certain

principles that apply to plants…and once I saw what was going on up there
[at Bader Farms], yeah, I could apply that to peaches.

Doc. 238, p. 10.  Dr. Baldwin's discussions with Bill Bader about various aspects of the

orchard, including the symptomology Mr. Bader observed in his orchards the prior two

years and his conversations with Dr. Bradley about what he observed in 2016 are all valid

and well within the bounds of an expert should do.  *Johnson*, 754 F.3d at 561.

> b. Dr. Baldwin conducted a thorough investigation that spanned years.

BASF's position amounts to an indictment that Dr. Baldwin didn't jump through

the hurdles Defendants created to establish causation.  There is no requirement that he do

so and all of the points BASF raises here are easily refuted, as either incorrect on the law

or the facts.

First, Defendants' arguments that Dr. Baldwin's failure to inspect Bader Farms in

2015 and 2016 when he wasn't even an expert witness in this case has been raised

repeatedly.  *See e.g.*, Docs. 217, 313.  As addressed above, in forming his opinion, Dr.

Baldwin is permitted to consider information he obtained from Dr. Bradley, Bill Bader, his

own observations of the area, and information being generated in the scientific community

in forming his opinion.  *Ward v. Target Corp.*, 2014 WL 251210, at *3 (D. Conn. June 4,

2014) (finding expert who based conclusions on "his own personal observations, his own

experience and knowledge, and his review of various materials and conversations with

other engineering and design professionals" to have relied on "the types of facts or data

upon which an expert would reasonably rely.").  As the Court acknowledged in its Order

denying Defendants' motion to exclude Dr. Baldwin, "Numerous other sources support

[his] opinions pertaining to the 2015 and 2016 season." Doc. 275, p. 7. That other experts, like Dr. Bradley and Dr. Prostko, agree with Dr. Baldwin's conclusions does not mean that he failed to properly investigate or that his opinion is not his own and based on sound, scientific methods.

Second, BASF's outrage over Dr. Baldwin's failure to conduct analytical testing for the presence of dicamba is feigned. On direct examination, Dr. Baldwin was asked about an Engenia herbicide launch training document with which he is familiar. That document states that BASF does not take samples of plants for off-target movement because "you cannot detect it at these rates. It's pointless." 2/6/2020 Trial Tr. 1358:14-1359:2 (Baldwin). Dr. Baldwin agreed with the statement in the document, saying, "That is correct. And they're the dicamba people." *Id.* at 1359:2. Dr. Baldwin chose not to conduct analytical testing and addressed the shortcomings of such tests, shortcomings with which BASF clearly agrees. *Id.* at 1356:13-1358:2, 1358:14-1359:2.[4] Nothing in *Daubert* or Rule 702 required him to test. *Harrington v. Sunbeam Prods.*, No. 4:07-CV-1957 CAS, 2009 WL 701994, *5-6 (E.D. Mo. Mar. 13, 2009) (district court refused to exclude plaintiff's expert where defendant's expert tested the subject blanket and found no defect, plaintiff's expert did not test the blanket, but relied on other amassed information in support

---

[4] Dr. Baldwin also demonstrated the failings of analytical testing for auxin herbicides as evidenced by Dr. Prostko's tests, which detected 2,4-D in trees that were never sprayed with the herbicide. 2/6/2020 Trial Tr. 1357:19-1358:12 (Baldwin). In addition, in both his first expert report and his rebuttal report in this case, Dr. Baldwin discussed and cited to scientific studies that support this view about the unreliability of analytical testing, as Plaintiff explained in its response to Defendants' *Daubert* motion to exclude Dr. Baldwin. Doc. 238, p. 19-20.

of his conclusions, stating "Sunbeam's post-fire testing of the subject blanket's safety circuit and controls does not conclusively establish that [plaintiff's expert's] opinions or methods are unreliable…"); *Dejana v. Marine Tech., Inc.*, No. 4:11-CV-1690-JAR, 2013 WL 6768407, *14 (E.D. Mo. Dec. 20, 2013) (absence of "scientific testing or analysis…computer modeling or accident reconstruction…go to weight, not admissibility…").  Moreover, none of Defendants' own expert witnesses tested any of the samples they obtained at Bader Farms for dicamba either.  2/12/2020 Trial Tr. 2235:13-24 (Schnabel).

Third, Dr. Baldwin testified at length about the extent of his inspections and research in this case and his opinion, based on that, is that Bader Farms' orchards are being exposed to dicamba sprayed over the top of Xtend crops multiple times a year, beginning in 2015. 2/7/2020 Trial Tr. 1506:19-1508:2 (Baldwin); *see also id.* at 1466:6-9.

Defendants continually criticize Dr. Baldwin's use of the phrase "common sense," but he is using the common sense of a scientist with over 45 years of experience diagnosing herbicide injury in sensitive vegetation.   2/6/2020  Trial  Tr.  1248:6-11,  1260:13-21 (Baldwin).  He used the information, knowledge, skill, and training he has and diagnosed the injury to Bader Farms' orchards.  Over the pendency of this litigation, Dr. Baldwin conducted five inspections – two in 2017, two in 2018, and one in 2019.  *Id.* at 1303:12-16, 1305:17-18, 1324:5-9, 1333:20-22.  Dr. Baldwin testified that, during the course of those inspections, his early 2017 opinion that dicamba sprayed over Xtend crops was causing the damage to Plaintiff's orchards was confirmed.  For example, Dr. Baldwin testified that in the summer of 2017, he observed clear dicamba damage on non-DT

soybeans around and including at Bader Farms.  *Id.* at 1306:7-21.  That is consistent with Dr. Bradley's data representing the number of acres damaged and the 335 complaints in Missouri the summer of 2017, 24 of them in Dunklin County.  *Id.* at 1314:5-17; Pltf-2019 Exh.

Dr. Baldwin testified that in all years, he observed dicamba symptomology on other indicator plants – kudzu, sycamore, catalpa, and other trees.  *Id.* at 1322:4-1323:17, 1335:25-1336:12, 1341:7-2.  Dr. Baldwin was resolute that he observed dicamba symptomology on Plaintiff's peach trees.  *See e.g., id.* at 1321:22-1323:4, 1330:1-6, 1325:12-1326:6, 1334:20-25, 1343:12-25, 1378:16-17; 2/7/20 Trial Tr. 1443:14-21, 1465:11-16, 1474:2-6, 1478:5-7, 1508:21-25 (Baldwin); Pltf-2174, 2119 (video) Exhs.  He further testified that the symptomology he observed was more severe in 2018 than in 2017.  2/6/2020 Trial Tr. 1328:25-1329:17 (Baldwin).  Dr. Baldwin compared his observations and photos of Bader Farms' peach trees with those of other scientists who conducted studies on the effects of dicamba on peach trees.  *Id.* at 1330:7-23.  Again, the multi-year inspections of Plaintiff's farm confirmed Dr. Baldwin's initial impression of the cause of the symptomology and damage at Bader Farms.  2/7/20 Trial Tr. 1508:3-25 (Baldwin).  Far from reaching a conclusion and finding facts to support that conclusion, Dr. Baldwin's findings are the result of decades of knowledge, skill, training, and experience as a scientist, five inspections of Bader Farms, and four years observing the effects of dicamba in Southeast Missouri.

Fourth, Dr. Baldwin's conclusions about the damage to Bader Farms are not diminished by the many, unsupported alternate cause theories Defendants lobbed at trial

and again in their post-trial briefs.  There was no evidence at trial that herbicide spraying in corn, wheat, burndown, rights-of-way, or anything else caused the damage to Bader Farms.  Likewise, there is no evidence in this case to support a finding that other herbicides from neighboring farms or the spraying of any herbicide other than dicamba caused Plaintiff's harm.  2/7/2020 Trial Tr. 1476:17-10 (Baldwin).  Dr. Baldwin testified that the symptomology is evident on Bader Farms' peach trees, as well as surrounding indicator plants and those observations helped him reach his opinion.  *Id.* at 1466:10-1467:5.

It is disingenuous for BASF to raise these "alternate causes," given there is no evidence that they exist.  There is no evidence that corn and wheat farmers suddenly and inexplicably changed their farming practices, yet Defendants pretend applications in corn and other uses caused Plaintiff's damage.  One thing changed as Dr. Baldwin said, and that's the introduction of Xtend crops.  It is undisputed that the scope and scale of dicamba's use grew exponentially after the release of the Xtend technology, particularly in Southeast Missouri.  *See also* 2/6/2020 Trial Tr. 1283:23-1286:2 (Baldwin) (testifying that the Xtend system vastly increased the acres sprayed with dicamba, permits much higher use rates, altered dicamba's use from the cool months, as it had been with cereal crops, to hot, summer months.).  Dr. Baldwin explained that the use rate of dicamba in the past was extremely low in Southeast Missouri because of its agricultural makeup.  It's a region that doesn't have much pasture, historically grows little corn, but grows a lot of soybean and cotton (the dominant crops in Dunklin County), two crops that are very sensitive to dicamba.  *Id.* at 1267:5-22, 1296:8-13; 2/7/2020 Trial Tr. 1478:20-22 (Baldwin).

What's more, dicamba had never been used in the Bootheel as a standalone (or foundation) herbicide. 2/6/2020 Trial Tr. 1284:20-1285:3 (Baldwin).  That did not happen until the release of the Xtend technology.  The record is nearly devoid of any evidence of off-label applications of herbicides other than dicamba which was sprayed off-label in 2015 and 2016.  The only evidence at trial of a burndown application was regarding a 2015 aerial burndown application.  2/5/2020 Trial Tr. 978:11-980:1 (Bader).  Mr. Bader testified that this burndown application had no lasting effect on the peach trees and by the first of June, the trees looked good again.  *Id.*  Also, it is undisputed that burndown happens in early spring.  2/5/2020 Trial Tr. 1175:13-14 (Bader).  Dunklin County farmers, including Bill Bader, have been spraying burndown since the early 1980s.  *Id.* at 1175:25-1176:3.  In all that time, Bader Farms had practically no problems with herbicide injury of any sort.  *Id.* at 1175:8-1176:18.  With the only two incidents that occurred – a 2,4-D injury in 2008 and the 2015 incident – the symptoms presented on the trees within a day or two of exposure. *Id.* at 1175:15-20.  These are facts that factored into Dr. Baldwin's opinion.

Dr. Baldwin admitted corn is planted around Bader Farms, but testified that he does not believe alleged dicamba applications in corn (of which there was zero evidence of at trial) are the source of damage to Plaintiff's orchards.  2/7/2020 Trial Tr. 1507:2-1508:2 (Baldwin).  Dr. Baldwin testified that use of dicamba in cereal crops can occur "at certain times," but not typically in the summer months and not coinciding when farmers spray dicamba over the top Xtend crops.  2/6/2020 Trial Tr. 1409:9-1410:15 (Baldwin).  Despite defense counsel attempting to illicit testimony from Dr. Baldwin that late applications in other crops *could have* impacted Bader Farms, it is clear from Dr. Baldwin's testimony that

this was highly unlikely.  Dr. Baldwin is under no obligation to chase to ground every imaginary potential alternate cause that Defendants' lawyers might concoct.  Dr. Baldwin employed his education, training, observation, and common sense to rule out all plausible alternative causes.

The important factor is not that dicamba can be used, but when it is actually used. There is absolutely no dispute that Southeast Missouri summertime weather (high heat and humidity) create the perfect environment for an already volatile herbicide to become even more so.   1/28/2020 Trial Tr. 381:2-25 (Carey); 2/6/2020 Trial Tr. 1268:24-1269:25 (Baldwin).  Were there any doubt in his mind about his conclusions, he said 2019 "put it all together" for him.  2/7/2020 Trial Tr. 1474:2-1475:8 (Baldwin).

The cases BASF cites are completely irrelevant to the law and the facts of this case. Dr. Baldwin conducted a very thorough investigation and established the causal link between the rampant spraying of dicamba over the top of Xtend crops from 2015 forward and Plaintiff's injuries.   He explained his methodology at trial and, despite defense counsel's cross examination, was unscathed.  2/6/2020 Trial Tr. 1384:1-1385:1, 1366:8-22 (Baldwin); 2/7/2020 Trial Tr. 1465:3-16, 1466:6-1467:17, 1499:6-1504:12 (Baldwin).

Finally, it is undisputed that peach trees are sensitive to dicamba.  2/6/20 Trial Tr. 1427:14-1428:10 (Baldwin).   There is no safe level of dicamba for sensitive plants. 2/7/2020 Trial Tr. 1496:10-1497:13 (Baldwin).  With respect to yield, Dr. Baldwin's role was never to quantify the effect dicamba had on Bader Farms' yield.  Rather, his role was to establish whether the repeated exposure to dicamba could and did have a negative effect on the yield.  He concluded it can't help but have a cumulative effect.  *Id.* at 1497:11-17.

To support his conclusions that the repeated exposure of dicamba negatively impacted Plaintiff's yields, Dr. Baldwin considered the only existing dicamba on peach studies known to exist (Dr. Bradley's and Dr. Prostko's), and his scientific knowledge of dose response.   *See e.g.*, 2/6/2020 Trial Tr. 1353:25-1355:3, 1355:25-1356:12 (Baldwin); 2/7/2020 Trial Tr. 1466:6-1467:17, 1470:2-4, 1488:25-1489:24 (Baldwin).   His conclusions are supported by current research on soybean, a bioindicator plant, about the cumulative effect of low doses of dicamba in sensitive plants over time.  *Id.* at 1467:11-17. That Dr. Baldwin, or any thinking person, considers this common sense does not mean that his conclusions aren't valid.

### c.   Dr. Baldwin Properly Ruled Out and Ruled In Causes.

Dr. Baldwin employed accepted scientific methods of an expert in his field to rule out and rule in the cause of the damage he observed.  As he testified on cross:

> I ruled out certain things.  I mean I went there looking for herbicide symptomology first.  I didn't start somewhere at the bottom and work up.  I went there as a weed scientist to render opinion on whether I felt like herbicides were affecting – in this particular case, dicamba was affecting his peaches.  And the symptomology was very evident.  And if I had not seen symptomology, I'd have been done.  But the symptomology was very evident every time I went there, and especially in the summertime visits, and I did enough to make sure I wasn't missing anything.   But the herbicide symptomology itself was overwhelming.

*Id.* at 1465:6-16.

On re-direct, Dr. Baldwin covered the waterfront, testifying about many specific alternate causes he ruled out and why.  *Id.* at 1499:6-1504:12; *see also* 2/6/2020 Trial Tr. 1366:8-1367:13 (Baldwin).  BASF reciting hypothetical, potential alternate causes at this stage is improper.  If BASF wished to place these matters properly into evidence before

the jury it had every opportunity to do so.  BASF chose not to offer testimony from its experts regarding many supposed potential causes.  Asking the Court for "a do-over" at this stage is not appropriate and not a basis for a new trial.

Moreover, contrary to BASF's interpretation of the law, Dr. Baldwin is not required to "rule out" *every* possible (or impossible) alternative cause Defendants conjure up as a potential blame for Bader Farms' damage.  The Eighth Circuit rejects this argument.  "We have consistently ruled that experts are not required to rule out all possible causes" when offering a differential causation opinion. *Johnson*, 754 F.3d at 557, 563–64 (8th Cir. 2014); *see also Lauzon v. Seneco Prods.*, 270 F.3d 681, 693 (8th Cir. 2001) (An "'expert's causation conclusion should not be excluded because he or she has failed to rule out *every* possible alternative cause.'") (internal citations omitted); *Dejana*,  2013 WL 6768407, at *13, "an expert's testimony is not precluded by the failure to rule out all other possible theories of the event; the possibility of other explanations goes to weight, not admissibility, of testimony.")  These cases are instructive, as here, BASF makes the same arguments that the Eighth Circuit has rejected.

BASF's argument that Dr. Baldwin is required to have experience with Armillaria root rot also fails.  Experts are not required to have expertise in every alternative cause a defendant might blame.  *See, e.g., Gilliland v. Novartis Pharm. Corp.*, 34 F. Supp. 3d 960, 968 (S.D. Iowa 2014) (refusing to require plaintiff's expert to have expertise in osteomyelitis, defendant's alleged alternate cause of plaintiff's osteonecrosis of the jaw ("ONJ"), because the expert's opinion was based upon his knowledge and experience with ONJ).

16

Dr. Baldwin is not and never claimed to be a "peach expert." His expertise is in the effect of herbicides on sensitive plants. He was the only expert in the case who demonstrated a working knowledge of that. There was no evidence in the case that general plant stress, improper tree spacing, orchard replant disease syndrome, or other herbicides could have contributed to the decline of Bader Farms' orchards whatsoever. As for drought, Dr. Baldwin testified that 2019 was the wettest spring on record, as the jury filled with Southeast Missourians were well aware. 2/7/2020 1474:24-1475:8 (Baldwin). This laundry list provided by BASF were not potential causes raised by any one of Defendants' three causation expert witnesses. Defense counsel raising these "causes" in a post-trial brief is not a proper basis for a new trial.

Dr. Baldwin's opinions are based upon an abundance of factual and scientific information, rendering them both reliable and helpful to the jury. As the Eighth Circuit explained in *Johnson*, "a differential expert opinion can be reliable even with less than full information." 754 F.3d at 564 (8th Cir. 2014) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 759 (3d Cir.1994)). The Court held:

> So even if the district court believed there were better grounds for some alternative conclusion (perhaps that the microwave killed any C. sak), or there were some flaws in the experts' methods (for not having tested the household environment or that water testing was incomplete), because the expert testimony in this case was within "the range where experts might reasonably differ," the jury, not the trial court, should be the one to "decide among the conflicting views of different experts."

754 F.3d at 564 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999)).

The record demonstrates that Dr. Baldwin properly ruled in and ruled out a long list of alternate causes.  BASF is not entitled to a new trial.

### 2.     Dr. Baldwin is Qualified to Render All the Opinions He Rendered.

As discussed in the preceding section, Dr. Baldwin need not be a plant pathologist or an expert in Armillaria root rot in order to render his opinion that dicamba sprayed over the top of Xtend crops is causing cumulative damage to Plaintiff's orchards.  In fact, the testimony of the two pathologists who testified for Defendants at trial undermines BASF's argument that Dr. Baldwin should not have been permitted to testify in this trial.  Both Defendants' plant pathologist expert witnesses denied dicamba was affecting Bader Farms.  Dr. Schnabel vigorously opined that dicamba was having no effect on the trees.  2/12/2020 Trial Tr.  2148:21-23, 2182:13-15, 2189:2-5, 2212:1-3, 2213:7, 2214:10-11, 2215:9 (Schnabel).  Dr. Schnabel went even further, testifying that he knows what "chemical" injury on peach trees looks like and the injury was absent on Plaintiff's trees.  *Id. at* 2213:17-19.  Thus, if BASF's pathologist can testify that Bader Farms trees are not being damaged by dicamba then certainly Dr. Baldwin can testify that they are, and that the dicamba injury is weakening the trees, making them more susceptible to disease, pathogens, adverse weather, and other assaults that a healthy tree would resist.  2/6/2020 Trial  Tr.  1296:21-1297:13, 1359:16-24 (Baldwin); 2/7/2020 Trial  Tr.  1470:2-16 (Baldwin).  This continual exposure resulted in a reduction in tree viability and yield.  *Id.*; 2/7/2020 Trial Tr. 1466:10-1467:17, 1488:25-1489:24, 1496:10-1497:13 (Baldwin).

The scientific literature shows that Armillaria is almost always a secondary pathogen.  2/6/2020 Trial Tr. 1359:6-15 (Baldwin); 2/7/2020 Trial Tr. 1454:24-1455:12,

1456:18-21, 1457:12-1458:9 (Baldwin).  Armillaria has existed in the soil of Southeast Missouri for centuries, a fact that BASF's own expert doesn't dispute.  2/6/2020 Trial Tr. 1360:15-21; 2/12/2020 Trial Tr. 2220:5-8 (Schnabel).  There's nothing new about this pathogen.  BASF's objection seems to be that Dr. Baldwin is capable of reading scientific literature and applying it to the facts of this case.  The Court should give no credence to BASF's objection to Dr. Baldwin's testimony that Armillaria is a secondary pathogen.  First, three scientific articles support his conclusion.  2/7/2020 Trial Tr. 1455:6-12, 1456:18-21 (Baldwin).  Second, the article Dr. Baldwin relied on that BASF finds most objectionable, the one authored by Paul Steiner  that BASF now refers to as a "non-peer-reviewed paper from a conference in 1976," (Doc. 582, p. 14) was cited to and relied on by both Dr. Brannen and Dr. Schnabel.  Expert Report of Dr. Brannen and Dr. Schnabel, Exhs. 4 and 5, attached.

The issue is one of credibility.  When asked whether Dr. Baldwin is qualified to render an opinion about the cause of Bader Farms' damage, Dr. Brannen testified, "I agree he has the background as far as his weed science credentials.  He has very excellent weed science credentials, so he can make conclusions.  I just disagree with his conclusions…" 2/10/2020 Trial Tr. 1907:1-7 (Brannen).  The jury, in turn, chose to disagree with Defendants, and the jury is the sole judge of credibility at a trial.  The jury listened attentively to the opinions of all four causation experts in this case and concluded Dr. Baldwin's opinion was the only one that made sense.  Their decision should not be disturbed.

### 3.     Dr. Baldwin is imminently qualified to testify about volatility, atmospheric loading, and long-range transport of dicamba.

As noted above, weed scientists routinely research and analyze volatility and long-range transport of herbicides.   BASF's characterization of these topics as purely "meteorological" is false.   As the Court has already ruled, such matters are firmly within Dr. Baldwin's training and experience.   Doc. 275.   They are integral to the field of weed science. In fact, two of the sources Dr. Baldwin cites in the reliance materials of his Second Supplemental and Rebuttal Report are articles published in peer-reviewed climate journals in 2019 and both are authored by Dr. Kevin Bradley.   Supplemental Rebuttal Expert Report of Dr. Baldwin, 12/27/19, Exh. 6, attached (citing *Dicamba Applications to Air after Application to Soybean under Stable and Nonstable Air Conditions*, Journal of Environmental Quality, and *Inversion Climatology in High-Production Agricultural Regions of Missouri and Implications for Pesticide Applications*, Journal of Applied Meteorology and Climatology).   These are subjects that weed scientists study and deal with in the field every day.   Dr. Baldwin demonstrated the range of his knowledge and experience on these subjects at trial.

In spite of Defendants' protests, the undisputed record in this case is that atmospheric loading, exactly as Dr. Baldwin described, occurs and damaged Bader Farms in the manner described by Dr. Baldwin.   With regard to the movement of dicamba, its volatility characteristic, landscape damage, and atmospheric loading, Dr. Baldwin testified as follows:

- In the summer of 2017, the Bootheel experienced unprecedented landscape damage caused by in crop use of dicamba, 2/6/2020 Trial Tr. 1315:3-1316:4 (Baldwin);

- Dr. Baldwin defined and explained the phenomenon of atmospheric loading, *id.* at 1316:17-1317:10; 1401:5-8;

- Dr. Baldwin offered specific examples of atmospheric loading that have occurred in the past, *id.* at 1317:11-1318:7;

- Dr. Baldwin testified, "treating huge acreages at the same time in the same area is one of the things that" causes atmospheric loading, *id.* at 1318:22-25;

- Dr. Baldwin testified during his summer of 2017 inspection of Bader Farms, he observed landscape damage, *id.* at 1321:22-1323:4;

- Dr. Baldwin testified that landscape damage is a hallmark of over the top movement of herbicides, *id.* at 1323:15-17;

- Dr. Baldwin testified that, of all the years he inspected Bader Farms, he observed the worst damage in 2018, *id.* at 1329:4-8;

- Dr. Baldwin also testified about temperature inversions and the work that other weed scientists, such as Dr. Norsworthy and Dr. Bradley, have done related to the effect of temperature inversions in the Bootheel and Northeast Arkansas, *id.* at 1345:23-1347:23;

- Although in closing argument, Monsanto's lawyer referred to Plaintiff's "theory" of temperature inversions, Dr. Baldwin offered testimony about the

XtendiMax label and its instruction regarding temperature inversions, *id.* at 1348:2-12, 1348:25-1350:23;

- Dr. Baldwin opined that it is impossible to tell where volatiles moving in a temperature inversion originated, *id.* at 1350:17-23;

- Dr. Baldwin testified that in the Bootheel and Northeast Arkansas, because farms are so large and Palmer amaranth grows so quickly, it is impossible to follow the label while spraying thousands of acres, *id.* at 1352:10-24;

- Dr. Baldwin vehemently disagreed with Defendants' claims that academics' volatility studies support Defendants' contention that the new, alleged low volatility dicamba herbicides are not causing volatility problems, *id.* at 1369:9-1376:1;

- XtendiMax and Engenia are prone to volatilize, *id.* at 1471:18-21;

- Dr. Baldwin testified that tests show dicamba can volatilize 72-96 hours after application, *id.* at 1345:11-18;

- Dr. Baldwin testified that the landscape damage at Bader Farms is a combination of volatility and physical drift, but it is mostly volatility, *id.* at 1413:23-1414:3, 1416:18-25;

- In Dr. Baldwin's experience, landscape damage is always associated with temperature inversions and that's what's happening at Bader Farms, *id.* at 1420:11-20;

- It was obvious to Dr. Baldwin that "this wasn't a point source issue; it was an air mass loading issue," 2/7/20 Trial Tr. 1504:18-24 (Baldwin);

- Volatility can and does present as drift patterns, as he saw at Bader Farms during his February 2017 inspection, *id.* at 1509:3-14.

Echoing Dr. Baldwin's position regarding temperature inversions, Dr. Carey testified that temperature inversions "absolutely increase the risk of off-target movement," causing the herbicide to move "great distances."  1/28/2020 Trial Tr. 381:15-25 (Carey). Also supporting Dr. Baldwin's testimony regarding atmospheric loading is BASF's field representative, who referenced the "huge cloud of dicamba" blanketing the Bootheel at a time when far less Xtend seed was planted in Southeast Missouri than in later years.  Pltf-1371 Exh.  Plaintiff's "theory" as BASF calls it, is a reality.   Dr. Baldwin was well within the range of his knowledge, skill, and expertise testifying on these matters.

### B.     The Court's Order To Exclude BASF's Three Undisclosed Witnesses Was Correct.

"The rules governing litigation in federal courts ensure fair and orderly proceedings free from prejudicial surprises." *Vanderberg v. Petco Animal Supplies Stores, Inc.*, 906 F.3d 698, 699 (8th Cir. 2018).  Fed. R. Civ. P. 26(a)(2) establishes the rules pertaining to expert witnesses.   According to the rules, the "failure to make a timely disclosure is equivalent to failure to disclose." *Mayhall v. Berman & Rabin, P.A.*, Case No. 4:13CV00175 AGF, 2013 WL 4496279, *2 (E.D. Mo., Aug. 21, 2013).  "[A]n incomplete or evasive disclosure also is treated as a failure to disclose." *Id.*  The rules of disclosure are formal and not discretionary.   The very purpose of Rule 26(a)(2), which governs disclosure of expert witnesses, is:

> to give each side clear notice of who will be giving opinion testimony in the respective case-in-chief so that each side can prepare to respond, including

23

> taking depositions.  A vague cross-reference . . . does not provide that notice.
> This is especially so because counsel often insert vague, ambiguous and
> flexible caveats, reserving the supposed right to call generalized categories
> of witnesses.  These insertions have little or no practical effect.

*Castillo v. City and County of San Francisco*, 2006 WL 618589, *2 (N.D. Cal. Mar.

9, 2006).

The *Castillo* court went on to say, "Clearcut notice is required."  *Id.*  That did not

happen in this case.  Here, BASF claims its disclosure in the dicamba multidistrict litigation

("MDL"), where 18 expert witnesses were disclosed for class certification purposes, was

effective disclosure in *Bader* because BASF included "reservation of rights" language in

its *Bader* disclosure – reserving the right to call any or all MDL witnesses to the extent that

witnesses' testimony was relevant in *Bader*.   BASF's generalized identification of a

panoply of witnesses from the MDL does not satisfy the clear dictates of Rule 26(a)(2).

Despite its assertions, BASF failed to disclose Drs. Gallus, Hewitt, and Jackson as  is

required.  It wasn't until BASF served its Witness List (Doc. 328) on January 7, 2020,

identifying these three experts as "May Call" witnesses, that Plaintiff had any notion that

BASF purported to call these witnesses in the instant action.  Plaintiff raised the issue with

the Court, including Plaintiff's objection to BASF's untimely and prejudicial attempt to

identify these witnesses as experts for trial, in the first, off-the-record, pretrial conference

on January 9, 2020.  The next day, Plaintiff filed Plaintiffs' Motion to Strike Undisclosed

BASF Expert Witnesses (motion to strike), stating that they were not disclosed as Rule

26(a)(2) requires and Plaintiff had not received an expert witness report for any of the three witnesses. [5]  Doc. 332.

On January 23, 2020, after full briefing of the issue, the Court granted Plaintiff's motion to strike Drs. Hewitt, Gallus and Jackson.  The Court stated:

> I've read this very, very closely.  It's clear to the Court that [these witnesses] were endorsed as class certification experts.  They were not endorsed as experts in this specific case except by way of a general endorsement of all experts for all purposes.  And it's the Court's impression that that's too prejudicial to the Plaintiffs.  It really . . . amounts to sandbagging I think.

1/23/2020 Trial Tr. 32:24-33:10 (Court).

The Court reached the right conclusion.  BASF's attempt to include these witnesses as experts in this case was an unfair surprise and prejudicial to Plaintiff, as the Court correctly determined.  By the time BASF informed Plaintiff that it "May Call" these witnesses, the trial date was less than three weeks away.  Had BASF's intention been anything other than sandbagging, it would have made a timely disclosure of these witnesses as Fed. R. Civ. P. 26(a)(2) requires and as it did with its other expert witnesses, including Dan Westberg, who BASF properly designated in both the *Bader* case and the MDL. Rather than properly disclose these three expert witnesses in *Bader*, by identifying them in BASF's Expert Witness Disclosure for *Bader* and providing expert reports, BASF disclosed the witnesses "as class certification" expert witnesses in the MDL only.  BASF argued that the following language put Plaintiff on notice of its intention to call Hewitt, Gallus, and Jackson as expert witnesses:  "BASF reserves the right to rely on the opinions

---

[5] Plaintiff incorporates the arguments it made in its motion to strike (Doc. 332) herein by reference.

of experts disclosed by Defendant Monsanto Company, in addition to the opinions of experts previously disclosed by Defendants in MDL Docket No. 2820, to the extent those opinions are relevant to Bader Farms' and/or Bill Bader's claims and/or BASF's defenses in this matter." This is precisely the catchall, evasive non-disclosures that the *Mayhall* and *Castillo* courts held violated the rules of procedure.

### 1.    The Court Did Not Abuse Its Discretion And Did Not "Punish" BASF.

The disclosure mandates of Fed. R. Civ. P. 26 "are given teeth by the threat of sanctions in Rule 37." *Vanderberg*, 906 F.3d at 702. Fed. R. Civ. Pro. 37(c)(1) "provides that when a party fails to comply with the disclosure requirements of Rule 26(a), "'the party is not allowed to use that information or witness to supply evidence on motion, at a hearing, or at a trial, unless the failure was substantially justified or harmless.'" *Id.*, quoting Fed. R. Civ. P. 37(c)(1). The Eighth Circuit has said, "Unlike under Rule 37(b), where a district court has broad discretion to fashion its own remedy for a party's violation of a discovery order . . . Rule 37(c)(1) "makes exclusion of the evidence the default, self-executing sanction for failure to comply with Rule 26(a)." *Id.* at 705; *see also Musser v. Gentiva Health Svcs.*, 356 F.3d 751, 758 (7th Cir. 2004). The Court did not abuse its discretion by striking Drs. Gallus, Hewitt, and Jackson. The Court acted in accordance with the rules of procedure and ordered a remedy that was appropriate under the circumstances of the case.

BASF identifies the four factors courts may consider to determine whether an exclusion is harmless or substantially justified, but the Eighth Circuit in *Vanderberg* makes

clear that exclusion is the default.  Rule 37(c)(1) merely "permits, but does not require," an alternative sanction.  *Vanderberg*, 906 F.3d at 705.  The Eighth Circuit's reasoning in that case illustrates why the Court did not abuse its discretion by excluding BASF's three undisclosed expert witnesses.

In *Vanderberg*, the plaintiff in a personal injury case against Petco failed to timely disclose any retained or treating expert witnesses.  In response to written discovery, he produced over 500 pages of medical records, the names of treating physicians, including a Dr. Petsche and Dr. Verma, treatments provided, the names of treaters from one medical facility, and stated:  "See medical records for specific treatments and examinations."  *Id.* at 700.  Dr. Petsche's reports included operative reports, but he did not submit an expert witness report or summary of facts and opinions.  *Id.* at 700-701.  A month after the close of discovery, which was two months before trial, Petco filed a motion for summary judgment.  *Id.* at 701.  In response to the motion, the plaintiff relied on statements in Dr. Petsche's and Dr. Verma's operative notes.  *Id.*  Petco asked the district court to exclude the doctors because they were nondisclosed experts.  *Id.*  The court granted Petco's request and in turn, granted its motion for summary judgment on the basis that causation of the plaintiff's injuries was an essential element of his claims and such evidence was required in order to maintain his claims.  *Id.* at 701-702.

On appeal, the plaintiff argued the trial court abused its discretion.  The Eighth Circuit disagreed.  The court noted that despite the "production of hundreds of pages of medical records, which included operative notes" from the two doctors whose testimony the plaintiff sought, the requirements of the rule were not satisfied.  *Id.* at 703.  Rule 26

requires notice of the information that a party intends to present at trial and the court reasoned the plaintiff did not provide that.

Next the court considered whether the failure to disclose Dr. Petsche as an expert witness was "substantially justified" or "harmless." The Eighth Circuit noted that the trial court found it neither substantially justified or harmless; the Eighth Circuit agreed. *Id.* at 704. The court said, while the record did not reflect bad faith on the plaintiff's part, there was also "no apparent justification." *Id.* Quoting the trial court, the Eighth Circuit noted, the plaintiff failed to provide a timely (or untimely) Rule 26 disclosure for Dr. Petsche. *Id.*

The court also agreed with the trial court that Petco was "significantly prejudiced", as its summary judgment motion had already been filed, it had not deposed the two treaters the plaintiff wanted to use as experts, trial was two months away, and allowing the treaters to be experts would have resulted in a continuance of the trial date. *Id.* The Eighth Circuit's reasoning is applicable here. The court stated:

> We also reject any suggestion that Vanderberg's failure to adhere to Rule 26(a)(2) was harmless because **Petco should have figured out** that he would rely on his treating physicians to provide expert testimony on causation. The expert witness disclosure requirements would be rendered meaningless if a party could ignore them and then claim that the nondisclosure was harmless because the other party should have read between the lines. Moreover, parties such as Petco are entitled to presume that opposing parties will comply with the Rules of Civil Procedure and that experts will be properly disclosed in accordance with the rules. **'Litigants should not have to guess who will offer expert testimony; they need knowledge to conduct their own discovery** and proffer responsive experts. That's why failure to comply with Rule 26(a)(2)(A) leads to the exclusion of expert testimony by a witness not identified as an expert.

*Id.*, quoting *Cripe v. Henkel Corp.*, 858 F.3d 1110, 1112 (7th Cir. 2017) (emphasis supplied). The court also rejected the plaintiff's argument that, because the exclusion of

his witnesses dictated a dismissal of the case, the trial court should have imposed a lesser sanction.  The court acknowledged that when exclusion is "tantamount to dismissal" the trial court may need to consider lesser sanctions, the court was unpersuaded that the trial court abused its discretion.  *Id.* at 704-705.  The court found that the district court reasonably concluded that exclusion of the testimony was the only appropriate remedy because Petco would have been seriously prejudiced by allowing it.  *Id.* at 705.

The facts of *Vanderberg* and this case are strikingly similar and this Court's decision to exclude BASF's undisclosed expert witnesses was correct, as the Eighth Circuit makes clear.  BASF's failure to properly disclose three expert witnesses was not justified as the Court has already ruled.  Plaintiff will not rehash the arguments it made in its motion to strike, but suffice it to say, that BASF's feeble excuse is without merit.  BASF's designation of Dr. Dan Westberg in *Bader* and the MDL belies that excuse.

It is also no excuse to fail to disclose these experts in *Bader* simply because Ms. Randles is a member of the MDL's Executive Committee.  *Bader* was its own case, with its own Case Management Order, on its own separate track, and with issues that were specific to *Bader*.  Providing the reports in the MDL but not *Bader*, with a sweeping "reservation of rights" to call any of the 18 witnesses Defendants designated in the MDL, is much more egregious than the plaintiff in *Vanderberg* producing over 500 pages of medical documents with a message to "See medical records for specific treatments and examinations."  That's not a proper disclosure.  To quote the Eighth Circuit, that's a message to "figure it out."  *Bader* counsel was entitled to and should have been permitted to conduct its own discovery with respect to these experts.  *Vanderberg*, 906 F.3d at 704.

BASF's non-disclosure prevented that.  Furthermore, the purpose of the disclosure is to give the opposing side notice of who may be called to trial.  The *Castillo* court addressed and rejected this type of "reserving a so-called 'right' in boilerplate fashion to call any expert designated by the other side."  *Castillo*, 2006 WL 618589 at *1-2.  It fails to give adequate notice, was not justified, it was a surprise, and prejudiced Plaintiff.[6]

Allowing these witnesses to testify would have seriously prejudiced Plaintiff.  Had the Court allowed BASF to proceed with these witnesses, Plaintiff, on the eve of trial, would have been scrambling to prepare for the testimony of experts Plaintiff had no idea would testify.  The alternative would have been a continuance, which Plaintiff made clear to the Court at every turn it did not want.  This case was filed in November 2016, and transferred to this Court in December 2016.  Plaintiff had waited over three years for a fair day in Court and no last-minute  "sandbagging" should have been allowed to disrupt the efficient pursuit of justice.  The Eighth Circuit's decision in *Vanderberg* supports this conclusion.

## 2.    The Exclusion Of These Witnesses Did Not Prejudice BASF.

There was no prejudice to BASF by the exclusion of these witnesses.  First, BASF's own company document, drafted by a BASF employee, confirmed Dr. Baldwin's atmospheric loading opinion.  Pltf-1371 Exh., stating, "There must be a huge cloud of

---

[6] BASF's argument that Plaintiff was not surprised also fails because, not only did BASF properly designate one of its expert in in the MDL and *Bader*, but Monsanto did as well.  Monsanto designated Dr. James Griffin and Tony Schroeder as expert witnesses in the MDL and in *Bader* and unlike BASF, provided timely expert witness reports for both that were *Bader*-specific, which allowed *Bader* counsel to participate in and depose those witnesses.

dicamba blanketing the Missouri bootheel."  If that isn't an admission that atmospheric loading and volatility are real, nothing is.  Second, if this information was so important to Defendants at trial and so crucial to their defense, these joint venturers and co-Defendants, who have a written joint defense agreement, had a properly designated expert at their disposal – Monsanto's expert, Tony Schroeder.  In fact, after the Court granted Plaintiff's motion to strike BASF's untimely experts, the Court inquired whether Defendants had other expert witnesses who could testify about the volatility, atmospheric loading, and off-site movement topics that BASF was insisting that the three BASF experts would testify about, and counsel for Monsanto informed the Court that they did.  1/23/2020 Trial Tr. 36:1-15.  So, contrary to BASF's assertions that it was prejudiced, it was not because Defendants could have easily called Tony Schroeder at trial to rebut Dr. Baldwin's testimony and they did not.  They made the decision not to do so and cannot claim the result of their own decision is tantamount to prejudice.

BASF's contention that allowing these witnesses to testify would not have disrupted the order and efficiency of trial is misplaced and beside the point.  The immense prejudice to Plaintiff that would have occurred with the inclusion of three new expert witnesses is the disruption.  As the Eighth Circuit said, "[T]he burdens on parties who are not adequately apprised of an opposing party's experts' identity and expected testimony are also real and costly."  *Vanderberg*, 906 F.3d at 706.  The burden on Plaintiff by allowing BASF to proceed would have been unfairly prejudicial and not in accordance with case law or the rules of procedure.  The Court's decision to exclude Drs. Gallus, Hewitt, and Jackson was the only fair and reasonable result.  *See Musser*, 356 F.3d at 758.

## II.    THERE WAS NO ERROR IN ADMITTING REPORTS OF DICAMBA DAMAGE.

"A district court's rulings on admissibility of evidence are entitled to great deference, and we will reverse only if the district court has committed a clear abuse of discretion." *Trickey*, 705 F.3d at 806. (citing *Safety Nat'l Cas. Corp. v. Austin Resolutions, Inc.*, 639 F.3d 498, 503) (8th Cir. 2011). A jury's verdict must not be disturbed "absent a showing that the evidence was so prejudicial as to require a new trial which would be likely to produce a different result." *Id.* (quotation and citation omitted).

### A.    Other Claims Evidence Was Not Inadmissible Hearsay.

BASF argues that certain of Plaintiff's evidence was impermissible hearsay. First, much of the evidence BASF claims to be hearsay was not because it was offered for notice, not for the truth of the matter asserted. Second, whether evidence is hearsay and if so, whether it falls within an exception is within the sound discretion of the trial court.

But BASF's primary complaint is the admission of Pltf-2019 Exh., facts and data compiled by Dr. Kevin Bradley. After extensive briefing and argument, the Court ruled that under Fed. R. Evid. 703, Plaintiff could use the documents. Doc. 512. It was clear to the Court, and Plaintiff, that Exhibit 2019 is not inadmissible hearsay because it is both a "market quotations, lists, directories, or other compilations that are generally relied on by the public or by persons in particular occupations" (Fed. R. Evid. 803(17))[7] and a statement

---

[7] *See, e.g., United States v. Woods*, 321 F.3d 361 (3rd Cir. 2003) ("As with other hearsay exceptions, the admissibility of market reports and commercial publications under Rule 803(17) is predicated on the two factors of necessity and reliability. Necessity lies in the fact that if this evidence is to be obtained, it must come from the compilation, since the task of finding every person who had a hand in making the report would be impossible. Reliability is assured because the compilers know

in a learned treatise (Fed. R. Evid. 803(18)).  Pltf-2019 Exh. was also admissible pursuant to Fed. R. Evid. 807 for the reasons discussed below.

BASF objects to two additional exhibits, Pltf-605 Exh. (1/29/20 Trial Tr. 462:8-14 (Carey)) and Pltf-199 Exh. (1/29/20 Trial Tr. 565:25-566:3 (Carey)).  However, both exhibits were admitted solely for notice and not for the truth of the matter asserted.  All the above-mentioned exhibits were used to show that Defendants knew damage complaints were being made—and took little to no action.  Thus, even if such evidence was hearsay, it was all properly admissible for notice.  *Estate of Thompson v. Kawasaki Heavy Indus.*, 291 F.R.D. 297, 308 (N.D. Iowa 2013) (complaints are "not necessarily offered for their truth, but may be offered to prove the defendant's notice of defects, the defendant's ability to correct known defects, the magnitude of the danger, the product's lack of safety for intended uses or causation.").

BASF's argument that this evidence fails to qualify as notice because they do not involve "substantially similar" circumstances is absurd.  The Court, both at the pretrial conference and during trial, indicated that it found the off-target movement complaints made by soybean farmers that are reflected in the facts and data compiled by Dr. Bradley to be substantially similar to the off-target movement complaints made by Plaintiff.

The propensity of dicamba to move off-target has nothing to do with whether the neighboring land is planted in soybeans or peach trees.  The fact that thousands of off-target movement complaints have been reported by soybean farmers is relevant to whether

---

that their work will be consulted; if it is inaccurate, the public or the trade will cease consulting their product.") (quoting 5 Weinstein's Federal Evidence § 803.19[1] (Matthew Bender 2002).

dicamba (including XtendiMax and Engenia) can and did move off-target onto Plaintiff's peach trees.   These are at least substantially similar, if not identical, issues.  The other supposedly different "circumstances" BASF alludes to – the extent, nature, degree, and causes of alleged symptomology, the dicamba herbicide applied, and related issues are certainly similar if not identical to issues presented in this case.  The facts and data compiled by Dr. Bradley are directly relevant to the issues presented in this case, and were correctly allowed into evidence.

The Eighth Circuit recently rejected the same type of similarity BASF suggests is required. *See Adams v. Toyota Motor Corp.*, 867 F.3d 903, 913 (8th Cir. 2017) In *Adams*, Toyota argued the district court erred in allowing evidence of incidents of unintended acceleration.   Toyota argued the other incidents lacked the requisite similarity to the plaintiff's incident  The Eighth Circuit rejected Toyota's argument, stating, "there are no hard or fast rules as to what degree of similarity there must be to make the evidence admissible", rather, "the appropriate focus is on all of the circumstances surrounding . . . the evidence." *Id.* (internal citations omitted).

Even the cases BASF cites recognize that substantially similar circumstances warrant the admission of evidence—even when not perfectly identical.  *See Drabik v. Stanley-Bostitch, Inc.*, 997 F.2d 496, 508 (8th Cir. 1993) (finding no error in admitting evidence of head, foot, and leg injuries to other individuals by a nailer in a head and brain injury case); *First Sec. Bank v. Union Pac. R.R. Co.*, 152 F.3d 877, 879 (8th Cir. 1998) (admitting a prior auto/train accident as substantially similar).

Indeed, in *Olson v. Ford Motor Co.*, the Court actually excluded the specifics of customer complaints as hearsay.  410 F.Supp.2d 855,861-862 (D.N.D. 2006).  It further held that "introduction into evidence of the specific details of the customer complaints would not only be a waste of time, it would confuse and mislead the jury and be prejudicial to Ford."  *Id.* at 864.  Instead, the court allowed the plaintiff to present evidence of complaints as notice to show the defendant received the complaints and was on notice of the allegations in the complaints.  *Id.* at 863-864.  However, the plaintiff was "prohibited from introducing the specific details of the complaints."  *Id.* at 864.  Finally, the court held that the plaintiff could "reference the number of 'substantially similar' customer complaints received to establish notice and for purposes of explaining the factual basis of an expert's opinion."  *Id.* at 865.  This is exactly what the Court did in *Bader*.

BASF's position that Pltf-2019 Exh. does not constitute notice because it is after the "incident" at issue occurred is also misguided.  Doc. 582, p. 30.  Notice is not solely limited to a failure to warn of a products' defects.  *Estate of Thompson v. Kawasaki Heavy Indus.*, 291 F.R.D. 297.  Notice goes to Plaintiff's negligence claims despite BASF's case cites narrowly applying it to failure to warn claims in cases where a specific device resulted in a one-time injury.[8]  This notice including, but not limited to, Dr. Bradley's data, while received by BASF, resulted in no useful action by BASF to reduce the danger.  BASF's determination to do nothing to reduce of harm to farmers despite the ever accumulating weight of notice it received constitutes a breach of duty.  Each year that the Xtend

---

[8] *See Bachtel v. Taser Int'l, Inc.*, 2013 WL 317538 (E.D. Mo. Jan. 28, 2013) (plaintiff alleged a Taser was a substantial contributing factor in her son's death).

technology was on the market, including in 2017 forward, the damage to Bader Farms continued.  Therefore, there is no bright line as to post-sale, as the sales continued.

**B.**     **The Court Properly Admitted Exhibit Pltf-2019 Under Fed. R. Evid. 703.**

The Court has broad discretion regarding the admissibility of evidence "and a determination that the probative value of certain evidence outweighs any potential unfair prejudice is also a matter within the ***discretion*** of the trial ***judge***."  *Smith v. Firestone Tire & Rubber Co.*, 755 F.2d 129, 134 (8th Cir. 1985) (citations omitted) (emphasis in original).

Fed. R. Evid. 703 addresses the importance of allowing experts to testify about the bases for their opinions - even if some bases would otherwise be inadmissible - in "helping the jury evaluate the opinion" of the expert.  The Advisory Committee Notes to Rule 703 further recognize the importance of allowing an expert to testify about the bases for his opinions in his direct testimony where, like here, it is anticipated that the opponent likely will seek to undermine the foundation of the experts' opinions on cross-examination:

> Moreover, in some circumstances the proponent might wish to disclose information that is relied upon by the expert in order to "remove the sting" from the opponent's anticipated attack, and thereby prevent the jury from drawing an unfair negative inference.  The trial court should take this consideration into account in applying the balancing test provided by this amendment.

Fed. R. Evid. 703 advisory committee's notes to 2000 amendments (emphasis supplied).

The Court carefully considered multiple rounds of briefing and argument regarding Dr. Bradley's data contained in Pltf-2019 Exh. and other exhibits.  The Court found the data admissible on notice.  2/6/20 Trial Tr. 1182:24.  The Court also found, "this is the kind

of information, facts, or data that the expert has been made aware of and that, as an expert of the field of weed science, that he would reasonably rely on this kind of evidence. I agree with that altogether." *Id.* at 1237:12-15. The Court found it was "completely relevant." *Id.* at 1238:24. The Court based its ruling to allow the evidence on Fed. R. Evid. 703, finding the "probative value in helping the jury evaluate the opinions substantially outweighs their prejudicial effect." Id. at 1239:22-1240:2.

Dr. Baldwin is not a mouthpiece for Dr. Bradley and Dr. Bradley was not an expert witness who Defendants were precluded from examining. Dr. Bradley is an independent, academic scientist who compiled this data in the course of his work and whose data is relied on by experts in his field (Dr. Baldwin among them), the EPA, and even Monsanto. That data was relevant to and indistinguishable from the facts of the case. Dr. Baldwin reasonably relied on Dr. Bradley's facts and data compilations in providing his opinions, as he is permitted to do under Rule 703. Dr. Baldwin also testified that the facts and data contained in these maps are the types of facts and data reasonably relied upon by experts in the field. 2/6/20 Trial Tr. 1309:14-24 (Baldwin). Rule 703 permits those facts and data compilations to be shown to the jury in order to help the jury understand the underlying bases for Dr. Baldwin's opinions. This important justification for allowing an expert to refer to otherwise inadmissible evidence is expressly recognized in Rule 703 and in the Advisory Committee Notes. The probative value far exceeds any supposed prejudicial effect, which BASF has not shown.

At trial, Dr. Baldwin thoroughly explained Dr. Bradley's methodology and walked through the data, making its relevance clear. 2/6/2020 Trial Tr. 1308:24-1315:8 (Baldwin).

37

And he made clear that the numbers were estimates. *Id.* at 1312:15-18. Dr. Baldwin clearly explained the difference between alleged and confirmed complaints, which was documented in the data relied upon. *Id.* at 1309:3-13. He specifically explained the nature of the data as identified by the titles of the maps. *Id.* at 1312:15-1313:4. He also testified from his own personal knowledge that the number of alleged complaints in Arkansas was ultimately found to be very close to the number of confirmed cases of dicamba damage. 2/7/20 Trial Tr. 1511:13-1512:9 (Baldwin).

As Plaintiff has said in prior briefing and argument, and as the Court is aware, this data is reliable and widely relied on by other scientists. As discussed in prior briefing on this issue, this data has been cited and relied on in at least six published academic journals and other scholarly literature. Doc. 429, pp. 4-5 . Monsanto relied on it in 2018, when working to get its XtendiMax label re-registered with the EPA. Doc. 354, p. 26. And the data is discussed and cited in two EPA documents that BASF admitted into evidence at trial. B-979, 980 Exhs.

Defendants cannot rely on Dr. Bradley's data when they find it convenient to do so and dispute that same data when they find it inconvenient. If Dr. Bradley's data was sufficiently reliable to be cited by Monsanto to the EPA and cited by the EPA in its reports, it is nonsensical to argue it is not reliable enough to be shown to a jury.

At trial, no evidence was presented from any source challenging the reliability of Dr. Bradley's data. The probative value of the data far outweighs any prejudicial effect. The information was not cumulative because there is no other information as broad reaching or widely cited on this issue. 2/6/2020 Trial Tr. at 1309:25-1310:4 (Baldwin).

38

Thus, there is no question that Dr. Baldwin could rely on it in forming his opinions. *See* Fed. R. Evid. 703. And Rule 703 authorized the information to be disclosed to the jury.

There was no prejudice to Defendants. Monsanto and BASF counsel cross examined Dr. Baldwin extensively about the data and its reliability. 2/6/20 Trial Tr. 1432:25-1437:7 (Baldwin); 2/7/20 Trial Tr. 1484:4-1485:19 (Baldwin). In addition, Dr. Carey testified that the fact that a claim was made does not mean there was actual dicamba damage. 1/29/20 Trial Tr. 597:1-14, 599:3-6 (Carey). The likelihood that any jury confusion occurred about how the facts and data were compiled by Dr. Bradley and the reasons Dr. Baldwin relied on that data is nonexistent.

There is little question that Defendants on cross-examination sought to undermine the foundation of Dr. Baldwin's opinions in this case. The rationale set forth in the Advisory Committee Notes is directly applicable to Dr. Baldwin's testimony on direct about the bases for his opinions. The Advisory Committee Notes to Rule 703 expressly recognize this: "Of course, an adversary's attack on an expert's basis will often open the door to a proponent's rebuttal with information that was reasonably relied upon by the expert, even if that information would not have been disclosable under the balancing test provided in this amendment." *Id.* (emphasis supplied).

BASF's continuous assertions that the data contained in Pltf-2019 Exh. is unreliable, it could not challenge the data, and the data was prejudicial are meritless. There was neither prejudice nor hearsay, and defense counsel cross examined Dr. Baldwin at length. In addition, as discussed below, the Court gave two limiting instructions on these issues during trial. 1/30/20 Trial Tr. 710:12-23 (Carey); 2/6/20 Trial Tr. 1340:17-25 (Baldwin).

There was simply no prejudice to Defendants, as the probative value outweighed any prejudicial effect. *United States v. Walker*, 470 F.3d 1271, 1275 (8th Cir. 2006).

### C.      There Is Absolutely No Justification For A New Trial.

BASF's claim of error is moot in light of Defendants presenting their own actual hearsay evidence in the form of anecdotal hearsay accounts of farmers allegedly expressing desire or support for the Xtend system and the massive stack of complaints Monsanto's counsel used during opining statement and cross examination of Dr. Baldwin.  2/6/20 Trial Tr. 1432:25-1437:7 (Baldwin); 1/27/20 Trial Tr. 200:12-201:4 (Opening); 2/14/20 Trial Tr. 2496:1-24 (Closing).

BASF's argument that the complaint information contained in Pltf-2019 Exh. was the one piece of evidence that single-handedly led to the jury's verdict has no merit.  Doc. 582, p. 35.  There was no one piece of evidence that led to the jury's verdict.  The jury viewed the evidence as a whole and found it more probably true than not true that Defendants' conduct led to the damages at Bader Farms.  The jury found Plaintiff's evidence compelling and credible, while Defendants' was not.  Dr. Baldwin credibly provided extensive testimony of the damage he saw at Bader Farms and its cause.  2/6/20 Trial Tr. 1295:14-1296:7, 1305:17-1306:21, 1325:12-1326:20, 1330:1-23, 1334:18-25, 1335:23-1336:15, 1342:1-2, 1343:12-17 (Baldwin).  His testimony included powerful maps of sales data showing Xtend purchases around Bader Farms.  *Id.* at 1299:11-25, 1301:17-1302:1, 1316:7-16, 1323:21-1324:4.  And, Engenia sales data for Dunklin County, where Bader Farms is located, shows 100 purchasers, including Bader Farms'

neighbors. 2/7/20 Trial Tr. 1505:11-21 (Baldwin). The damage was so widescale, farmers started planting defensively.  2/6/20 Trial Tr. 1376:2-18 (Baldwin).

In addition to the legion of complaints about admission of Pltf-2019 Exh. into evidence, BASF has identified several trial transcript citations that it claims show Plaintiff quoting "extensively" from the document.  However, some of those citations do not apply to Pltf-2019 Exh.  For example, the testimony attributed to Dr. Carey (1/30/20 Trial Tr. 763:17-18 (Carey)) is not regarding Pltf-2019 Exh.–which is blatantly obvious because it involves 2018 and 2019, which are not in Pltf-2019 Exh.  But more importantly, no Defendant objected to that testimony.  The argument at 2/14/20 Trial Tr. 2467:16-17 was a direct reference to Dr. Carey's testimony regarding his chart estimating expected claims.

In order to avoid any potential prejudice to Defendants, the Court gave two limiting instructions regarding this evidence:

> Ladies and gentlemen, I'm going to read to you a limiting instruction at this time.  Plaintiff has introduced certain documents and reports regarding unconfirmed incidents of off-target movement of dicamba that the witness Dr. Ford Baldwin relied on in forming his opinions.  I instruct you that those documents are not evidence of and you should not consider them evidence of the truth of the information contained in those documents.

2/6/20 Trial Tr. 1340:17-25 (Baldwin).

> Plaintiff has introduced certain documents that it contends are evidence that Monsanto was given notice of certain claimed and unconfirmed incidents of off-target movement and illegal use of dicamba. I instruct you that those documents are not evidence of, and you should not consider them evidence of, the truth of the information contained in those documents. You may consider those documents and testimony related to those documents only for the limited purpose of determining whether or not Monsanto had notice of what was being reported, but not as evidence of the accuracy or truth of what was being reported.

41

1/30/20 Trial Tr. 710:12-23 (Carey).

The Court's determination that the "probative value in helping the jury evaluate the opinions substantially outweighs their prejudicial effect" is "afforded substantial deference."  United States v. Walker, 470 F.3d 1271, 1275 (8th Cir. 2006).  "A limiting instruction diminishes the danger of unfair prejudice arising from the admission of the evidence."  Id.  Moreover, a jury is presumed to follow a court's limiting instruction. Bradshaw v. FFE Transp. Servs., 715 F.3d 1104, 1109 (8th Cir. 2013).  BASF's concerns were obviated by these limiting instructions.  Estate of Thompson v. Kawasaki Heavy Indus., 291 F.R.D. at 308.

The jury was fully capable of understanding this evidence as instructed.  The Court's admission of this evidence was fully within its discretion and there was no "gross abuse of discretion resulting in fundamental unfairness."  Bradshaw v. FFE Transp. Servs., 715 F.3d 1104, 1108 (citations omitted).  A new trial is not warranted. [9]

## III.  THE COURT PROPERLY INSTRUCTED THE JURY CONSISTENT WITH MISSOURI LAW.

The Court spent many days over the course of several weeks listening to argument, reviewing briefing submitted by the parties, and working to craft jury instructions that correctly instructed the jury on the law as it applies to the case tried by the parties.  The Court's Herculean effort was successful.

---

[9] During Plaintiff counsel's punitive damages closing argument, neither the complaints, nor any other evidence related to Defendants' conduct from 2017 forward, was mentioned at all. Thus, it is inconceivable that this data influenced the jury's punitive damages verdict award in any way.

BASF complains that "instructional errors misled the jury about the proper legal standards and *likely* affected this verdict." Doc. 582, p. 36 (emphasis supplied). Even if BASF were correct, which it is not, it would need to show more than *likely* harm to be entitled to a new trial.

Jury instructions are subject to the harmless error rule, the trial court's judgment will be reversed only if the error "adversely affects the substantial rights of the complaining party." *Flanigan v. Burlington Northern Inc.*, 632 F.2d 880, 889 (8th Cir.1980) (citations omitted), *cert. denied*, 450 U.S. 921, 101 S. Ct. 1370, 67 L.Ed.2d 349 (1981). Under this rule, the appellant generally has the burden of establishing the prejudicial effect of the trial court's refusal to give a requested instruction. *Id.* "A trial judge is given broad discretion in framing the instructions, and will not be disturbed on appeal if the instructions, when considered as a whole, adequately and sufficiently state the law applicable to the case." *Bizzle v. McKesson Corp.*, 961 F.2d 719, 722 (8th Cir. 1992) (citing *Roth v. Black & Decker United States, Inc.*, 737 F.2d 779, 784 (8th Cir.1984).

## A.   It Was Proper To Instruct The Jury Regarding The Dicamba-Tolerant System.

BASF continues to pretend it is in this case merely as an independent distributor of a herbicide. But, as the jury recognized, BASF is in this case because it is a full participant in the creation of the dicamba-tolerant system. BASF's liability rests on four related grounds. First, BASF sold a product to be used in the system. Second, BASF is a developer and promoter of the system. *See* Pltf-1075 at 1075.0002 Exh. ("I feel we need to get behind Xtend soybeans and promote…then use the momentum to sell Engenia.). Third, BASF is

43

a joint venturer in the development and promotion of the system.  *See* Pltf-1220 at 1220.0001 Exh. (The deregulation of Monsanto's dicamba-tolerant soybean seed is critical to BASF's future herbicide opportunity. \*\*\* BASF Executive management has pledged to support Monsanto in their seed deregulation efforts; as we have a vested interest in their success.").  Fourth, BASF is a co-conspirator in the development and promotion of the system. *See* Pltf-1108 at 1108.0005 ("DT System = DT Crop in combination with any DT System Crop Protection Product.").

Plaintiff's claims are predicated on BASF's negligence in the development and commercialization of the dicamba-tolerant system and its related joint venture and conspiracy with Monsanto.  BASF's attempt to focus on Engenia does not erase its conduct in the creation and commercialization of the dicamba-tolerant system.  The jury decided a negligence case and negligence is based on a defendant's conduct.  *Martin v. Survivair Respirators, Inc.*, 298 S.W3d 23, 31 (Mo. Ct. App. 2009) ("The difference between a negligence claim and a strict liability claim is the latter focuses on the product, whereas the former focuses on the conduct of the defendants.").

In this case, BASF's entire range of conduct in the development and promotion of the DT system was submitted to the jury.  BASF's continued insistence that the jury could not consider anything other than the intrinsic characteristics of Engenia is the latest in its repeated attempts to define Plaintiff's claims to its own liking.

Plaintiff's counsel has always been certain about the theory of its case and the Court is clear as well.  In spite of documents like Pltf-1108, Defendants remain, or pretend to be, confused.  As the Court stated during the February 13 jury instruction conference, "I think

the confusion results in your [Defendants'] unwillingness to acknowledge that the whole claims are based on a system." 2/13/2020 Trial Tr. 2348:2-3. The Court also stated, "I bought into the idea that the product is the system, the dicamba-tolerant system as reflected in the defendants' own documents time and again. And so the system is not just the seeds. The system is the dicamba-tolerant seeds, plus the low-volatility corresponding herbicides." 2/13/2020 Trial Tr. 2293:14-18. BASF cannot escape liability with games of semantics.

### 1.   BASF's Reliance *Benjamin Moore* and *Sperry* Is Misplaced.

BASF's reliance on *Benjamin Moore & Co. v. City of St. Louis*, 226 S.W.3d 110 (Mo. 2007) and *Sperry v. Bauermeister, Inc.*, 804 F. Supp. 1134 (E.D. Mo. 1992), aff'd, 4 F.3d 596 (8th Cir. 1993), is misplaced. For instance, in *Benjamin Moore* the Court was considering whether liability could be imposed on one or more defendants based on a market share theory of liability. *See Benjamin Moore*, 226 S.W.3d at 113. The reason *Benjamin Moore* plaintiffs in were attempting to rely on alternate theories of liability is the identities of the suppliers of *any* of the products could not be determined. *See Benjamin Moore*, 226 S.W.3d at 113 ("The city could not connect any specific defendant to any specific abatement project."). In essence, the issue was whether one of the many named defendants' paint or some other, unnamed manufacturers' product, caused the plaintiffs' injuries.

*Benjamin Moore* bears no resemblance to this case. The manufacturers of the product at issue in the instant action are known and knowable. Here, the product is the dicamba-tolerant system. That is Plaintiff's theory of the case and that is the case that was

submitted to the jury.  BASF and Monsanto entered in a joint venture and conspiracy to design, manufacture, and sell the system for their mutual benefit.  Also, there is no dispute that the components of this system were purchased and used by farmers throughout Dunklin County, including the area surrounding Bader Farms, beginning in 2015 and continuing to present.  *See e.g.,* 2/5/2020 Trial Tr. 981:14-982:20, 988:3-989:19 (Bader); 2/6/2020 Trial Tr. 1292:10-15 (Baldwin); 2/7/2020 Trial Tr. 1476:14-1477:10, 1504:25-1505:9 (Baldwin); 2/3/2020 Trial Tr. 853:5-11, 854:19-855:9, 860:8-20 (Cravens); Pltf-2007, 2008, 2009, 2010 Exhs.  The sales records, product use maps, and witness testimony identify sales and use of the Xtend system in close proximity to Plaintiff's orchards.  *Id.*

Defendants' system was designed for the very purpose of allowing dicamba to be sprayed over the top during the growing season, whereas prior to that, over the top spraying could not occur.  1/29/2020 Trial Tr. 417:8-23, 417:24-418:8 (Carey).  Defendants knew this would (and did) change how dicamba was sprayed: both when it would be sprayed, and the proximity of it spraying to emerged crops.  In other words, Defendants' Xtend system was designed to and did completely change the role of dicamba in farming.[10]  This change, or to be more precise, Defendants' actions of ushering in this change – not the specific type of dicamba sprayed, when, and where – is the basis of liability.  BASF

---

[10] Dr. Baldwin testified that, prior to the release of the Xtend seed, dicamba's *national* use was very limited to 35 million acres and a consumption of roughly 6 million pounds.  2/6/2020 Trial Tr. 1266:18-1267:4 (Baldwin).  Usage in Southeast Missouri and Northeast Arkansas were far below the national average. *Id.* at 1267:20-22.  By 2017, with release of the complete system, use increased dramatically.  Pltf-2019 Exh.  And as Dr. Carey concedes, after the Xtend technology, use increased exponentially to roughly 60 million pounds a year by 2018, all because of Xtend. 1/30/2020 Trial Tr. 757:12-759:10, 759:13-22 (Carey).

understood there would be liability for its actions and planned to defend in court.  Pltf-502.0002  Exh.

Second, and more importantly, the claims Plaintiff submitted to the jury were negligent design and failure to warn.  Doc. 544. While the Court expressed its belief that *Benjamin Moore* would apply in a pure products liability case, it stated that such application does not extend to a negligence case.  2/13/2020 Trial Tr. at 2294:19-25. Instruction No. 7, which is from the Missouri Approved Instructions ("MAI"), defined negligence for the jury.  The first element of Instruction No. 10, the negligent design and negligent failure to warn instruction for 2017 to present, instructed the jury to find in favor of Plaintiff and against BASF and/or Monsanto if it believed that the Defendants "individually or jointly with another defendant designed, manufactured, or sold any one or more component of the dicamba-tolerant system".  Doc. 554.

In its criticism of Instruction No. 10, BASF chooses to disregard the portion of the instruction that allows the jury to consider its joint actions with Monsanto.  But those joint actions gave rise to the dicamba-tolerant system.  The jury understood this and rendered a verdict reflecting those facts.

*Sperry* is distinguishable because the evidence in *Sperry* "clearly shows that the defendant was not the designer, manufacturer, or installer of the entire mill system".  *Sperry v. Bauermeister, Inc.*, 804 F. Supp. 1134, 1139 (E.D. Mo. 1992), aff'd, 4 F.3d 596 (8th Cir. 1993).  In this case, Plaintiff alleged that BASF and Monsanto were joint venturers and coconspirators in the development and launch of the entire dicamba-tolerant system.

Instruction No. 10 correctly reflected the joint nature of the endeavor.  Because BASF was a designer of the dicamba-tolerant system, liability attaches under *Sperry.*

      **B.**      <u>**Jury Instruction No. 11 Correctly Instructed the Jury on Damages**</u>.

            **3.**      **Businesses in Missouri May Properly Recover Damages for Lost Profits.**

BASF cites a host of cases for the proposition that the "general rule is that the measure of damages for trees which are not valuable for timber is the injury to the land caused by destroying them." Doc. 582, p. 41 (quoting *Barnes v. Arkansas-Missouri Power Co.*, 281 S.W. 93, 95 (Mo. Ct. App. 1926). The *Barnes* court, explaining the rationale for the "general rule" stated, "[t]his rule is based on the obvious reason that the value of such trees, considered apart from the land, would not be adequate compensation for the trespass." *Id.*  Clearly that logic is not applicable to the situation facing Bader Farms, first because this is not a trespass case, and second because Bader Farms does not own the land on which its trees grow.

Dr. Guenthner's calculations made clear the value of the Bader Farms orchards is in neither the timber nor the value of the land, but in the profits generated by harvesting peaches from the trees year in and year out.  Dr. Guenthner testified regarding net present value of Bader Farms' peach blocks as they existed in 2015, prior to dicamba striking them. 2/7/2020 Trial Tr. 1552:15-21; Pltf-2196 Exh.  He also testified regarding the net present value of the 2016-2019 peach tree plantings.  *Id.* at 1552:22-1553:9; Pltf-2196 Exh.  Dr. Guenthner also explained to the jury how he used the expected profits from peach harvests

to reach his conclusions regarding the net present value of the peach blocks.  *Id.* at 1533:5-1534:7.

In contrast, the *Barnes* court explains the value of a tree as part of the realty is the appropriate measure of damages for shade and ornamental trees:

> The measure of damages in this character of cause where damages are sought for the destruction of a tree used for shade or ornament is the difference in the market value of the premises on which the tree is growing with and without the tree. This, after all, it seems to us, is the value of the tree because of its peculiar place and location on the premises. A tree in the back yard, among others, though a beautiful ornament and shade, might be of less value to the premises than a tree in the front yard, and well located, though of less beauty and less valuable as cordwood.

*Barnes v. Arkansas-Missouri Power Co.*, 281 S.W. 93, 95 (Mo. App. 1926).

Of course, the value of the Bader Farms orchards has nothing to do with how the trees look in their particular places on the property.  The value, and thus the damage, stems from the lost profits resulting from the inability of the trees to produce peach crops.  Hence, the appropriate measure of damages was submitted by Plaintiff based on Dr. Guenthner's calculations.

BASF also cites a series of trespass cases for the proposition that damages stemming from the loss of future crops are prohibited because of the "uncertainty and speculative nature of such a claim."  Doc. 582, p. 40 ( quoting *Beaty v. N.W. Elec. Power Co-op., Inc.*, 312 S.W.2d 369, 372 (Mo. App. 1958)).  However, a month after the *Beaty* opinion was issued, the Missouri Supreme Court, in *Myers v. Karchmer*, 313 S.W.2d 697 (Mo. 1958), allowed a plaintiff to recover damages for future lost farm earnings in a negligence action.

The plaintiff in *Myers* was a 65-year old farmer rendered permanently and totally disabled in an automobile wreck. *Id.* at 700, 704. The defendants argued Mr. Myers's claim for future lost farming profits were "a matter of speculation and conjecture." *Id.* at 704. The plaintiff presented evidence his earnings were from the operation of two farms and livestock sales. *Id.* at 705. He also presented evidence of his gross and net annual earnings. *Id.* The court held: "There was substantial evidence that plaintiff, by reason of the injuries, would sustain a loss of future earnings. The amount of such future earnings was for the jury on the evidence presented." *Id.* at 705. In this case, we presented substantial evidence of Bader Farms' loss of future earnings, and the amount of loss was for the jury.

In *Beckett v. Kiepe*, 369 S.W.2d 258 (Mo. App. 1963), a farmer again claimed he was unable to farm due to injuries caused by defendant. *Id.* at 262-63. Defendants objected to an award of damages based on the loss of future crops. *Id.* at 262. The court held the plaintiff could recover for those losses by introducing evidence of the loss of crops based on a proper foundation of prior crops planted, yield, and similar conditions. *Id.* at 262-63.

Dr. Guenthner testified to a reasonable degree of agricultural economic certainty by comparing actual profits to what was reasonably expected. 2/7/2020 Trial Tr. 1528:2-1529:13 (Guenthner). In calculating costs, he relied on university budgets, which is the same method used by banks when making loan determinations. *Id.* at 1548:5-1549:21. Dr. Guenthner also reduced the damage number to account for 2015-2018 revenues. *Id.* at 1571:24-1572:19. Dr. Guenthner also considered the impact of adverse weather on future harvests. *Id.* at 1601:18-1602:9, 1618:21-25, 1636:9-1637:2. As in *Beckett*, a proper

foundation was laid as a basis for the jury to award damages for the loss of income from the orchard.

BASF states the "Eighth Circuit recently affirmed this long-standing [value of land] measure of damages in *Keller v. McGarity Flying Service, LLC*, 944 F.3d 975, 982 (8th Cir. 2019)." Doc. 582, p. 41. BASF fails to mention that *Keller* specifically limited that valuation method to damage claims under RSMo. § 537.340 "for injury to trees that 'have no substantial market value' if cut down- such as 'trees used for a windbreak, and ornamental or shade trees." *Id.* at 981 (citing *Barnes*, 281 S.W. at 95-96). The *Keller* court also stated "the particular facts and circumstances of each case dictate the applicable measure of damages. In cases involving claims under section 537.340 for damage to windbreak or ornamental trees, Missouri courts have instructed that the applicable measure of damages 'must be distinguished' from the measure of damages applicable in other situations." *Id.* at 982 (citations omitted). Because Dr. Guenthner provided detailed testimony establishing the amount of Bader Farms' damages to a reasonable degree of economic certainty based on well-supported profitability calculations, this is just the kind of situation that "must be distinguished."

Other cases have also allowed plaintiffs to recover for damage to future crops. In *In re Genetically Modified Rice Litigation*, Bayer argued that plaintiff's future damages were too uncertain and speculative. 2010 WL 4643265, *1 (E.D. Mo. Nov. 9, 2010). The court rejected Bayer's arguments, finding that "plaintiff provided evidence based on plaintiff's actual yields, government crop data, and accepted economic calculations to

demonstrate that it suffered market loss, future, and alternative crop yield and crop variety damages."  This approach is consistent with the Missouri law on damages.

Moreover, recovering for loss of business profits is widely accepted in Missouri jurisprudence.  In tort cases "involving damage to persons, property or businesses, a party requests damages for loss of business profits."  *Ameristar Jet Charter, Inc. v. Dodson Int'l Parts, Inc.*, 155 S.W.3d 50, 54 (Mo. banc 2005).  Missouri courts have held plaintiffs may be compensated for any damages plaintiffs sustained and are reasonably certain to sustain in the future as a direct result[11] of another party's actions.  *Shady Valley Park & Pool v. Fred Weber, Inc.*, 913 S.W.2d 28, 34-35 (Mo. App. 1995).  For example, in a negligence action, which Plaintiff has pleaded here, a "plaintiff may recover damages which are the direct or proximate result of the occurrence."  Id. at 35.

"The goal of awarding damages is to compensate a party for a legally recognized loss." *Ameristar Jet*, 155 S.W.3d at 54.   "The particular facts and circumstances of each case dictate which measure of damages is appropriate." *Gee v. Payne*, 939 S.W.2d 383, 385 (Mo. App. 1997). "The proper measure of damages is a question of law for determination by the trial court." *Id.*; *Green v. Study*, 286 S.W.3d 236, 242 (Mo. App. 2009).

In *Shady Valley*,  the plaintiff dug two lakes on its property, stocked them with fish, and operated wholesale fish hauling and fee fishing businesses.  913 S.W.2d 28.  The

---

[11] In this case, Plaintiff is entitled to recover for damages Defendants "directly caused or directly contributed to cause."  *See* M.A.I. 19.01; *Carlson v. K-Mart*, 979 S.W.2d 145, 146 – 47 (Mo. banc 1988).

defendant was in charge of a highway construction project that resulted in mud and silt flowing into the lakes, forcing the closure of the businesses.  *Id.*  Shady Valley is very similar to the Bader case.  As a result of the defendant's actions, the Shady Valley plaintiff lost extensive tree cover and a deep vegetative mat and suffered mud and silt in its lakes, which killed the fish.  *Id*.  Shady Valley lost contracts and customers for both the supply of fish and fee fishing experiences.  *Id*.  Although the defendant argued damages were limited to the value of the property, the court ruled the injury was not just to the lakes but also to the businesses.  *Id*. at 34-35.  Accordingly, the proper measure of damages included future losses attributable to the business closure.  *Id*.

Contrary to BASF's assertions, there is no one-size-fits-all standard in Missouri when it comes to damages.  Just as it was appropriate in Shady Valley to recover for all damages proximately caused by the negligence, not just those to real property, Bader Farms can recover for all damages Defendants' wrong-doing contributed to cause.  *Id.* at 34-35.  Missouri courts consistently recognize that prospective profits lost due to property damage are recoverable.  *See Volume Services, Inc., v. C.F. Murphy & Associates, Inc.*, 656 S.W.2d 785 (Mo. App. 1983).

Lost profits determinations are not an exact science, but that is not a bar to their recovery.  *Gateway Foam Insulators, Inc. v. Jokerst Paving & Contracting, Inc.*, 279 S.W.3d 179, 186 (Mo. banc 2009).  "Where damages are in the nature of lost profits, all that can be required is to produce all relevant facts tending to show the extent of damages[.]" *Smith Moore & Co. J.L. v. Mason Realty & Inv., Inc.*, 817 S.W.2d 530, 534

(Mo. App. E.D.1991) (*citing Gasser v. John Knox Village*, 761 S.W.2d 728, 731[1] (Mo. App. 1988).   Bader Farms did exactly that at trial.

### 4.    MAI 4.01 Was The Appropriate Damage Instruction.

In BASF's continuing effort to recast Plaintiff's case as seeking to recover only for property damage, it again asserts MAI 4.02 should have been given to the jury.  If Bader Farms had only brought a claim for property damage, MAI 4.02 would have been the appropriate instruction.  As MAI 4.02 Notes on Use state: "This instruction should be used in cases involving property damage only."   However, because Bader Farms sought damages beyond property damage, the use of MAI 4.02 would have been improper.

Like the defendant in *Shady Valley*,  BASF mischaracterizes Plaintiff's claim as being only for damages to real property.  Recognizing the damage to the fish business, the *Shady Valley* court did not limit the plaintiff's recovery to damages to its real property because the damages had gone "beyond mere property loss." *Id.* at 35. As a result, the court held that it was proper to submit a damages instruction based on MAI 4.01 to the jury. *Id.* at 34–35; *see also Rotert v. Peabody Coal Co.*, 513 S.W.2d 667, 677 (Mo. App. 1974) (holding lost profits resulting from death of pigs properly submitted under MAI 4.01).

Additionally, Bader Farms submitted a claim for mitigation expenses.  2/5/2020 Trial Tr. 1152:1-11 (Bader); 2/7/2020 Trial Tr. 1569:25-1570:12 (Guenthner); Pltf-2196 Exh.  Those mitigation expenses included application of micronutrients and other nutrients not normally applied to an agricultural crop.  *Id.*  Mitigation expenses are not elements of property damage and not properly submitted under MAI 4.02.

Even if Plaintiff had brought a claim for property damage, *City of Kennett v. Akers*, 564 S.W.2d 41 (Mo. 1978), makes clear the mitigation expenses would have made the use of MAI 4.02 improper.   In *Akers*, the court stated that "[a]ny reasonable expenses proximately resulting from damage to property are usually a proper element of recovery and such expenses are not to be classified as property loss or property damage."  *Id.* at 50 (citations omitted).   In *Akers*, the plaintiff sought recovery for the cost of loading a damaged transformer for transportation to a repair site and the labor cost of moving the damaged transformer out and the repaired one into a substation.   The *Akers* court held "MAI No. 4.02, which is to be applied where damages involve property damage only was not proper in this instance. Damages were correctly submitted under the more general MAI No. 4.01." *Id.* (citations omitted).

It is clear that MAI 4.01 is the only proper damage instruction for the claims Bader Farms pleaded and proved.  This Court did not err.

   **C.**   **The Joint Venture Instruction (Instruction 16) Was Free Of Error**.

   **1.**   **The Joint Venture Correctly Applied Missouri Law**.

This Court has already correctly held more than once that Missouri law applies to Plaintiff's joint venture claim. Doc. 453, Order, at 3-4.  Missouri law applies here because Plaintiffs were injured by Defendants' joint venture in Missouri.  *Thi v. Schneider Nat'l Carriers, Inc*., 2005 WL 1703116, at *1 (W.D. Mo. July 18, 2005) (for tort claims, Missouri applies the most significant relationship test as defined in the Restatement (Second) of Conflict of Laws).  The fact that two of several agreements between BASF and Monsanto have narrow New York choice of law provisions is irrelevant.  Those two

agreements do not exclusively evidence the joint venture, and those provisions only pertain to disputes between BASF and Monsanto concerning the agreement itself, not tort claims by third-party farmers who did not sign Defendants' contract. *See, e.g., Inacom Corp. v. Sears, Roebuck & Co.*, 254 F.3d 683, 687 (8th Cir. 2001) (Choice of law provision that "Agreement shall be governed by and construed in accordance with [Illinois law]" adequately covers disputes concerning how to construe the contract, but not broad enough to govern torts and "does not address the entirety of the parties' relationship."); *A.D. v. Credit One Bank, N.A.*, 885 F.3d 1054, 1064 n.14 (7th Cir. 2018) ("We already have concluded that A.D. is not a party to the cardholder agreement, and generally, choice-of-law clauses in contracts do not apply to non-parties.").

As this Court held in denying BASF's motion to reconsider, "If this case presented an issue between BASF and Monsanto regarding one of the pertinent contracts, then it is clear that New York law applies to govern the contract.  However, the question here is whether the defendants were engaged in an implied joint venture, based on their actions and not necessarily on the written agreements alone. The contracts' choice of law provision does not apply to third parties whose claims sound in tort." Doc. 453, Order, at 3-4 (citing *Inacom Corp.*, 254 F.3d at 688; *Jeff-Cole Quarries, Inc. v. Bell*, 454 S.W.2d 5, 14-15 (Mo. 1970)).

BASF's argument that "Defendants contemplated that their relationship would be governed by New York law, and New York requires that joint venturers share losses" is not compelling. BASF argued in summary judgment briefing that New York law and Missouri law on joint venture were effectively the same.  So, it is disingenuous to now

suggest BASF "contemplated" New York law would apply to impose a stricter "loss sharing" requirement. Doc. 219, BASF Mem. at 12, n.2. Only after this Court denied summary judgment and noted that "the requirement of shared losses is not a strict one under Missouri law" did BASF decide this Court is required to apply New York law. Doc. 323, BASF Mem. at 5. BASF is incorrect. Moreover, any expectation BASF had that its relationship with Monsanto would be governed by New York law is not shared by Monsanto, who does not dispute Missouri law applies to this claim.

### 2. "Shared Pecuniary Interest" Correctly States The Law.

The elements of a joint venture include (1) "an express or implied agreement among members of the association," (2) "a common purpose to be carried out by the members," (3) "a **community of pecuniary interest** in that purpose," and (4) an "equal voice" among all members "in determining the direction of the enterprise." *Ritter v. BJC Barnes Jewish Christian Health Sys.*, 987 S.W.2d 377, 387 (Mo. App. 1999). This is the law. Missouri does not require a strict "duty to share in losses," so what BASF demands is error. BASF's dissatisfaction with Missouri's lack of a strict "loss sharing" requirement does not make Instruction 16 confusing or improper.

In fact, BASF had an opportunity during closing to explain to the jury what "shared pecuniary interest" means under Missouri law, and BASF's counsel grossly misrepresented the law:

> You will see the instruction that says "shared pecuniary interest" and "equal voice." Now those are not everyday terms. Shared pecuniary interest is another way of saying shared profits and losses. They are in it together. If they lose money, we lose money. If they make money – they sold the seed, and **you have heard some of the figures about how much seed they sold**.

57

**BASF did not get half of that money. There was no share of profits and losses** and there was no equal voice.

* * *

Pecuniary interests are shared profits and losses. That was not happening here. Royalties are not the same as profits.

**If you have a joint venture you have a business together. Businesses mean you create an entity, you have a board of directors, you have common employees, you pool your assets. All of these issues.**

**MR. RANDLES:** Your Honor, I object. The Court says in the instructions what the elements of a joint venture are. None of these are included.

**THE COURT:** The jury will be guided by the evidence presented and the instructions on the law.

**MR. MANDLER:** To have a joint venture you still have to operate a business. Shared pecuniary interest means a business. Shared control means a business. And at the end of the day, BASF and Monsanto were not running a business together.

02/14/2020 Trial Tr. 2528:12-20; 2530:24-2531:15 (BASF Closing).

BASF cannot now be heard to complain that it believes the jury might have been confused by the phrase "shared pecuniary interest."  Any possible confusion—though there was none—was of its own making and to its own benefit.

### 3.    The Preponderance Of The Evidence Standard Applies.

This Court has thoroughly analyzed Missouri law and concluded a "preponderance of the evidence" standard, not a "clear and convincing standard," applies to Plaintiff's joint venture claim.  (Doc. 453, Order, at 1-3) (analyzing applicable Missouri precedent); *see also Morley v. Square, Inc*., 4:10-CV-2243-SNLJ, 2016 WL 1615676, *7 (E.D. Mo. Apr. 22, 2016) (citing *Grissum v. Reesman*, 505 S.W.2d 81, 86 (Mo. 1974)).  This Court reasoned:

58

[A]s this Court painstakingly set out in *Morley v. Square, Inc*., 4:10CV2243 SNLJ 2016 WL 1615676 (E.D. Mo. Apr. 22, 2016), although *Grissum* is the most recent Missouri Supreme Court pronouncement, the rule has been frequently misstated. Per *Grissum*, 505 S.W.2d at 86, the rule in Missouri is that

> [a] preponderance of the evidence is necessary and sufficient to prove a joint adventure. The clear and convincing standard, then, is simply the exception to the general rule for [cases involving an oral contract to convey real estate or a resulting trust in real property].

*Morley*, 2016 WL 1615676, at *7 (internal citation omitted). *Grissum* relied on *Brooks v. Brooks*, 208 S.W.3d 279 (Mo. 1948), which in turn relied on 48 C.J.S. Joint Adventures, § 12 (1965), for the general rule that a "preponderance of the evidence is necessary and sufficient to prove a joint adventure." *Id.* at 284.

Doc. 453, Order, at 2 (citing *Grissum v. Reesman*, 505 S.W.2d 81, 86 (Mo. 1974)).

This Court went on to explain the error in *Cutcliff v. Reuter*, 889 F.3d 491, 495 (8th Cir. 2018), upon which BASF and Monsanto continue to rely. *Id.* at 3 (*Cutcliff* "notes that a partnership must be proved by 'clear, cogent, and convincing evidence,' but omits the later passage in *Morrison* that includes the phrase '. . .or at least by a preponderance of the evidence.'").

As this Court recognized, the Missouri Supreme Court has not reversed *Grissum*, and this Court is bound to follow the most recent Missouri Supreme Court pronouncement. *Id.* Defendants' painful and repeated reliance on the apparent misstep in *Cutcliff* does not change Missouri law. Accordingly, the "preponderance of the evidence" standard applies. There is no error in the joint venture instruction.

## D. Instruction 17 Correctly Instructed On Civil Conspiracy.

BASF is critical of Instruction No. 17 because it does not specifically require the jury to find that BASF and Monsanto "agreed to pursue [an] unlawful [objective]" and that

they "committed one or more acts in furtherance of the unlawful objective," as did the instruction it submitted.  Doc. 582, p. 51.  BASF goes on to complain about the instruction because it "permitted the jury to find a conspiracy based on the *lawful* development and commercialization of herbicide and seed products."  *Id.* at 52.  Remarkably, this argument is made immediately below BASF's recognition that the "unlawful objective" conspiracy element can be satisfied by "an agreement or understanding between two persons to do an unlawful act, or to use unlawful means to do an act which is lawful."  *Id.* at 51.

Instruction No. 17 satisfies the "unlawful objective" element by allowing a finding of civil conspiracy for doing a lawful act by unlawful means.  The agreement to develop and commercialize the dicamba-tolerant system was, admittedly, lawful.  However, using off-target movement and damage to third-party farmers to increase sales is an unlawful means.  *See Enstein v. Di Mase*, 2017 WL 3129812 (W.D. Mo. July 21, 2017) ("A conspiracy to 'injure or destroy the trade, business or occupation of another is an unlawful conspiracy.'" (quoting *Envirotech, Inc. v. Thomas*, 259 S.W.3d 577, 587 (Mo. Ct. App. 2008)); *see also* Pltf-22, 1009 Exhs.

So, Instruction No. 17 only allowed a conspiracy finding if: 1) the jury found BASF and Monsanto "agreed to develop and commercialize the dicamba tolerant system"; and 2) BASF and Monsanto made the agreement "with the expectation that off-target movement and damage to third-party farmers would increase sales of their dicamba-based products." In other words, the jury had to find that BASF and Monsanto agreed to do a lawful act using unlawful means, which satisfies the unlawful element under Missouri law.  Because

60

BASF is wrong about the omission of an element of the claim, it's argument regarding prejudice fails.

Since MAI does not contain an instruction for civil conspiracy, Plaintiff submitted an instruction tracking the instruction approved in *Haynes v. Hawkeye Security Insurance Co.*, 579 S.W.2d 693, 705 (Mo. App. 1979)[12].  The defendant in *Haynes*, like BASF in this case, complained because the instruction made no mention of unlawfulness or illegality. *Id.* at 705 - 706.  The *Haynes* court pointed out that inclusion of such a hypothesis "would have been erroneous as being argumentative."  *Id.* at 706.

So, in this case, the Court provided the jury with an instruction that contained all of the elements required to find a conspiracy and avoided error by rejecting BASF's proffered conspiracy instruction, which required a finding of some hypothesized unlawful objective. Doc. 545, Instruction LL.  BASF's request for a new trial should be rejected.

## IV.   JOINT VENTURER LIABILITY FOR PUNITIVE DAMAGES IS THE LAW IN MISSOURI: ANYTHING ELSE IS ERROR.

BASF was not prejudiced by the Court's notification during trial that Missouri law holds joint venturers jointly liable for punitive damages.  BASF has known of Plaintiff's joint venture and punitive damages claims throughout the course of this lawsuit and trial,

---

[12] Rule 70.02(b) states that "where there is no applicable MAI so that an instruction not in MAI must be given, then ... such instructions shall be simple, brief, impartial, free from argument, and shall not submit to the jury or require findings of detailed evidentiary facts." A not-in-MAI instruction, therefore, is reviewed to determine "whether the jury [could] understand the instruction and whether the instruction follows applicable substantive law by submitting the ultimate facts required to sustain a verdict." *Seitz v. Lemay Bank and Tr. Co.*, 959 S.W.2d 458, 462 (Mo. 1998).

and BASF has invariably defended against every allegation that <u>any</u> conduct occurred in the scope of a joint venture.  That advocacy did not turn to complacency upon the Court's prior, limited motion to dismiss ruling: nor was complacency replaced with urgency (or any apparent shift in strategy, complaint of prejudice, record objection, or request to offer additional evidence) when this Court advised joint liability is the law.  That's because there was never any prejudice.

 BASF previously filed a motion to dismiss Plaintiff's claim for joint and several punitive damages liability.  Doc. 178, at 14-15.  Plaintiff responded that BASF and Monsanto should both be liable for the punitive damages flowing from their joint venture and conspiracy.  Doc. 182, at 23, ("There is no doubt, based on the allegations in this case and prior orders of this Court, that if Plaintiffs' claims based on common action by these two Defendants are sustained by a jury, Plaintiffs would be entitled to punitive damages against both Defendants.").  Plaintiff went on to state, "However, to the extent BASF is asking that the jury separately determine the amount of punitive damages assessed between Monsanto and BASF, Plaintiffs have no objection." *Id.*

In the context of these representations, this Court granted BASF's motion to dismiss Plaintiff's joint liability punitive damages claim and denied BASF's motion to dismiss Plaintiff's several liability punitive damages claim.  Doc. 191, at 15-16.

Subsequently, during trial but <u>before</u> the close of the evidence,[13] this Court advised the parties that Missouri law, as articulated in *Blanks v. Fluor*, provides joint venturers are

---

[13] Plaintiff's trial team recall the Court advising counsel for all parties about *Blanks* during an instruction conference earlier in the week, prior to the close of evidence.  In any event, the timing

jointly liable for punitive damages.    Therefore, this Court instructed the parties it would allow Plaintiff's joint liability punitive damages claim if the jury found Defendants acted in a joint venture.   This is consistent with Missouri law.   *Blanks v. Fluor Corp.*, 450 S.W.3d 308, 401–02 (Mo. Ct. App. 2014) (citing R. S. Mo. § 353.150) (In Missouri, all joint venturers are jointly and severally liable for everything chargeable to the joint venture, including punitive damages).   This is not optional or discretionary, and BASF's post-trial objections cannot change well-settled law.

As this Court already held, this rule derives from the Uniform Partnership Act and applies equally to punitive damages. Doc. 572, Memorandum and Order, at 5 (citing § 358.130 RSMo (emphasis supplied); *Blanks*, 450 S.W.3d at 401-02.   The Court in *Blanks* explained, "[u]nder Missouri law, partners are vicariously liable for punitive damages based on acts of their copartners done in the course of partnership business." *Id.* (citing *Rogers v. Hickerson,* 716 S.W.2d 439, 447 (Mo. App. S.D. 1986).   Moreover, "[t]his liability attaches even if partners did not participate in, ratify, or have knowledge of the activity giving rise to the award of punitive damages." *Id.* (citing *Rogers,* 716 S.W.2d at 447).

Contrary to BASF's argument, where a joint venture is found, there is no requirement in Missouri for the jury to assess the individual culpability of each joint venturer. *Blanks*, 450 S.W.3d at 402. "Given that the partnership is liable for penalties incurred by a partner for acts done in the course of the partnership's business, including

---

is irrelevant because it had no impact on the scope of relevant evidence or the vigor with which any party argued for or against a finding of joint venture.

punitive damages, and that partners are liable for everything chargeable to the partnership, proof of individual culpability is not required." *Id.* (emphasis supplied).

The court in *Blanks* cited approvingly the Eighth Circuit's application of Missouri law in *Blue v. Rose*, 786 F.2d 349 (8th Cir. 1986), in which the Court held that "the verdict and judgment for compensatory damages against partners liable for the willful torts of copartners must be in one amount against all jointly sued partners." *Blue*, 786 F.2d at 352. The Court further held:

> The above principles are applicable where an award of punitive damages is based upon actions by one or more partners acting within the scope of authority and in furtherance of the partnership business, as in the present case. In such a situation, under the general principles of agency and partnership law, all the partners could be held jointly liable for the punitive damages, and a single sum verdict is warranted.

*Id.* at 352–53 (Where "the tortious acts were clearly performed within the scope of partnership authority and business… the single sum verdict and judgment as to punitive and compensatory damages was proper.").[14]

---

[14] BASF incorrectly states that *Blue v. Rose* precludes admissibility of Monsanto's net worth if BASF is held jointly liable for punitive damages. This is not correct. The facts in *Blue*, and the case it relies upon *State ex rel. Hall v. Cook,* involved situations where multiple defendants are all named on the punitive damage verdict form, and the jury is asked to render a verdict against all in a single sum. In that narrow situation, when the jury is deciding what is appropriate to punish multiple defendants in one sum, evidence of an individual partner's net worth is inadmissible. *See State ex rel. Hall v. Cook,* 400 S.W.2d 39, 42 (Mo. 1966) ("Evidence of wealth of one defendant would be improper" "when the submission as to punitive damages was to be for a verdict against all jointly for the same amount.") (emphasis supplied).

However, here, BASF was not on the punitive damages verdict director, it remained silent during Phase II, and the jury instructions directed the jury to only consider what was necessary "to punish Defendant Monsanto Company for the conduct for which [it] found that Defendant Monsanto Company is liable for punitive damages(.)" Doc. 559, Instruction 20. In this instance, evidence of Monsanto's net worth is admissible.

Here, the jury held that Monsanto and BASF were acting in a joint venture as to claims in Verdict Form A, including Monsanto's Negligent Design or Failure to Warn 2015-2016.  Doc. 551, Verdict Form B.  By operation of law, therefore, BASF is jointly and severally liable for the punitive damages assessed against Monsanto for this claim. There is no legal basis or requirement to individually assess the conduct or culpability of BASF, other than to conclude Monsanto and BASF were acting in a joint venture as defined in Instruction 16—and the jury did this.

Unquestionably aware of this Court's ruling before the jury instructions were finalized and approved, **BASF did not ask that the jury separately determine the amount of punitive damages** assessed between Monsanto and BASF, it did not object to Verdict Form B's direction that allocation is only required if the jury finds "NO" joint venture and "NO" conspiracy, and BASF did not propose any Verdict Form that would require the jury to compare or allocate fault or separately assess punitive damages between Monsanto and BASF at all.

BASF is not "substantially prejudiced" as it argues: it is not prejudiced at all. Surely, BASF is not announcing it would have tried harder to avoid a joint venture finding had it known earlier about *Blanks*.  BASF spent virtually its entire breath at trial denying the existence of a joint venture, denying it had anything at all to do with Xtend seed—least of all Monsanto's decision to launch it in 2015 and 2016.  BASF elicited testimony from

virtually every witness that BASF played no role in Monsanto's decision to launch the seed.  BASF repeatedly argued and elicited testimony that, unlike Monsanto, it agreed to work with academics.  Why?  Because these were hotly contested issues throughout the trial with or without joint liability.  There is no prejudice.  There is only operation of Missouri law and the requirement to give legal effect to the jury's joint venture and punitive damages findings.

## V.   THE JURY'S PUNITIVE DAMAGES AWARD IS SUPPORTED BY THE EVIDENCE.

### A.   BASF's Due Process Rights Were Not Violated By Imposition Of Punitive Damages.

BASF's "due process" arguments are mainly repackaged arguments made in Section IV, *supra*.  For all the same reasons BASF was not prejudiced by this Court's decision to allow joint liability for punitive damages under Missouri joint venture law, BASF's due process rights have not been violated. The Court's judgment reflecting Missouri law does not entitle BASF to a new trial.  BASF decided to enter into a relationship with Monsanto, the characteristics of which meet the elements of a joint venture.  With that decision, BASF gave up any right it had to be treated differently or evaluated separately from Monsanto in the imposition of punitive damages flowing from the joint venture. The cases BASF cites do not help it. *See, e.g., Pac. Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 20 (1991)  (Imposition of punitive damages against corporation for acts of its agent under *respondeat superior*—without any independent finding of fault—did not violate corporation's due process rights or the state's interest in "meaningful individualized assessment of appropriate deterrence and retribution."); *State Farm Mut. Auto. Ins. Co. v.*

*Campbell*, 538 U.S. 408, 416 (2003) (saying nothing about a co-partner or co-joint venturer's entitlement to an individualized determination of punitive damages).

BASF argues, based on its own conjecture, that the jury's punitive damages award was the result of passion or prejudice. The size of the punitive damage award is not proof the jury was improperly motivated by passion or prejudice, it is proof the jury found the conduct at issue outrageous and reprehensible and determined "strong medicine" was needed to punish and deter such a recalcitrant company with enormous wealth.

"Absent exceptional circumstances not present here, [reviewing courts] assume that the jury understood and properly applied the court's instructions." *Banks v. Koehring Co.*, 538 F.2d 176, 179–80 (8th Cir. 1976) (citing *Barnes v. Omark Industries, Inc.*, 369 F.2d 4, 11 (8th Cir. 1966)). BASF's displeasure with the amount is not evidence the jury ignored the instructions. *Id.* ("Defendant's disagreement with the jury's view of the facts" does not mean the verdict is inconsistent with the instructions).

There is no justification for a new trial.

**B.     The Jury's $250 Million Punitive Award Is Appropriate Given The Reprehensibility Of The Conduct And The Amount Needed To Punish And Deter.**

BASF's *Gore* analysis is flawed at the outset because the relevant inquiry pertains to Monsanto's conduct, its reprehensibility, and the amount needed "to punish Defendant Monsanto Company for the conduct for which [the jury] found that Defendant Monsanto Company is liable for punitive damages(.)" Doc. 559, Instruction 20. While Plaintiff agrees BASF's conduct was reprehensible and its net worth is larger than Monsanto's, that is not the relevant due process assessment. Plaintiff's arguments supporting the propriety

and constitutionality of the jury's punitive damages award are set forth, in their entirety, in Plaintiff's Opposition to Monsanto Company's Renewed Motion For Judgment As A Matter Of Law On Punitive Damages Or, In The Alternative, Motion For A New Trial Or Remittitur.  Plaintiff incorporates that brief fully here by reference.

To determine if a punitive damages award comports with due process, Missouri and Federal courts look at three guideposts: "(1) the reprehensibility of the defendant's misconduct; (2) the disparity between the harm suffered and the amount of punitive damages awarded; and (3) the difference between the punitive damages awarded in the case compared to the amount of awards awarded and penalties imposed in similar cases." *Poage v. Crane Co.*, 523 S.W.3d 496, 522–23 (Mo. Ct. App. 2017) (applying the three "*Gore*" guideposts articulated by the United States Supreme Court in *State Farm*, 538 U.S. at 418, 123 S.Ct. 1513).

The first guidepost, the "reprehensibility of the conduct," is the most important consideration and given the most weight. *Id.* at 523 (citing *State Farm*, 538 U.S. at 419, 123 S.Ct. 1513). Punitive damages should reflect the enormity of the offense, and "some wrongs are more blameworthy than others." *Blanks,* 450 S.W.3d at 410  (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575, 116 S.Ct. 1589 (1996)). For instance, "an incident that is recidivistic can be punished more harshly than an isolated incident." *Id.* (quoting *Gore,* 517 U.S. at 577, 116 S.Ct. 1589). "Repeated instances of wrongful conduct can demonstrate that 'strong medicine' is required to deter further repetition." *Id.*

Monsanto's conduct in carrying out the joint venture purpose (e.g. commercialization of the dicamba-tolerant system) was reprehensible. It involved

68

repeated, reckless commercialization decisions, in both 2015 and 2016.  Monsanto knew that off-label spraying would occur over XtendFlex cotton in 2015 *and it did in fact occur*. And, Monsanto knew off-label spraying would be "rampant" in 2016, and still Monsanto proceeded to commercialize Xtend soy in 2016, knowing growers would spray BASF's Clarity over the top.  This was no isolated incident or mistake or mere accident; rather, it served Monsanto's (and BASF's) plan to sell more product.  Internal company documents reveal "protection from your neighbor" and "defensive planting" (e.g. the threat and expectation of injury) would drive sales.

Furthermore, this reckless indifference spanned a decade, consisted of a pattern of repeated misconduct, and constitutes reprehensibility supporting the jury's award of punitive damages. *See May v. Nationstar Mortg., LLC*, 852 F.3d 806, 814 (8th Cir. 2017) (citing *Diesel Mach., Inc. v. B.R. Lee Indus., Inc*., 418 F.3d 820, 839 (8th Cir. 2005) (observing that a pattern of misconduct constitutes repeated actions).  Monsanto had countless opportunities to stop, heed industry and academic warnings, and protect Bader Farms.  But, Monsanto chose profits at every turn.  This was no mistake.  Monsanto's argument that its conduct was "on the low end" of reprehensibility ignores the evidence the jury obviously credited.  It also suggests that "strong medicine" is, indeed, required to deter Monsanto from repeating this conduct with future crop systems.  The first guidepost supports the jury's award.

The second *Gore* guidepost requires consideration of the ratio of the punitive damage award to the harm that either has occurred or is likely to result from Monsanto's

conduct.  *Blanks*, 450 S.W.3d at 411.  "High-ratio punitive-damage awards are sometimes necessary in order to have a sufficient deterrent effect."  *Id*.

The Court in *Poage v. Crane Co*. explained precisely why the jury's $250 million punitive damages award is proper in this case:

> The threat of a punitive damages award needs to be great enough to dissuade a company from engaging in wrongdoing; it needs to be substantial enough to create a negative value proposition for the company. Obviously, the risk of higher punitive damages awards increases the "cost" in a company's cost-benefit analysis.

523 S.W.3d 496, 523–24 (Mo. Ct. App. 2017).    Here, the jury heard evidence that Monsanto's net worth in 2018 was $7.8 billion.  02/15/2020 Trial Tr. 3012:17-21.  The jury concluded $250 million was necessary to sufficiently punish Monsanto's outrageous conduct and deter it and others from similar conduct.  This does not shock the conscience or set off any alarm bells.

Missouri courts applying the federal *Gore* guideposts have upheld punitive damages awards in double-digit ratios to compensatory damages, including in instances of multi-million-dollar verdicts.  *See, e.g., Ellison v. O'Reilly Automotive Stores, Inc*., 463 S.W.3d 426, 441-42 (Mo. App. W.D. 2015) (upholding 10:1 ratio, $2,000,000 in punitive damages with $200,000 in compensatory damages, in discrimination case); *Lynn v. TNT Logistics N. Am. Inc.*, 275 S.W.3d 304, 310-12 (Mo. App. W.D. 2008) (MHRA case where jury awarded $6.75 million in punitive damages, $50,000 in compensatory damages, trial court remitted the punitive damages to $450,000, and appellate court found the amount of remittitur to be abuse of discretion and, considering *Gore*, increased the punitive damages award to $3.75 million—a 75:1 ratio); *Mignone v. Missouri Dep't of Corr*., 546 S.W.3d

70

23, 45 (Mo. Ct. App. 2018), reh'g and/or transfer denied (Mar. 22, 2018) (upholding 10:1 ratio, $1 million punitive damages and $100,000 compensatory damages); *Lewellen v. Franklin,* 441 S.W.3d 136, 148 (Mo. 2014) (ratios of 40:1 and 22:1 were not grossly excessive).

BASF's suggested punitive damage ratio of 1:1 would punish and deter nothing. It would not create a negative value proposition for Monsanto, and it would have no noticeable impact on its cost-benefit analysis. In fact, such a low award would likely serve to encourage and embolden future reckless commercialization decisions because the potential profits from selling an incomplete system would still grossly exceed the costs, even with the assessed penalty.[15] Given the particulars of this case, the size of the punitive damages award does not violate Monsanto's due process rights.

---

[15] BASF incorrectly argues—with no legal authority—that this Court should evaluate the ratio using only 40% of the compensatory damage award (e.g. $6 million) because punitive damages were only submitted on the 2015-2016 claim. BASF Mem. at 59, n.28. This is error. The evidence at trial showed Bader Farms' orchard suffered an indivisible injury—numerous exposures over consecutive seasons to the same perennial trees, all causing or contributing to cause Bader Farms' lost profits and lost future profits. In these instances, while the conduct supporting an award of punitive damages can be limited to the 2015-2016 claim, the compensatory damages are not apportioned or limited by time period. The Eighth Circuit has explained:

> An indivisible injury has been defined as one which is "incapable of any logical, reasonable, or practical division." *Chrysler Corp. v. Todorovich*, 580 P.2d 1123, 1131 (Wyo.1978). Black's Law Dictionary 914 (4th ed. 1968) defines indivisible as "not susceptible of division or apportionment; inseparable; entire." As Professor Prosser has observed: "Certain results, by their very nature, are obviously incapable of any logical, reasonable or practical division. Death is such a result, and so is a broken leg or any single wound, the destruction of a house by fire, or the sinking of a barge." W. Prosser, Handbook of Torts, § 52, at 315 (4th ed. 1971).

*Mitchell v. Volkswagenwerk, AG*, 669 F.2d 1199, 1203, n.2 (8th Cir. 1982). Here, Monsanto (and BASF) effectively sank the barge. The exposures in 2015-2016 contributed to cause lost profits and lost future profits, and injury is not capable of division. This is why the verdict form did not

The third *Gore* guidepost—the relationship between the amount of punitive damages awarded and comparable civil penalties or awards—is only relevant when comparable civil penalties or awards exist. Most often, that is not the case, and Courts disregard this factor. *See Poage*, 523 S.W.3d at 523 ("The third guidepost is often 'inconsequential' and difficult to apply.") (citing *Brady v. Curators of Univ. of Missouri*, 213 S.W.3d 101, 111 (Mo. E.D. App. 2006) ("The Southern District of this court recognized the difficulty of applying the third guidepost in certain cases.").

There is no comparable civil penalty for destroying a family's peach business. Even where an arguably comparable statutory penalty exists (though none does in this case) Courts discount this guidepost where the jury imposed a punitive damage award to address egregious or repeated misconduct—something the statutes and ordinances rarely contemplate. *See, e.g., Lewellen*, 441 S.W.3d at 148 (Recognizing that "[t]here is no doubt that the punitive damages awards in this case are larger than the penalties authorized under the MMPA," but still upholding the 40:1 and 22:1 punitive damages awards based upon the other two guideposts due to egregious and repeated misconduct).

The jury's punitive damages award comports with due process and should stand.

## VI.    <u>**THE VERDICT WAS NOT AGAINST THE WEIGHT OF THE EVIDENCE**</u>.

In its Motion for a New Trial (Doc. No. 582, p.62), BASF argues that it is entitled to a new trial pursuant to Fed R Civ. P. 59(a)(1)(A) because the jury's verdict is against

---

call for the jury to apportion damages separately between the 2015-2016 and 2017-present claims. The applicable ratio should include the full compensatory award.

the weight of the evidence, resulting in a miscarriage of justice, citing *Gray v. Bicknell*, 86 F.3d 1472, 1480 (8th Cir. 1996).

BASF's passing citation to *Gray* omits critical aspects of the high standard for being granted a new trial, which requires the party seeking it to demonstrate a "miscarriage of justice."  In *Trickey*, the Eighth Circuit upheld Judge Limbaugh's order denying a motion for a new trial, and articulated the proper standard for a new trial in greater detail:

> The district court may grant a new trial when the first trial resulted in a miscarriage of justice, through a verdict against the weight of the evidence, an excessive damage award, or legal errors at trial. ***With respect to legal errors, a "miscarriage of justice" does not result whenever there are inaccuracies or errors at trial; instead, the party seeking a new trial must demonstrate that there was prejudicial error. Errors in evidentiary rulings are prejudicial only where the error likely affected the jury's verdict.***

705 F.3d 788 (8th Cir. 2013) (citations omitted). *See also*, *King v. Sw. Foodservice Excellence, LLC*, No. 17-cv-2551, 2019 WL 6115138 (E.D. Mo. Nov. 18, 2019); *Keller Farms Inc. v. Stewart*, No. 16-cv-265, 2018 WL 10322058 (E.D. Mo. Dec. 13, 2018).

It is almost entirely within the discretion of the trial court whether to grant a new trial. *See* Fed. R. Civ. P. 59(a); *Orthoarm, Inc. v. Forestadent USA, Inc.*, No. 4:06-CV-730-CAS, 2008 WL 4681385, at *2 (E.D. Mo. Oct. 21, 2008) (citing *Belk v. City of Eldon*, 228 F.3d 872, 878 (8th Cir. 2000)); *Leichihman v. Pickwick Int'l,* 814 F.2d 1263, 1267 (8th Cir. 1987). ("A motion for new trial is addressed to the judicial discretion of the district court and will not be reversed except for a clear abuse of that discretion."). Courts within this Circuit have further articulated the high standard necessary to satisfy the test for being granted a new trial under Rule 59.

A.    <u>**Weight Of The Evidence**</u>.

"In determining whether or not to grant a new trial, a district judge is not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *King v. Davis*, 980 F.2d 1236, 1237 (8th Cir. 1992) (citing *White v. Pence,* 961 F.2d 776, 780 (8th Cir. 1992)). "[T]he 'trial judge may not usurp the function of a jury... [which] weighs the evidence and credibility of witnesses.'" *White,* 961 F.2d at 780 (quoting *McGee v. S. Pemiscot Sch. Dist.*, 712 F.2d 339, 344 (8th Cir. 1983)). *See also*, *Hogan Logistics, Inc. v. Davis Transfer Co., Inc.*, No. 4:16-cv-1541 CAS, 2018 WL 3475532, *2-3 (E.D. Mo. July 19, 2018) citing *Manus v. Am. Airlines, Inc.*, 314 F.3d 968, 973 (8th Cir. 2003) (the court "may not usurp the role of the jury by granting a new trial simply because it believes other inferences and conclusions are more reasonable.") (quotation omitted).   "Instead, a district judge must carefully weigh and balance the evidence and articulate reasons supporting the judge's view that a miscarriage of justice has occurred." *King,* 980 F.2d at 1237.  *See also Keller Farms*, 2018 WL 10322058, at *1-2.

"[T]he prevention of injustice is the overriding principle in deciding whether to grant a new trial on the ground that the verdict was against the weight of the evidence." *Pickwick Int'l,* 814 F.2d at 1267; *King*, 2019 WL 6115138 at *3. "The court should reject a jury's verdict only where, after a review of all the evidence giving full respect to the jury's verdict, the court is left with a definite and firm conviction that the jury has erred." *Ryan v. McDonough Power Equip., Inc.*, 734 F.2d 385, 387 (8th Cir. 1984). ***Where***

***reasonable minds can differ in evaluating the credible evidence, a new trial based on the*** ***weight of the evidence should <u>not</u> be granted***. *Jacobs Mfg. Co. v. Sam Brown Co.*, 19 F.3d 1259, 1267 (8th Cir. 1994) (emphasis supplied); *see also*, *McKee v Reuter*, No. 16-cv-207, 2019 WL 6250845, \*5 (E.D. Mo. Nov. 22, 2019)(same); *Am. Modern Home Ins. Co. v. Thomas*, 413 F. Supp. 3d 921, 928 (E.D. Mo. 2019) (same).

**B.      Evidentiary Rulings.**

"An allegedly erroneous evidentiary ruling does not warrant a new trial unless the evidence was so prejudicial that a new trial would likely produce a different result." *Burris v. Gulf Underwriters Ins. Co.*, 787 F.3d 875, 880 (8th Cir. 2015) (internal quotation marks and citation omitted); *Am. Modern Home Ins. Co.*, 413 F. Supp. 3d at 928; *King Sw. Foodservice*, 2019 WL 6115138, \*3.

**C.      The Weight Of The Evidence Supports The Jury Verdict.**

As Plaintiff has already addressed each of the issues raised in this section in its oppositions to BASF's other post-trial motions, Plaintiff refers the Court to that briefing.

**1.      Joint Venture and Conspiracy**

*See* Sections I and II, Plaintiff's Opposition to BASF Corporation's Renewed Motion For Judgment As A Matter Of Law.

**2.      Negligent Design and Negligent Failure to Warn**

*See* Section IV, Plaintiff's Opposition to BASF Corporation's Renewed Motion For Judgment As A Matter Of Law.  *See also* Section III(A)*,* herein.

**3.      Compensatory Damages**

*See* Section V, Plaintiff's Opposition to BASF Corporation's Renewed Motion For

Judgment As A Matter Of Law.  *See also* Section III(B), herein.

### 4.     Punitive Damages

*See* Section V, herein.

## VII.   <u>THERE IS NO CUMULATIVE PREJUDICE</u>.

BASF urges the Court to apply the cumulative error doctrine as a basis to grant a new trial.  Specifically, BASF claims that multiple errors occurred at trial and those errors, "piled on top of one another," had a substantial prejudicial effect on the verdict, rendering the trial fundamentally unfair. To support its arguments, BASF relies on *Thompson v. City of Chi.*, 722 F.3d 963, 979 (7th Cir.2013), *Faught v. Washam*, 329 S.W.2d 588, 601-04 (Mo. 1959), and *Myers v. Moffett*, 312 S.W.2d 59, 65 (Mo. 1958).  But the Eighth Circuit has never endorsed the cumulative error doctrine cases in civil litigation.

As the Ohio Court of Appeals has noted, the Eighth Circuit has not adopted it.  *See Dep't of Natural Resources v. Ebbing*, 28 N.E.3d 682, 714, n.22 (Ohio Ct. App. 2015).

> Among Federal Appellate Courts, this issue is similarly undecided. The Third Circuit Court of Appeals has affirmatively stated that it does not apply cumulative error in civil cases. *See U.S. S.E.C. v. Infinity Group Co.,* 212 F.3d 180, 196 (3d Cir.2000). The Fourth, Tenth, and Eleventh Circuits have all indicated that their courts have not affirmatively determined the issue of whether cumulative error applies in civil cases. *See Greig v. Botros,* 525 Fed.Appx. 781, 795 (10th Cir.2013); *Esoteric, LLC v. One (1) 2000 Eighty–Five Foot Azimut Motor Yacht Named M/V STAR ONE,* 478 Fed.Appx. 639, 641 (11th Cir.2012); *Anthony v. Ward,* 336 Fed.Appx. 311, 322 (4th Cir.2009). On the other hand, the Second, Sixth, Seventh, Ninth, and Federal Circuits have all stated that they would apply the cumulative error doctrine in civil cases (and some have actually applied it to reverse a judgment). *Malek v. Federal Ins. Co.,* 994 F.2d 49, 55 (2d Cir.1993); *Kendel v. Local 17–A United Food & Commercial Workers,* 512 Fed.Appx. 472, 485 (6th Cir.2013); *Thompson v. City of Chicago,* 722 F.3d 963, 979 (7th Cir.2013); *Jerden v.*

      *Amstutz,* 430 F.3d 1231, 1240–41 (9th Cir.2005); *Hendler v. United States,*
      952 F.2d 1364, 1383 (Fed.Cir.1991).

Further, it appears unlikely that the Eighth Circuit would apply the cumulative error

doctrine in civil cases since it has rejected the doctrine for criminal cases. *See Middleton*

*v. Ropern*, 455 F.3d 838, 851 (8th Cir. 2006) ("Second, Middleton's argument contradicts

Eighth Circuit precedent. We repeatedly have recognized 'a habeas petitioner cannot build

a showing of prejudice on a series of errors, none of which would by itself meet the

prejudice test.'") (citation omitted); *United States v. Robinson*, 301 F.3d 923, 925, n.3 (8th

Cir. 2002) (recognizing "the numerosity of the alleged deficiencies does not demonstrate

by itself the necessity for habeas relief," and noting the Eighth Circuit's rejection of

cumulative error doctrine) (citing *Wainwright v. Lockhart,* 80 F.3d 1226, 1233 (8th Cir.

1996) (rejecting the argument that cumulative effect of errors alone demonstrated a

deprivation of fair trial)).

      The two state court cases that BASF relies on for the cumulative error doctrine,

*Fought* and *Myers*, are questionable authority.  In *Moore v. Ford Motor Co.*, No. ED-

92770, 2009 WL 4932736, *6 (Mo. Ct. App. Dec. 22, 2009), *aff'd in part*, 332 S.W.3d

749, 769, n.13 (2011), the Missouri Court of Appeals addressed the "two cases more than

fifty years old" (*Fought* and *Myers*) cited by appellant to support their contention that the

cumulative effect of non-prejudicial errors can be sufficient to show overall prejudice. *Id*.

The Court noted "recent cases interpreting that proposition have not found the cumulative

error argument to be persuasive." *Id*.  Finding that none of the appellants' allegations

resulted in errors either singly or in combination with each other, the Court upheld the denial of the motion for a new trial based on cumulative errors.

**A.** **None Of The So-Called Errors Cited By BASF Are Error, And Even If They Were, There Was No Prejudice.**

As Plaintiff has already addressed each of the issues raised in this section throughout this brief, Plaintiff refers the Court to those specific sections.

**1.** **Dr. Baldwin Is An Expert.**

*See* Section I(A), herein.

**2.** **BASF's Late Identified Experts Were Properly Excluded.**

*See* Section I(B), herein.

**3.** **Evidence of Other Claims Was Proper.**

*See* Section II(A-C), herein.

**4.** **The Court Properly Instructed The Jury As to Damages, Joint Venture, and Conspiracy.**

*See* Section III(C-D), herein.

**5.** **The Court Properly Reversed the Ruling On Joint Punitive Damages.**

*See* Section IV, herein.

**VIII. CONCLUSION**

For all these reasons, BASF Corporation's Alternative Motion for New Trial should be denied.

Dated: April 24, 2020.

Respectfully submitted,

By: *Beverly T. Randles*  _____
Billy R. Randles, #40928MO
Beverly T. Randles, #48671MO
Angela M. Splittgerber, #53271MO
RANDLES & SPLITTGERBER, LLP
5823 N. Cypress Ave.
Kansas City, Missouri 64119
(816) 744-4779
bill@randleslaw.com
bev@randleslaw.com
angie@randleslaw.com

DAVIS GEORGE MOOK LLC
Brett A. Davis, #43299MO
Tracey F. George, #52361MO
L. Benjamin Mook, #49821MO
1600 Genessee, Ste. 328
Kansas City, MO 64102
Tel. (816) 569-2629
Fax (816) 447-3939
brett@dgmlawyers.com
tracey@dgmlawyers.com
ben@dgmlawyers.com
*Attorneys for Plaintiff*