**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| **BADER FARMS, INC. and** | ) | |
| **BILL BADER** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **MDL No. 1:18md2820-SNLJ** |
| | ) | |
| **v.** | ) | **Case No. 1:16cv299-SNLJ** |
| | ) | |
| **MONSANTO CO. and** | ) | |
| **BASF CORP.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM and ORDER

After a three-week-long jury trial, this Court entered judgment for plaintiff Bader Farms, Inc. and against defendants Monsanto Company and BASF Corporation and awarded actual damages in the amount of $15,000,000 and punitive damages in the amount of $250,000,000. Currently before the Court are BASF's renewed motion for judgment as a matter of law [#579], BASF's alternative motion for a new trial [#581], BASF's motion to alter judgment [#583], Monsanto's renewed motion for judgment as a matter of law on punitive damages or motion for new trial or remittitur [#585], Monsanto's renewed motion for judgment as a matter of law or new trial [#587], Monsanto and BASF's motions for hearing [#621, #624], BASF's motion to join Monsanto's supplemental brief [#643], and plaintiff's motion to strike [#642].

Plaintiff Bader Farms grows peaches and other crops in the Missouri Bootheel region. Plaintiff claims that its peach orchards suffered injury beginning in 2015 after defendants Monsanto Company (a company that sells crop seed and herbicide) and BASF

1

Corporation (a company that sells herbicide) conspired to develop and market dicamba-tolerant ("DT") seeds and dicamba-based herbicides. Dicamba had long been used as an agricultural herbicide, as it kills many plants not genetically modified to withstand its use. The defendants sought to make DT seeds to combat weeds that had become resistant to Roundup and other herbicides. Dicamba, however, was known for being prone to drift and volatilization, which can cause injury to non-DT crops, so defendants had to formulate a low-volatility herbicide to be used with the DT seed.

Plaintiff claims the defendants conspired to create an "ecological disaster," where Monsanto released its DT seeds in 2015 and 2016 with no corresponding low-volatility dicamba herbicide. As a result, farmers illegally sprayed an old formulation of dicamba herbicide that was unapproved for in-crop, over-the-top use and was prone to drift. Drifting dicamba would cause damage to neighboring, non-tolerant crops, forcing neighboring farmers to plant Monsanto's dicamba-tolerant seed defensively, and that increased demand for both defendants' new dicamba herbicide during the 2017 growing season. Some farmers, like plaintiff here, could not plant a DT crop, and they say they suffered injuries from the nearby dicamba use as a result.

Numerous lawsuits were filed against defendants based on these circumstances, and the cases filed in federal court have been consolidated into the *In re Dicamba Herbicides Multi-District Litigation*,1:18-MD-2820-SNLJ (E.D. Mo.) (the "MDL"). The present case was filed on November 23, 2016 and was consolidated into the MDL. Numerous MDL plaintiffs have joined the Master Crop Damage complaint, which focuses on soybean growers in several states. The *Bader* plaintiff did not join in the Master Crop Damage

2

complaint and followed its own litigation schedule. The parties are in the process of settling the soybean-related and other claims, but the *Bader* plaintiffs are not involved in those settlement discussions.

## I.     BASF's Renewed Motion For Judgment As A Matter Of Law [#579]

Federal Rule of Civil Procedure 50 states that a court should grant judgment as a matter of law when a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue. Fed. R. Civ. P. 50(a)(1); *Duban v. Waverly Sales Co*., 760 F.3d 832, 835 (8th Cir. 2014). The Court must "(1) resolve direct factual conflicts in favor of the nonmovant; (2) assume as true all facts supporting the nonmovant which the evidence tended to prove; (3) give the nonmovant the benefit of all reasonable inferences; and (4) deny the motion if the evidence so viewed would allow reasonable jurors to differ as to the conclusions that could be drawn." *Roberson v. AFC Enters., Inc*., 602 F.3d 931, 933 (8th Cir. 2010) (quoting *Larson ex rel. Larson v. Miller*, 76 F.3d 1446, 1452 (8th Cir. 1996) (en banc)).

This Court applies the same standard as that for granting summary judgment. *Tatum v. City of Berkeley*, 408 F.3d 543, 549 (8th Cir. 2005). The motion "must be granted when the non-movant's case rests solely upon speculation and conjecture lacking in probative evidentiary support." *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1050 (8th Cir. 2000) (quotation omitted).

### A. Joint Venture Claim

The jury found that defendants BASF and Monsanto were in a joint venture. BASF argues that the joint venture theory fails as a matter of law because (1) their relationship

was fully governed by express written contracts, and (2) there is no evidence of any implied agreement meeting the requirements of a joint venture.

### 1.    Legal framework

A joint venture is "an association of two or more persons to carry out a single business enterprise for profit." *Ritter v. BJC Barnes Jewish Christian Health Sys*., 987 S.W.2d 377, 387 (Mo. App. 1999). The elements of a joint venture are (1) "an express or implied agreement among members of the association," (2) "a common purpose to be carried out by the members," (3) "a community of pecuniary interest in that purpose," and (4) an "equal voice" among all members "in determining the direction of the enterprise." *Id.* In other words, a joint venture is a partnership that is limited to a single business purpose. *See Jeff-Cole Quarries, Inc. v. Bell*, 454 S.W.2d 5, 14-15 (Mo. 1970).

The crux of BASF's first argument is that "corporations may become members of joint ventures only by express agreement or contract," relying on *In re Genetically Modified Rice Litig*., 666 F. Supp. 2d 1004, 1027 (E.D. Mo. 2009), *adhered to on reconsideration*, 4:06MD1811 CDP, 2011 WL 5024548 (E.D. Mo. Oct. 21, 2011). BASF's premise appears to be an overstatement of the law.  As this Court observed in its Memorandum & Order denying summary judgment [#288 at 16], the *Rice* decision nonetheless reserved the joint venture question for the jury where the express agreements between defendants showed the companies were operating under their express corporate forms or as a joint venture.  *Id.*

The oft-cited case in support of BASF's argument is *Ritter*, which states that "courts will not imply a joint venture where the evidence indicates that the parties created a different business form." *Ritter*, 987 S.W.2d at 387 (relying on *Rosenfeld v. Brooks*, 895 S.W.2d 132, 135 (Mo. App. E.D. 1995)).  That is because "the unequivocal existence of a

definite business form is the most reliable expression of the relationship among the parties." *Rosenfeld*, 895 S.W.2d at 135, *cited by Ritter*, 987 S.W.2d at 387.  Ritter states that "Although Missouri courts hold that a corporation may be an arm of a joint venture, we will not imply this arrangement." *Id.* (citing *Rosenfeld*, 895 S.W.2d at 135).  That said, *Ritter* went on to consider whether the corporate parties' relationship met the elements of a joint venture and concluded that it did not. *Id.*

Looking to *Rosenfeld*, then, the plaintiff there sought to show that the corporation he had created with other individuals was a joint venture and that a sale in stock of a corporation to another company had created a joint venture. *Rosenfeld*, 895 S.W.2d at 133. The court held that the express contracts governing those transactions did not support that a joint venture existed, nor could plaintiff show any existence of an oral contract.  *Id.* at 135. The court then observed,

> Nor can plaintiff show an implied joint venture agreement. Although plaintiff presented several facts consistent with an implied agreement, it is inappropriate for a court to imply a joint venture where, as here, it is evident that there is a different business form involved. "The existence of a different type of express contract is in itself inconsistent with a claimed relationship of a joint venture by implication." *Jeff–Cole Quarries, Inc. v. Bell*, 454 S.W.2d 5, 16 (Mo. 1970). This principle dictates that the unequivocal existence of a definite business form is the most reliable expression of the relationship among the parties. In this case, the unequivocal existence of the corporate form of SCC precludes plaintiff from demonstrating the joint venture by implication.

*Rosenfeld*, 895 S.W.2d at 135.   The *Ritter-Rosenfeld* rule appears to be, then, simply that an "unequivocal existence of a definite business form is the most reliable expression of the relationship." *Id.* However, *Rosenfeld* goes on to say "that it is possible for a corporation to exist as an arm of a joint venture. However, courts will not *imply* such arrangements."  *Id.* (emphasis in original).  *Rosenfeld*'s pronouncement that courts will not imply corporate

joint ventures cites *Denny v. Guyton*, 40 S.W.2d 562, 569–70 (Mo. *banc* 1931), but *Guyton* actually holds to the contrary.

The Missouri Supreme Court discussed the "recent origin" of joint venture at length in the 1931 *Guyton* case. *Id.* at 570. The court noted that joint venture "need not be express but may be implied in whole or in part from the conduct of the parties." *Id.* at 571 (quoting 33 C.J. 847). "If a joint venture is proved, either by direct evidence of a mutual agreement to that end or by proofs of facts and circumstances from which it is made to appear that such enterprise was in fact entered into, the law fixes the rights of the parties." *Id.* (quoting 33 C.J. 848). In discussing "an abundance of case law on the subject," *Guyton* points out that joint venture "can arise only by contract or agreement between the parties[,]…. But joint adventure may be established without any specific formal agreement to enter into a joint enterprise; it may be implied or proven by facts and circumstance showing such enterprise was in fact entered into." *Id.* (citations omitted).

The Missouri Supreme Court further stated,

> Bearing in mind that the existence of an agreement of joint adventure may also be inferred from the acts and conduct of the parties, we now turn to facts and circumstances in evidence some of which in the opinion of the trial judge, who alone had the advantage of seeing and hearing all the litigating parties except Wolcott on the witness stand, outweighed the denials of these three defendants and other evidence introduced in their behalf on this question. It has been well said by the Supreme Court of Oklahoma in *O. K. Boiler & Welding Company et al. v. Minnetonka Lumber Company et al.*, 103 Okl. 226, 229 P. 1045, 1047, 1048: "Whether a joint enterprise has been created or not may be determined from the apparent purposes and the acts and conduct of the parties who join in the undertaking. The acts and conduct of the parties engaged in the accomplishment of the apparent purposes may speak above the expressed declarations of the parties to the contrary."

40 S.W.2d at 583 (emphasis added).

6

The court even added that "we are not favorably impressed with the argument that if there had been an agreement of joint adventure, it would have been evidenced by a written contract…." *Id.* at 585.  The court concluded, "Upon a thorough study of the entire record, we find from the evidence [the parties] engaged together under an oral agreement as joint adventurers in the business of furnishing horses and mules to the British government[.]" *Id.* at 586.  This agreement of parties was apparently evidenced by both oral statements among the parties and other facts and circumstances that together implied what was not written (and which in fact conflicted with the stated corporate forms of the parties). Finally, the court repeatedly acknowledged the importance of inferences from "acts and conducts," and it states nowhere that a joint venture cannot be implied among corporate entities.  *Id.* at 583.

"A federal court must follow the announced state law … unless there are very persuasive grounds for believing the state's highest court would no longer adhere to it." *See Williamson v. Hartford Life and Acc. Ins. Co.*, 716 F.3d 1151, 1154 (8th Cir. 2013). This Court is thus bound to follow the law of the Supreme Court of Missouri in this case. *Id.* Certainly, an express statement of corporate form is important evidence in a joint venture analysis, but the written agreements do not end this Court's inquiry.  Indeed, a later Missouri Supreme Court case—*Jeff-Cole Quarries*—was also relied upon by *Rosenfeld* and involved a joint venture among individuals and "alter ego corporations." *Jeff-Cole Quarries*, 454 S.W.2d at 15-16.  The court observed that "the controlling consideration here is that the parties entered into a detailed contract" for construction of certain buildings. *Id.* at 16.  The court held that "there is no sufficient evidence that this contract did not represent the intent of the parties.  The existence of a different type of express contract is in itself inconsistent" with an implied joint venture. *Id.*  Nevertheless, consistent with *Guyton*,

the *Jeff-Cole* court went on to examine the circumstances of the transactions and whether the parties had in fact entered into a contract of joint venture: "There certainly was no evidence of an express agreement to create a joint venture," the court stated; "the question here is whether the evidence shows, by facts and circumstances, that one was in fact created." *Id.*

Recent authority further supports that an implied agreement is permitted. *See TooBaRoo, LLC v. Western Robidoux, Inc.*, 2020 WL 5637616, at *7, --- S.W.3d --- (Mo. App. W.D. Sept. 22, 2020). *TooBaRoo* involved two businesses and stated that a joint venture "arises only from contract, but the agreement may be established without formal terms, and implied from circumstances that such an enterprise was in fact entered into." *Id.* In sum, other court of appeals opinions—*Ritter* and *Rosenfeld* in particular—rejecting the possibility of an implied joint venture appear to misread Missouri Supreme Court precedent. This Court thus rejects BASF's argument that an express joint venture was required as a matter of law under the circumstances. That said, this Court bears in mind that "the unequivocal existence of a definite business form is the most reliable expression of the relationship among the parties." *Rosenfeld*, 895 S.W.2d at 135. And, further, the "existence of a different type of express contract is in itself inconsistent with a claimed relationship of a joint venture by implication." *Jeff–Cole Quarries*, 454 S.W.2d at 16.

The evidence in this case is that Monsanto and nonparty BASF SE entered into the 2010 Umbrella Agreement, which formed an Alliance Management Team ("AMT"). The AMT itself has no apparent corporate form, but, as will be explained, its purpose was effectively to carry out a joint venture between BASF SE's affiliate (defendant BASF Corporation) and Monsanto. Later agreements (but not all of them) indeed disclaimed a joint venture, but, plaintiff insists, the menagerie of agreements and course of conduct,

taken together form an implied joint venture.  That is not antithetical to *Jeff-Cole*, *Guyton*, *Ritter, Rosenfeld*, *Rice*, or any other Missouri authority.  As explained at length in this Court's Memorandum and Order denying summary judgment, ultimately

> "the question here is whether the evidence shows, by facts and circumstances, that [a joint venture] was in fact created." *Jeff-Cole Quarries, Inc.*, 454 S.W.2d at 16.  "The required intent necessary to find a partnership existed is not the intent to form a partnership, but the intent to enter a relationship which in law constitutes a partnership." *Morley v. Square, Inc.*, 4:10CV2243 SNLJ, 2016 WL 1615676, at *7 (E.D. Mo. Apr. 22, 2016) (quoting *Hillme v. Chastain*, 75 S.W.3d 315, 317 (Mo. App. S.D. 2002)) (internal quotation omitted).

[#288 at 12.]  The Court next turns to the elements necessary to show a joint venture.

## 2. Implied Agreement

As indicated, the elements necessary to show a joint venture are (1) "an express or implied agreement among members of the association," (2) "a common purpose to be carried out by the members," (3) "a community of pecuniary interest in that purpose," and (4) an "equal voice" among all members "in determining the direction of the enterprise." *Ritter*, 987 S.W.2d at 387.  BASF insists that evidence at trial did not satisfy these requirements.

BASF and Monsanto entered into multiple agreements pertaining to the development and commercialization of their dicamba tolerant ("DT") system.  To implement that system, the 2010 Umbrella Agreement mentioned above formed a joint governing body called the Alliance Management Team ("AMT") with equal representation from both BASF entities and Monsanto and alternating chairmanship. Later, Monsanto and BASF Corp., acting through the AMT, entered into a March 8, 2011 Dicamba Tolerance System Agreement ("DTSA"), a June 9, 2014 Amended & Restated Dicamba Tolerance System Agreement ("ARDTSA"), and an October 2014 Letter Agreement. On the issue of

joint control, this Court thoroughly considered these agreements and surrounding circumstances as submitted in the parties' summary judgment briefing and observed as follows:

> Some BASF documents also refer explicitly to the arrangement as a "joint venture." A 2015 invoice from BASF to Monsanto, for example, sought $349,922.51 for "the Dicamba Joint Venture." Other documents, such as a BASF presentation to the EPA and others stated that "BASF and Monsanto are engaged in a joint venture."

> Defendants say those statements are irrelevant and that the question of whether the ARDTSA creates a joint venture between BASF Corp. and Monsanto should be decided within the four corners of the contracts alone. To that end, defendants point out that the ARDTSA states that the parties intend to operate as independent contractors and disclaims any intent to create a partnership. Moreover, defendants argue that the ARDTSA's merger clause states that it is the whole agreement with respect to subject matter and displaces other oral or written agreements.

> Regardless of the ARDTSA's disclaimer of a partnership or joint venture, as this Court has stated, "the question here is whether the evidence shows, by facts and circumstances, that one was in fact created." *Jeff-Cole Quarries*, 454 S.W.2d at 16. "The required intent necessary to find a partnership existed is not the intent to form a partnership, but the intent to enter a relationship which in law constitutes a partnership." *Morley v. Square, Inc.*, 4:10CV2243 SNLJ, 2016 WL 1615676, at *7 (E.D. Mo. Apr. 22, 2016) (quoting *Hillme v. Chastain*, 75 S.W.3d 315, 317 (Mo. App. S.D. 2002)) (internal quotation omitted).

> To further distance themselves as joint venturers, and dispel the allegations that there was joint control or "equal voice," defendants characterize the ARDTSA as a "licensing and supply" agreement. Plaintiffs counter that the ARDTSA was in fact an amendment of a Project Agreement under the parties' pre-existing Umbrella Agreement. Under the Umbrella Agreement, according to plaintiffs, the parties agreed to contribute assets, including intellectual property and know-how to the joint development and commercialization of agricultural products in areas including seed treatment and weed control. Defendants, though, contend that the Umbrella Agreement is irrelevant to this dispute because the DTSA and ARDTSA both contain merger clauses. However, the parties do not appear to dispute that BASF and Monsanto entered into many agreements pertaining to the DT project, and

that each agreement pertains to its own subject matter—that is, the project was complex and involved numerous stand-alone agreements, and some of those agreements refer to each other.

Under the DTSA, in addition to certain obligations to grant reciprocal licenses, share access to regulatory data, and supply materials (including dicamba herbicide and dicamba-tolerant seed), the parties agreed Monsanto would make DT Systems Payments to BASF, which they call "value share payments."   The DTSA also established joint working groups, through which Monsanto and BASF jointly pursued development, regulatory, and commercialization efforts pertaining to their DT System.  Among other things, the Regulatory Working Group coordinated registration of herbicides for use in the DT system; the Development Working Group coordinated field trials and developed label recommendations and research studies; and the Commercialization Working Group evaluated operational considerations including forecasts for seed volume and chemistry volume, developed and coordinated a communications strategy, and developed and coordinated the commercial launch strategy.

On June 9, 2014, Monsanto and BASF entered into the ARDTSA. The ARDTSA contains all the same definitions as the DTSA for "Commercial Launch," "DT System," and "Losses."  The ARDTSA, like the DTSA, defines the DT System to include BASF's Clarity, BASF's "old dicamba" brand. The ARDTSA modifies the value share payments provided in the DTSA, basing them only on traited acres ("Traited Acres Payments"). Pursuant to their various agreements, Monsanto and BASF coordinated the strategy and schedule for commercialization of the dicamba tolerant cropping system—including DT seed and dicamba formulations—through the Commercialization Working Group, which in turn reported to the Alliance Management Team ("AMT"), which was established in the Umbrella Agreement.  As discussed above, the AMT includes equal representation and alternating chairmanship.  From March 2010 until the eve of the product launch, Monsanto and BASF continued to collaborate on and discuss aspects of the dicamba tolerant crop system at meetings of the AMT under the protocols set forth in the Umbrella Agreement.  In total, there were at least 17 meetings of the AMT in which the aspects of the dicamba tolerant crop system were discussed.  Under these circumstances, plaintiffs have at least established a question of fact regarding joint control.

[#266 at 11-14.]

The evidence anticipated on summary judgment was indeed offered at trial. Plaintiff's evidence was ample and persuasive.  The Umbrella Agreement in particular provides convincing evidence that the AMT was structured to provide the parties with joint control over the project.  Then, the parties furthered their joint control through the DTSA and ARDTSA and the creation of the various working groups.

BASF insists, though, that the various agreements show that the parties did not intend for a joint venture to exist and in fact prohibited any agreement outside the confines of those contracts. BASF's lead negotiator testified that he did not intend to create a joint venture with Monsanto. BASF further states plaintiffs cannot rely upon documents that refer to a "joint venture" because, BASF says, they are passing references by low-level, non-attorney employees with no material involvement with or knowledge of the operative agreements.[1]

To be sure, the "intent of the parties is the primary factor for determining whether a partnership exists." *Morley v. Square, Inc*., 4:10CV2243 SNLJ, 2016 WL 1615676, at *7 (E.D. Mo. Apr. 22, 2016) (citation omitted); *see also Grissum*, 505 S.W.2d at 85. However, "The required intent necessary to find a partnership existed is not the intent to form a partnership, but the intent to enter a relationship which in law constitutes a partnership." *Id.* (quoting *Hillme v. Chastain*, 75 S.W.3d 315, 317 (Mo. App. S.D. 2002)) (internal quotation omitted). The evidence at trial satisfies this standard and goes well beyond the "low-level" employee references BASF cites.  Again, the Umbrella Agreement and related

---

[1] In that regard, despite the disclaimers in two agreements, some BASF documents refer explicitly to the arrangement as a "joint venture." A 2015 invoice from BASF to Monsanto, for example, sought $349,922.51 for "the Dicamba Joint Venture." Other documents, such as a BASF presentation to the EPA and others stated that "BASF and Monsanto are engaged in a joint venture."

agreements, along with the actions of the AMT and workgroups, were ample evidence of intent to form a joint venture.  Evidence at trial included joint work plans listing the parties' extensive dicamba commercialization, regulatory, and development tasks, all approved by equal vote of the Umbrella Agreement's AMT. That AMT conducted at least 19 (not 17) meetings to coordinate the commercialization of the DT system.  As this Court has already noted, "the acts and conduct of the parties engaged in the accomplishment of the apparent purposes may speak above the expressed declarations of the parties to the contrary." *Guyton*, 40 S.W.2d at 583 (quotation omitted).  The jury reasonably found that the defendants had intended what is in law a joint venture.

As for whether BASF and Monsanto shared a pecuniary interest, "participation in profits and losses is the usual and perhaps most cogent test of the intention of the parties, but this is not conclusive."  *Grissum*, 505 S.W.2d at 85.  On the other hand, as this Court has observed, the requirement of "shared losses" is not a strict one under Missouri law. *Morley*, 2016 WL 1615676, at *8. Further, the losses need not be shared equally, and the joint venturers can choose to make whatever arrangements they think are appropriate. *Pigg v. Bridges*, 352 S.W.2d 28, 33 (Mo. *banc* 1961) ("There need not necessarily be an agreement to share losses. There must be, however, some control over the subject matter thereof or property engaged therein."); *see also Allison v. Dilsaver*, 387 S.W.2d 206, 213 (Mo. App. Springfield Dist. 1965); 48A C.J.S. Joint Ventures § 14. Moreover, the focus on "shared profits and losses" ignores that "profit" necessarily contemplates a "benefit [or] advantage remaining after all costs, charges, and expenses have been deducted from income." *Labor Discount Ctr., Inc. v. State Bank & Tr. Co. of Wellston*, 526 S.W.2d 407, 424 (Mo. App. E.D. 1975).  BASF agreed Monsanto would pay BASF "value share payments" as a means of sharing profits "for every single acre" of dicamba-tolerant seed

13

planted from 2015 to the present. Evidence shows that those payments were in fact made. In addition, Monsanto and BASF jointly agreed to share access to proprietary testing and data for regulatory approval, share materials to enable testing and development, share in the costs of dicamba residue testing, and make capital expenditures to fulfill their respective obligations under the agreements. Certainly, the concept of "shared losses" cannot be rigidly applied in the same way to every joint venture relationship, especially where, as here, the parties to the joint venture bring different assets and risks to the table. *See Allison*, 387 S.W.2d at 213. Although BASF relies on *Hatch v. V.P. Fair Found., Inc*., 990 S.W.2d 126, 138 (Mo. App. E.D. 1999), for the proposition that sharing in income is not sharing in profits, that case involved an agreement in which one party "was not to share in any of" the other's losses.  That court found that the record thus "did not support a finding that the parties had a community of pecuniary interest."  *Id.*  Here, though, BASF's focus on what it calls its "fixed" payments ignores that BASF also enjoyed additional profits gained from its enhanced sales of dicamba herbicide and its licensing of that herbicide for others to sell.  In that regard, "the mode of participation in the fruits of the undertaking may be left to agreement of the parties, and the benefits need not be of equal value or kind."  48A C.J.S. Joint Ventures § 14.  The big picture, then, demonstrates that Monsanto's profits were to be derived from its sale of seeds and herbicide; BASF's profits were derived from the sale of its herbicides and licenses, with the value share payments to BASF to even out their share.  There is enough evidence here to support the jury's finding of a shared pecuniary interest.

Finally, BASF continues to insist that the proper standard of proof is "clear and convincing evidence," and not the "preponderance of the evidence" applied by the Court.

This Court thoroughly addressed this matter in its Memorandum and Order on BASF's motion for reconsideration:

> In support of the clear and convincing standard, BASF relies on *Cutcliff v. Reuter*, 889 F.3d 491, 495 (8th Cir. 2018), in which the Eighth Circuit stated that a partnership can be established "by implication…only …where there is clear, cogent and convincing evidence that the purported partners have made a definite and specific agreement." *Id.* (quoting *Morrison v. Labor & Indus. Rel. Comm'n*, 23 S.W.3d 902, 909 (Mo. App. 2000)). <u>This Court, however, is bound to follow the law of the Supreme Court of Missouri in this case.</u> *See Williamson v. Hartford Life and Acc. Ins. Co*., 716 F.3d 1151, 1154 (8th Cir. 2013) ("A federal court must follow the announced state law … unless there are very persuasive grounds for believing the state's highest court would no longer adhere to it."). BASF states in its reply that *Grissum v. Reesman*, 505 S.W.2d 81, 86 (Mo. 1974), "applied the clear and convincing evidence standard to determine whether the plaintiff and her brother formed a partnership by implication." (#323 at 3 (citing *Grissum*, 505 S.W.2d at 86.) But as this Court painstakingly set out in *Morley v. Square, Inc*., 4:10CV2243 SNLJ 2016 WL 1615676 (E.D. Mo. Apr. 22, 2016), although *Grissum* is the most recent Missouri Supreme Court pronouncement, the rule has been frequently misstated. Per *Grissum*, 505 S.W.2d at 86, the rule in Missouri is that "[a] preponderance of the evidence is necessary and sufficient to prove a joint adventure. The clear and convincing standard, then, is simply the exception to the general rule for [cases involving an oral contract to convey real estate or a resulting trust in real property]." *Morley*, 2016 WL 1615676, at *7 (internal citation omitted). *Grissum* relied on *Brooks v. Brooks*, 208 S.W.2d 279 (Mo. 1948), which in turn relied on 48 *C.J.S. Joint Adventures*, § 12 (1965), for the general rule that a "preponderance of the evidence is necessary and sufficient to prove a joint adventure." *Id.* at 284. Not long after *Grissum*, an appellate court stated (relying on *Grissum*) that the agreement must be "proved by cogent, clear and convincing evidence, or at least by a preponderance of the credible evidence." *Brotherton v. Kissinger*, 550 S.W.2d 904, 907 (Mo. App. S.D. 1977). This confusion continued as other cases relied on *Brotherton*, such as *Morrison*, 23 S.W.3d at 3 909. *Cutcliff*, relied upon by BASF, cites *Morrison* and notes that a partnership must be proved by "clear, cogent, and convincing evidence," but omits a later passage in *Morrison* that includes the phrase "…or at least by a preponderance of the evidence." *Compare Cutcliff*, 889 F.3d at 495, *with Morrison*, 23 S.W.3d at 909. In any event, as BASF appears to acknowledge, the Missouri Supreme Court has not reversed *Grissum*. And this Court is bound to follow *Grissum* as the most recent Missouri Supreme Court pronouncement. *Williamson*, 716 F.3d at 1154.

15

[#453 at 1-3 (emphasis added).] In fact, the Missouri Court of Appeals recently adopted this Court's analysis in *Morley* and observed that "opinions from the Missouri Court of Appeals failing to follow the most recent controlling precedent from the Missouri Supreme Court…should no longer be followed as to the issue of the burden of proof." *TooBaRoo*, 2020 WL 5637616, n.8. This Court again declines to reconsider its analysis on this matter in light of the clear Missouri Supreme Court precedent it is bound to follow.

###    B.    Conspiracy Claim

Next, BASF seeks judgment as a matter of law on plaintiff's conspiracy claim. To establish a conspiracy, plaintiff must show the following elements: (1) two or more persons; (2) with an unlawful objective; (3) after a meeting of the minds; (4) committed at least one act in furtherance of the conspiracy; and (5) plaintiff was thereby damaged. *W. Blue Print Co., LLC v. Roberts*, 367 S.W.3d 7, 22 (Mo. *banc* 2012). The conspiracy must be proven by "clear and convincing evidence." *Nat'l Rejectors, Inc. v. Trieman*, 409 S.W.2d 1, 50 (Mo. 1966). The unlawful objective plaintiff alleges defendants created was an "ecological disaster" caused by release of the DT system.

BASF contends it cannot be liable for conspiring with Monsanto for plaintiff's alleged 2015 and 2016 damages because BASF Corporation played no role in Monsanto's decision to release DT seed in those years before a corresponding low-volatility herbicide came out. To be sure, the ARDTSA reserved to Monsanto alone the decision of whether, when, and how to commercialize DT seed, and Monsanto stipulated that BASF had no involvement in the decision. BASF further contends there is no evidence BASF encouraged farmers to spray older dicamba formulations illegally at any time, and that there is no evidence defendants agreed to design intentionally defective herbicides

16

Plaintiff responds that the jury instruction, Instruction 17, required only the following:

> First, defendants agreed to develop and commercialize the dicamba-tolerant system, and
>
> Second, defendants made said agreement with the expectation that off-target movement and damage to third-party farmers would increase sales of their dicamba-based products, and
>
> Third, defendants carried out said agreement, and
>
> Fourth, defendants' acts in furtherance of their agreement caused or directly contributed to cause plaintiffs' damages.

[#554 at Instruc. 17.] Plaintiff explains that the instructions did not require that the jury to find (1) that defendants jointly agreed to release the DT seed in 2015-2016, (2) that defendants agreed to encourage farmers to illegally spray old dicamba intending to cause off-target movement and drive defensive planting of DT seed, or (3) that defendants agreed to create defective new dicamba herbicides for the same reason.

BASF argues that even if the record supports the elements set out in Instruction 17, that Instruction does not set out the elements for an actionable conspiracy.  For example, BASF says, the instructions did not require that the defendants agreed to pursue an unlawful objective: The "only 'agreement' that the jury was asked to evaluate was whether defendants agreed to 'develop and commercialize the dicamba-tolerant system.'" [#620 at 21]. That agreement, BASF says, was lawful—and plaintiff admits it was lawful in its response to another motion [#611 at 72]. But plaintiff insists that the expectation of off-target movement and damage to third-party farmers to increase sales is an unlawful means. BASF responds that defendants obtained the legal right and authorization to sell their respective products and launches into a discussion of EPA approval. This appears to be an

effort to change the subject. Notwithstanding the defendants' legal right to sell their products, Instruction 17 asked the jury whether defendants sold the products expecting that damage to third parties would increase their sales. It is the knowledge of injury to third parties and the expectation that such injuries would fuel more sales that plaintiff posits is an unlawful means. Notably, BASF does not contest that such evidence existed.

BASF does contend that "expectations" cannot constitute an act in furtherance of the conspiracy nor support the requirement that defendants intended to harm the plaintiffs. *See Moses.com Sec., Inc. v. Comprehensive Software Sys., Inc.*, 406 F.3d 1052, 1064 (8th Cir. 2005). Plaintiff offered Instruction 17 and, because there is no Missouri Approved Instruction ("MAI") for civil conspiracy, based it on the instruction approved in *Haynes v. Hawkeye Sec. Ins. Co.*, 579 S.W.2d 693, 705 (Mo .App. W.D. 1979). The second portion of the instruction in *Haynes* was "defendants made said agreement with the intent to prevent any money for which [defendant] was liable to Linder from being paid to plaintiffs…". *Id.* BASF's argument appears to be that the use of the term "expectation" in Instruction No. 17 does not suffice to replace "intent" in the *Haynes* instruction. However, BASF did not list this specific concern among its objections to the jury instructions [#541]. In any event, an expectation of damage to other is obviously sufficient to constitute an unlawful purpose. Evidence supported that the defendants "expected" that the dicamba would drift such that one marketing tactic was to equate buying Xtend seeds to "protection from your neighbor." BASF also identified "Defensive Planting" as a "Market Opportunity" to increase sales. Meanwhile, externally, BASF personnel were directed to say that it "has not considered defensive planting in our sales projections."

Next, BASF argues that plaintiff provided no causal link between the alleged acts and the plaintiff's injury. That ignores BASF's actions to ramp up availability of its Clarity

18

(old dicamba) product after Monsanto announced the launch of Xtend seeds in 2015. This was despite defendants' inability to get approval for use of Clarity over-the-top due to concerns about Clarity's safety. BASF's Clarity sales increased from $60 million to $100 million in 2016. BASF also promoted sales of Monsanto's Xtend seed with the implication that it would drive up Clarity sales to farmers who intended to use Clarity improperly. Plaintiff produced evidence that its orchards were damaged by old dicamba at a time when BASF's own employees recognized, in July 2016, that "[t]here must be a huge cloud of dicamba blanketing the Missouri Bootheel." At the same time, evidence showed both defendants developed strategies to blame farmers and refuse to settle claims. The jury thus could find by clear and convincing evidence that BASF's acts in furtherance of its agreement caused or directly contributed to cause plaintiff's damages.

Finally, BASF argues that defendants cannot be simultaneously found to be co-conspirators and joint venturers because members of a joint venture cannot conspire with each other. *See Wiles v. Capitol Indem. Corp.*, 280 F.3d 868, 871 (8th Cir. 2002) ("[A] principal cannot conspire with its own agents."). This matter was raised for the first time on the evening of the jury instruction conference. BASF insisted that joint venture and conspiracy could not be submitted to the jury together because conspiring joint venturers was a "legal impossibility." *Creative Walking, Inc. v. Am. States Ins. Co*., 25 S.W.3d 683, 688 (Mo. App. 2000); *but see United States v. Krug*, 822 F.3d 994, 999 (8th Cir. 2016) (noting that evidence of joint venture supported criminal conspiracy).

It is error to submit two counts together only if the "two counts are so inconsistent that proof of one necessarily negates, repudiates, and disproves the other." *Trimble v. Pracna*, 167 S.W.3d 706, 711 (Mo. *banc* 2005). No party here suggests that any element required to prove one serves to disprove the other. Both concepts—conspiracy and joint

venture—are legal fictions; they are merely alternative ways to assign joint liability, and, even if the law says that simultaneous conspiracy and joint venture is a "legal impossibility," the jury's verdict is not invalidated under *Trimble*. There is no risk of any double recovery.  The point is denied.

### C.    Product Liability Claims

Plaintiff brought claims for strict liability-design defect (Count I), strict liability-failure to warn (Count II), negligent design and marketing (Count III), and negligent failure to warn (Count IV). BASF now moves for judgment as a matter of law on those claims. At the outset, however, the Court notes that plaintiff did not submit its strict liability claims to the jury—only the negligence claims were submitted.  Plaintiff's entire theory of the case has been that the defendants worked together on a dicamba-tolerant system; this case has never been about only the seeds or only the herbicide.  Further, BASF's individual liability is predicated solely on the damages caused in the years 2017 forward.  BASF's liability for damages that occurred in the years 2015 and 2016 is predicated solely on joint venture or conspiracy theories.

### 1.    Negligence

First, BASF argues that plaintiff did not show its damages for 2017 forward were caused by Engenia—the only product BASF sells. But conclusive proof that Engenia and not some other dicamba herbicide caused Bader's damage is not required here. It is true that "In all tort cases, the plaintiff must prove that each defendant's conduct was an actual cause, also known as cause-in-fact, of the plaintiff's injury." *City of St. Louis v. Benjamin Moore & Co.*, 226 S.W.3d 110, 113 (Mo. *banc* 2007).  But the product at issue in this case is the DT system, not the specific products that comprise the system.  Thus, plaintiff was not required to show that his orchard was specifically damaged only by Engenia. It was the

20

defendants' actions that ushered in the use of over-the-top dicamba, and not a specific type of dicamba, that is the basis of liability. That is the essence of this kind of negligence action. *See Martin v. Survivair Respirators, Inc.*, 298 S.W.3d 23, 31 (Mo. App. 2009) ("The difference between a negligence claim and a strict liability claim is the latter focuses on the product, whereas the former focuses on the conduct of the defendants.").  It is undisputed that BASF designed, manufactured, and sold its Engenia herbicide as part of the DT system. There was further evidence that Engenia was in fact used in close proximity to the plaintiff's farm, though that fact is not essential to liability.

BASF next argues that plaintiff failed to produce evidence that BASF breached any duty to plaintiff. As already discussed, BASF fully participated in the development, regulatory approval process, and broad promotion of a system it knew and intended would damage third parties such as plaintiff. BASF does not appear to argue that it owed no duties, and evidence at trial showed it knew that the relevant region was covered with farmers using Xtend seeds and a cloud of dicamba.

### 2.    Failure to warn

BASF next argues that plaintiff failed to prove failure to warn. The jury instruction for the combined claims for Negligent Design and Failure to Warn, Instruction No. 10, required plaintiff to prove as follows:

> First, such defendant, individually or jointly with another defendant, designed, manufactured, or sold any one or more component of the dicamba-tolerant system in 2017-present, and

> Second, dicamba-based herbicides have a propensity to move off target, and

> Third, such defendant failed to use ordinary care to either:(i) design a reasonably safe dicamba-tolerant system, or (ii) adequately warn of the risks of off-target movement, and

Fourth, such failure, in one or more respects submitted in paragraph Third, directly caused or directly contributed to cause damage to Plaintiff Bader Farms, Inc.

BASF first argues that it did not sell DT seed sold in 2015-16, so it could have had no duty to warn. That argument appears to be a red herring: the jury instruction pertains only to 2017 to the present.

Next, BASF argues that plaintiff did not identify an alternative warning label that does not exceed the parameters of FIFRA. *See Bader Farms, Inc. v. Monsanto Co*., 1:16CV299-SNLJ, 2019 WL 3017425, at *2 (E.D. Mo. July 10, 2019) (citing *In re Dicamba Herbicides Litig*., 359 F. Supp. 3d at 736 ("plaintiffs will not be allowed to submit failure to warn labeling claims that exceed the parameters of FIFRA")). As this Court already held, the "failure to warn claim is not directed so much to product labeling as it is to defendants' marketing materials and communications and contacts with farmers." [#288 at 21-22.] Moreover, plaintiff need not identify the content of what would be an adequate warning to prove failure to warn. *Moore v. Ford Motor Co*., 332 S.W.3d 749, 760 (Mo. *banc* 2011). In any event, at trial, plaintiff was precluded from offering any evidence challenging the warning labels themselves.

Finally, BASF argues that plaintiff failed to make a causal link between any failures in its marketing materials and the plaintiff's injury. This Court disagrees. "If there is sufficient evidence from which a jury could find that the [user] did not already know of the danger, there is a presumption that a warning will be heeded." *DG&G, Inc. v. FlexSol Packaging Corp. of Pompano Beach*, 576 F.3d 820, 824 (8th Cir. 2009) (quoting *Tune v. Synergy Gas Corp*., 883 S.W.2d 10, 14 (Mo. *banc* 1994)). Plaintiff's expert testified that farmers did not understand the risks. BASF employee Jason Roberts wrote in 2016 there was "a lot of mis-information out in the field" and that they "really need to educate

22

everyone on volatility for the Engenia launch." BASF and Monsanto together spread the news that the DT system's herbicide posed little risk. The Engenia label likewise provided no warning about volatility although evidence showed BASF was privately concerned and decided to deny that crop damage could occur.

### D.    Compensatory Damages

Having found defendants liable for the damages to plaintiff's peach farm, the jury awarded plaintiff $15 million compensatory damages. BASF seeks judgment as a matter of law for five reasons.

### 1.    Speculation

First, BASF says plaintiff's theory of future lost profits required the jury to engage in impermissible speculation. Both of plaintiff's experts, Drs. Baldwin and Guenthner, assumed in their damages calculations that Bader would be out of business in 2019 when in fact Bader was not out of business. Bader is still not out of business. BASF says this left the jury to speculate when and whether Bader would go out of business such that the damages calculation would be applicable.

Mr. Bader testified that dicamba damage negatively impacted production and revenues beginning in 2015 and continuing to the present. He testified that dead spots began appearing in the orchard in 2018 and that mitigating problems like insects, disease, and adverse weather had becoming extremely difficult. He said there is no way the peach operation can exist in the current dicamba market environment. Plaintiff concedes that there may be an occasional reprieve—as there was in 2019 when wet weather delayed dicamba spraying and the business was profitable. But plaintiff says ultimately the evidence showed the business is doomed by dicamba. Plaintiff's expert Dr. Guenthner based his opinion on that evidence.

Lost profits damages require "evidence that provides an adequate basis for estimating the lost profits with reasonable certainty." *American Jet v. Dodson Int'l Parts, Inc.*, 155 S.W.3d 50, 54 (Mo. *banc* 2005). "While an estimate of prospective or anticipated profits must rest upon more than mere speculation, uncertainty as to the amount of profits that would have been made does not prevent a recovery." *Id.* at 54–55 (internal quotation omitted). Indeed, where a loss "defies exact proof . . . it is reasonable to require a lesser degree of certainty as to the amount of loss, leaving a greater degree of discretion to the court or jury." *Id.* at 55. Here, the jury did not have to speculate, but neither did it require perfect certainty. Plaintiff submitted evidence of its losses and, with Guenthner's help, requested $20.9 in damages, including lost profits, from the jury. The jury awarded less— $15 million.

It should be mentioned, too, that, before trial, defendants moved to strike Guenthner's opinion regarding the damages expected if Bader Farms did not go out of business in 2019. Guenthner's testimony was that damages in further years would actually be higher than damages for the complete loss of the business in 2019 or 2020.  This would be due to repeated but unsuccessful efforts to keep the orchards viable and the inevitable demise of the business.  This Court granted that motion because plaintiff could not seek damages for injuries that could be avoided. [#285.] Plaintiff aptly states that "Defendants cannot in good faith gag Dr. Guenthner and then criticize his inability to speak on the issue."

## 2.    Correct standard for damage to fruit trees

Second, BASF says plaintiff's damages expert Dr. Guenthner failed to apply the correct standard under Missouri law for alleged damage to fruit trees. This jury was instructed in accordance with MAI 4.01, which is appropriate when damage goes beyond

mere property loss. *Shady Valley Park & Pool, Inc v. Fred Weber, Inc.*, 913 S.W.2d 28 (Mo. App. 1995); [#282 at 6]. BASF argues that the proper measure of damage to fruit trees is the difference between the market value of the land immediately before and after any alleged injury. *See Cooley v. Kansas City, P. & G.R. Co*., 149 Mo. 487 (1899); *see also Butcher v. St. Louis-San Francisco Ry. Co*., 225 Mo. App. 749 (1931) (collecting cases); *Shannon v. Hannibal & St. J. Ry. Co*., 54 Mo. App. 223, 226 (1893). This Court has already addressed defendant's argument on this issue:

> Although the general rule for crop damage may well be the "before" and "after" valuation of the property, as set out in Missouri Approved Instruction 4.02, it is hard to fathom how any "before" valuation can be calculated without regard to the potential for future profits. Regardless, Missouri Approved Instruction 4.01, which is the general damages instruction, appears to be the appropriate damages instruction when both property damage and future profits are claimed. This is especially so because of its proviso requiring that the damages be those plaintiff is "reasonably certain to sustain in the future," a provision that is absent from MAI 4.02. And obviously, this standard precludes the submission of future profits that are speculative, which should alleviate defendants' concerns.

> The closest case is *Shady Valley Park & Pool, Inc. v. Fred Weber, Inc.*, 913 S.W.2d 28 (Mo. App. 1995). There, defendant caused mud and silt to flow into plaintiff's lakes, and the plaintiff was forced to close its wholesale fish hauling and fee fishing businesses. Defendant maintained it was responsible only for damages to real property, and not to the business. The *Shady Valley* court held that plaintiff was not limited to damages to its real property because damages had gone "beyond mere property loss." *Id.* at 35. That court thus held that it had been proper to submit the damages instruction based on MAI 4.01 to the jury. *Id.* at 34–35.

[#282 at 6.] MAI 4.01 was properly submitted.

### 3.     Proof of lost profits

Third, BASF says plaintiff admits it did not experience lost profits from 2015-2018. Mr. Bader testified that Bader Farms' total average annual profit during 2011-2014 was $109,000 and that his CPA calculated his average annual profit for 2015-2018 was

$175,000. Plaintiff's expert, Dr. Guenthner, confirmed that Bader Farms' average profit related to peaches during 2011-2014 (before dicamba exposure) was $54,000, and during 2015-2018 was $87,000. These numbers, BASF says, reflect that plaintiff was not damaged by any dicamba exposure.

Plaintiff responds as it did at trial: that the numbers on which BASF base that argument are derived from his tax returns, and tax accounting for the business as a whole is different from calculations of profit from peach production.  As Dr. Guenthner—an agricultural economist and the only expert to testify on damages—testified, tax returns and income statements are not used for determining lost profits. Guenthner testified as to the correct data and methodology for calculating plaintiff's lost profits. The tax evidence was provided to the jury at trial through both defendants' cross examination and closing argument, and the jury had the ability to weigh the evidence and credibility of witnesses. The Court will not substitute its judgment for the jury's weighing of the evidence. *See Jacobson Warehouse Co. v. Schnuck Markets, Inc.*, No. 4:17-CV-00764 JAR, 2020 WL 853726, at *2 (E.D. Mo. Feb. 20, 2020).

### 4.  Non-dicamba damage

Fourth, BASF argues plaintiff cannot recover for yield loss it admits were not caused by dicamba. Under Missouri law, "recovery is prohibited when there is uncertainty or speculation as to whether the loss of profits was the result of the wrong." *Thoroughbred Ford, Inc. v. Ford Motor Co.*, 908 S.W.2d 719, 735 (Mo. App. 1995) (citing *Southern Missouri Bank v. Fogle*, 738 S.W.2d 153, 158 (Mo. App. 1987)). Here, BASF says, Dr. Guenthner admits that he did not remove from his damages calculations the yield loss from hail in 2015, glyphosate and glufosinate drift in 2016, drift in 2015 due to misapplication, and frost in 2017-2018. Plaintiff responds that the weather events and herbicide events had

been manageable until the trees became otherwise weakened by dicamba.  Regardless, any yield loss from other sources was presented to the jury and forcefully argued by defense counsel at closing.  And the jury presumably took into account the evidence that some damages were caused by sources other than dicamba.  Furthermore, plaintiff says that it did not ask for the jury to award damages for injuries not related to dicamba. Again, the jury also awarded $5.9 million less than plaintiff sought, which was far more than any damages possibly caused by the events cited by BASF.

### 5.    Mitigation costs and lost asset value

Finally, BASF says plaintiff failed to offer any evidence in support of the amount of its claim for mitigation and loss of use of equipment. As for mitigation, Dr. Guenthner testified that his only support for plaintiff's $1,060,000 in mitigation costs was Mr. Bader's representation of that amount—without supporting receipts, invoices, or application records to support the claim. BASF says Mr. Bader offered no testimony at trial to those amounts, thus BASF says Guenthner's parroting of his client's subjective claim of damages is not sufficient to support the claimed amount. *Keller Farms v. McGarity Flying Serv., LLC*, 944 F.3d 975, 981 (8th Cir. 2019).

BASF counsel, however, elicited specific testimony from Mr. Bader as to his mitigation costs. He also testified to his use of micronutrients, fertilizer, and other efforts to salvage his orchards from dicamba damage. Plaintiff also responds that Dr. Guenthner also testified regarding how he obtained information regarding mitigation expenses and asset value, including his research as to value from reports in similar cases from agricultural engineers. Guenthner testified that he found information supplied by Mr. Bader to be credible and trustworthy and that he relies upon information supplied in this manner in the course of forming his expert opinions.

As for lost asset value, BASF argues this claim for $557,500 suffers the same problem as plaintiff's entire damages claim: it is premised on plaintiff's claim that Bader Farms may go out of business at some undisclosed time. As already explained, plaintiff was only permitted to argue that it would go out of business, and it incorporated this into its damages calculation. The jury apparently applied the evidence as submitted to arrive at a damages award some 25% lower than the amount Bader sought.

### E.    Punitive Damages

The jury then awarded $250,000,000 in punitive damages against Monsanto for Monsanto's decision to release the Xtend seed without the corresponding herbicide in 2015 and 2016. Those damages were against Monsanto and BASF jointly and severally as a result of the joint venture and/or conspiracy findings. BASF argues that this award should be vacated because Section 537.067.2 RSMo states that the "defendants shall only be severally liable for the percentage of punitive damages for which fault is attributed to such defendant by the trier of fact."

BASF insists then, that "establishing a conspiracy will make all defendants jointly and severally liable for actual damages, but it does not change the rule that punitive damages are to be assessed against each tort-feasor depending, among other factors, upon his degree of culpability." *Taylor v. Compere*, 230 S.W.3d 606, 611 (Mo. App. S.D. 2007) (quoting *Moore v. Shelton*, 694 S.W.2d 500, 501 (Mo. App. S.D.1985)). The jury here was instructed not to allocate fault at all in the event it found either joint venture or conspiracy, but that was before the punitive damages phase of the trial. After the punitive damages phase, the jury filled out Verdict Form C – Punitive Damages, which was directed only at Monsanto and which stated as follows:

28

> We, the jury, assess punitive damages against Defendant Monsanto Company
> at $ 250,000,000.00 (stating the amount, or, if none, write the word "none").

[#558.]

The statute relied upon by BASF is Missouri's comparative fault statute, which is not in play in this case. Instead, the jury here determined that Monsanto and BASF acted together in a joint venture. Plaintiff says there is thus no additional requirement that the jury allocate fault between them—the jury already determined that their liability is joint and several. At the same time, Missouri courts have held that fault must be allocated under the statute even where the defendants were in a conspiracy. *Id.* However, the rule appears to be different in the context of a partnership or joint venture. In *Blue v. Rose*, 786 F.2d 349, 353 (8th Cir. 1986), for example, the Eighth Circuit rejected a requirement for allocation of punitive damages between partners where "the tortious acts were clearly performed within the scope of partnership authority and business." A recent Missouri case further observed that "Missouri recognizes that partners are vicariously liable for punitive damages based on acts of their copartners done in the course of partnership business." *Blanks v. Fluor Corp.*, 450 S.W.3d 308, 402 (Mo. App. E.D. 2014) (citing *id.*).

The parties cite no case that applies § 537.067 RSMo to a joint venture. Further, despite numerous objections to the punitive damages instructions, it does not appear that either defendant objected to submitting the punitive damages questions without allocation. Nor did either defendant submit an instruction on allocation.

BASF also complains that this Court had already dismissed plaintiff's joint liability punitive damages claim pursuant to § 537.067.2 RSMo. [#191 at 16.] However, that memorandum did not address the impact of a joint venture finding. To the extent BASF claims it was unable to defend against punitive damages as a result of the dismissal, that is

untrue. BASF was able and did in fact defend against the joint venture claim, which is the source of its liability for punitive damages.

Finally, BASF argues that plaintiff offered no evidence that the conduct underlying the award of punitive damages against Monsanto was conduct in furtherance of a joint venture involving BASF. Thus, BASF says, there was no "clear and convincing evidence" that could support even a vicarious award of punitive damages against BASF. However, evidence showed that BASF and Monsanto worked to commercialize a dicamba-tolerant system at all times covered by the evidence. And suffice it to say that the punitive damages instruction was based on Monsanto's conduct in releasing the Xtend seed without a corresponding herbicide in 2015-2016, which was surely an act in furtherance of the joint venture.

BASF's renewed motion for judgment as a matter of law is **denied**.

## II.    **BASF's alternative motion for a new trial [#581]**

BASF moves in the alternative for a new trial under Federal Rule of Civil Procedure 59(a)(1)(A). Under that rule, a "new trial is appropriate when the first trial, through a verdict against the weight of the evidence, an excessive damage award, or legal errors at trial, resulted in a miscarriage of justice." *Gray v. Bicknell*, 86 F.3d 1472, 1480 (8th Cir. 1996). Regarding errors in evidentiary rulings or jury instructions, a new trial will be granted where the error likely affected the jury's verdict. *See Burris v. Gulf Underwriters Ins. Co.*, 787 F.3d 875, 880 (8th Cir. 2015).

### A.    **Expert testimony**

BASF first contends that the Court erroneously admitted testimony of plaintiff's expert Dr. Ford Baldwin and erroneously excluded the testimony of three BASF experts.

### 1.     Plaintiff's expert Dr. Ford Baldwin

Dr. Ford Baldwin is a weed scientist. BASF does not contest that Dr. Baldwin is an expert in weed science, but rather BASF argues that certain opinions of his were improperly admitted.

### a.     Causation

Dr. Baldwin opined that plaintiff experienced yield loss due to exposure to dicamba that had been applied to nearby fields. BASF contends that this opinion was not scientifically valid and should have been excluded.

Much of BASF's argument was addressed before trial. [*See* #275 (denying defendants' joint motion to exclude Dr. Baldwin).] BASF complains that Baldwin issued an expert opinion in this case confirming dicamba damage after visiting plaintiff's orchards in the winter (February 2017), when there were no peach tree leaves or other living crops to inspect. BASF thus contends Baldwin formed his opinion first and then conducted research to support it later, rendering his opinion facially unreliable. BASF points out that Baldwin did not visit plaintiff in 2015 or 2016 at all—but that was because plaintiff had not yet retained Dr. Baldwin. Nonetheless, Baldwin testified that he spent significant time in the Missouri Bootheel in 2015 and 2016 observing the effects of dicamba use there, and he was permitted to consider other information provided to him. He admitted that his winter 2017 observations were limited due to the season, but he also said that his 2017 conclusions were confirmed by subsequent visits.

For example, Dr. Baldwin testified that soybeans are a bioindicator crop.  In the summer of 2017, Baldwin observed obvious dicamba damage on non-DT soybeans around and including at Bader Farms. That is consistent with a non-testifying expert's data representing the number of acres damaged and the 335 complaints in Missouri the summer

of 2017, 24 of them in Dunklin County. Further, Dr. Baldwin testified that in all years, he observed dicamba symptomology on other indicator plants—kudzu, sycamore, catalpa, and other trees, as well as on Plaintiff's peach trees. He further testified that the symptomology he observed was more severe in 2018 than in 2017. Dr. Baldwin also compared his observations and photos of Bader Farms' peach trees with those of other scientists who conducted studies on the effects of dicamba on peach trees. All in all, Dr. Baldwin's findings are the result of decades of knowledge, skill, training, and experience as a weed scientist, five inspections of Bader Farms, and four years observing the effects of dicamba in Southeast Missouri. Baldwin's opinions were the proper subject of cross-examination, not exclusion.

BASF claims that Baldwin failed to consider alternate causes of plaintiff's alleged problems. But there was no evidence at trial that herbicide spraying in corn, wheat, burndown (after the growing season), rights-of-way, or anything else caused the damage to Bader Farms, or at least the damage was minimal. Likewise, there is no evidence in this case to support a finding that other herbicides from neighboring farms or the spraying of any herbicide other than dicamba caused plaintiff's harm. Again, Dr. Baldwin testified that the symptomology is evident on Bader Farms' peach trees, as well as surrounding indicator plants and those observations helped him reach his opinion.

Dr. Baldwin also explained that the use rate of dicamba in the past was extremely low in Southeast Missouri because of its agricultural makeup. The region does not have much pasture and historically grows little corn. But the Bootheel grows a lot of soybean and cotton, and both are very sensitive to dicamba. Because of that danger, dicamba had never been used in the Bootheel as a standalone (or foundation) herbicide. That did not happen until the release of the Xtend technology. It is undisputed that peach trees are

32

sensitive to dicamba, and Baldwin testified there is no safe level of dicamba for sensitive plants.  Conducting a differential diagnosis, Baldwin concluded that plaintiff's peach orchards had been damaged by dicamba.

In any event, consideration of alternate causes is just one of the factors a court may consider in determining whether to admit expert testimony and that the failure to consider alternate causes goes to the weight and not the admissibility of the testimony. *Lauzon v. Seneco Prods.*, 270 F.3d 681, 693-94 (8th Cir. 2001). Defendants had ample opportunity for cross-examination to air those concerns with the jury.

Next, BASF argues that Baldwin's conclusions were flawed because he conducted no sampling or testing for dicamba on plaintiff's peach trees. However, as this Court already observed, peer-reviewed studies and defendants' own documents agree that such testing is typically futile, and even if such testing were advisable, "a differential expert opinion can be reliable even with less than full information." *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 564 (8th Cir. 2014) (internal quotation omitted). None of the defendants' experts tested samples, either. As noted, experts are not required to rule out all possible causes when offering a differential causation opinion. *Id.* at 563; *Lauzon*, 270 F.3d at 693-94.

### b.    Armillaria root rot

As indicated, Dr. Baldwin had no knowledge about Armillaria root rot until he read defendants' expert reports suggesting that such a pathogen had been the cause of Bader's problems. BASF argues that because he admitted he has no skill, experience, training, or education on Armillaria in peaches, Baldwin does not have the expertise necessary to conclude that the Armillaria root rot at Bader Farms was at most a "secondary pathogen" attacking the dicamba-weakened peach trees. Dr. Baldwin's expertise is the effect of

herbicides on sensitive plans. He is not required to have expertise in every possible alternative cause. *See, e.g.*, *Gilliland v. Novartis Pharmaceuticals Corp.*, 34 F. Supp. 3d 960, 968 (S.D. Iowa 2014). As noted, "The alternative causes suggested by a defendant affect the weight that the jury should give the expert's testimony and not the admissibility of that testimony, unless the expert can offer no explanation for why she has concluded [an alternative cause offered by the opposing party] was not the sole cause." *Id.* (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 265 (4th Cir.1999)).

### c.    Peach tree expertise

Similarly, BASF argues that this court erred by allowing Dr. Baldwin to provide opinions regarding alleged visual symptomology in peaches because Baldwin admitted he is not a peach expert. BASF argues that admission demonstrates Baldwin was clearly unqualified to render opinions about what he believed was causing the visual stress symptomology he believed he saw at Bader Farms and admission of the testimony on those issues was error. BASF's own expert, however, acknowledged that Dr. Baldwin had "excellent weed science credentials" sufficient for him to "make conclusions"—the defense expert just "disagree[d] with his conclusions." Plaintiff was not required to find an all-encompassing expert. Dr. Baldwin was not required to know details like proper tree spacing, as BASF insists, to testify regarding herbicide effects. Dr. Baldwin was qualified to opine on matters related to herbicide use, and he drew conclusions about the peach trees' exposure to dicamba as he was qualified to do.

### d.    Volatility, meteorology, "atmospheric loading," and long-range transport of dicamba

Dr. Baldwin testified that dicamba volatilizes, collects in temperature inversions in a phenomenon called "atmospheric loading," and moves off-site to harm sensitive plants,

creating a uniform "landscape effect" of dicamba symptomology, including at Bader Farms. BASF argues that this Court erred in permitting Dr. Baldwin to give this opinion because he lacked expertise in the fields of meteorology, environmental science, and long-range transport of pesticides that underlie this theory. However, it is well-established that weed scientists routinely research and analyze volatility and long-range transport of herbicides. This Court has already held that these matters are within Dr. Baldwin's training and expertise. [#275.]  In fact, Monsanto's witness Dr. Carey also testified that temperature inversions increase the risk of off-target movement, causing herbicides to move "great distances."

Ultimately, all of BASF's criticisms are proper subjects for cross-examination. Dr. Baldwin's testimony was properly admitted.

### 2.    BASF's three excluded experts

On January 7, less than three weeks before trial, BASF disclosed that it planned to call its experts Dr. Gallus (meteorology), Dr. Hewitt (pesticide application), and Dr. Jackson (environmental science/spray drift). This Court excluded those experts after full briefing of the issue on January 23 because they had not been disclosed under Rule 26(a)(2). BASF argued that it did disclose those experts along with their detailed expert reports as part of MDL discovery on April 19, 2019, and all three were deposed by a member of the MDL Plaintiffs' Executive Committee (of which Bader's counsel is also a member) in May 2019. BASF says that it disclosed those and 15 other experts in the *Bader* case just five days later when it stated "BASF reserves the right to rely on . . . the opinions previously disclosed by Defendants in MDL ... No. 2820, to the extent those opinions are also relevant to Bader Farms' and/or Bill Bader's claims and/or BASF's defenses in this

matter." [#341-7.] BASF contends that excluding those experts under Rule 37(c)(1) was an abuse of discretion because any technical failure was substantially justified and harmless.

A district court should consider several factors in determining whether a Rule 26(a) violation is justified or harmless, including (1) the reason for noncompliance, (2) the surprise and prejudice to the opposing party, (3) the extent to which allowing the testimony would disrupt the order and efficiency of the trial, and (4) the importance of the information or testimony. *Wegener v. Johnson*, 527 F.3d 687, 692 (8th Cir. 2008); *see also Rodrick v. Wal-Mart Stores East. L.P.*, 666 F.3d 1093 (8th Cir. 2012) (outlining similar factors, including the party's "bad faith or willfulness"). BASF argues that each of those factors weighs in favor of allowing BASF's experts to testify.

This Court excluded the experts despite BASF's insistence that they had been properly disclosed because the three were disclosed in the MDL as <u>class certification experts</u>. Moreover, even though the Bader Farms case was part of the MDL, it was a separate case on its own separate track with a separate Rule 26(a)(2) requirement. BASF argues that their opinions were clearly relevant to causation generally, however, so there could be no prejudice to plaintiff. BASF would have used these experts to rebut Baldwin's theories on volatilization and "atmospheric loading." But they were not disclosed as merits-phase experts. And *Bader*, although part of the MDL, had no class certification phase and therefore no reason to consider class certification experts. Although BASF points out that plaintiff's attorneys brought a *Daubert* motion in the MDL seeking exclusion of Dr. Gallus's testimony, again, that motion was filed in the context of class certification briefing.

By the time BASF disclosed the three experts to plaintiff, trial was less than three weeks away. BASF's argument that the experts had been properly disclosed is belied by

the fact that BASF did designate, *e.g.*, expert Dan Westberg in <u>both</u> the *Bader* case and the MDL. Monsanto similarly designated its experts in both the MDL and *Bader*, and Monsanto provided timely expert witness reports that were specific to the *Bader* case.

"Litigants should not have to guess who will offer expert testimony; they need knowledge to conduct their own discovery and proffer responsive experts. That's why failure to comply with Rule 26(a)(2)(A) leads to the exclusion of expert testimony by a witness not identified as an expert." *Vanderberg v. Petco Animal Supplies Stores, Inc.*, 906 F.3d 698, 704 (8th Cir. 2018) (affirming exclusion of non-disclosed experts) (internal quotation omitted). The Eighth Circuit has emphasized that bad faith need not be present to exclude a witness for failure to disclose. *Id.* As in *Vanderberg*, however, there appears to have been no justification for BASF's failure to disclose the three experts, particularly where they did disclose another expert also disclosed in the MDL. There were fewer than three weeks until the trial—certainly resulting in greater possible disruption to the trial schedule than in *Vanderberg*, where experts were excluded during summary judgment. The trial date had been continued repeatedly. "The burdens on parties who are not adequately apprised of an opposing party's experts' identity and expected testimony are also real and costly." *Id.* at 706.

Finally, any prejudice to BASF, if at all, was much lessened because BASF had, through its co-defendant Monsanto, a properly-disclosed expert witness who could testify on the same or at least similar topics. Monsanto confirmed that on the record before trial. The defendants chose not to call those witnesses at all during the trial, even after Baldwin testified as to the matters they say required rebuttal. BASF says now that it would have been unable to call that witness at trial, but BASF did not raise that issue with the Court.

Exclusion of the three BASF experts was proper.

### B.    Off-site dicamba movement

Next, BASF argues that this Court erroneously admitted evidence of off-site dicamba movement that constituted hearsay. The contested exhibits are

- Plaintiff's Exhibit 605, an article from *The Standard Democrat* alleging 115 dicamba complaints in southeast Missouri;

- Plaintiff's Exhibit 199, a survey from the Illinois Fertilizers and Chemical Association claiming 80% of those surveyed believed that (1) dicamba symptomology developed in nearby soybean fields after applying Defendants' respective herbicides and (2) symptomology appeared in adjacent fields even when the wind was not blowing toward that field during application; and

- Plaintiff's Exhibit 2019, a summary of survey data collected by Dr. Bradley estimating damage to 3.6 million soybean acres and claiming that state agriculture departments investigated over 2,700 dicamba-related injury complaints.

Exhibits 605 and 199 were admitted solely to show that defendants knew damage complaints were being made. They were admitted for notice and not for the truth of the matter asserted. The Court read to the jury a limiting instruction, and BASF does not appear to contest those exhibits as vehemently as Exhibit 2019.

Exhibit 2019 was admissible for notice and also under Federal Rule of Evidence 703 as the basis underlying Dr. Baldwin's opinion. Rule 703 states

> If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only

if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

The survey data is also not hearsay because under Federal Rule of Evidence 803(17), it is a "compilation[] that [is] generally relied on by the public or by persons in particular occupations." Dr. Bradley's survey data was relied upon by Dr. Baldwin and has been widely relied upon by other scientists. Monsanto relied on it in 2018 when working to re-register its XtendiMax label with the EPA; the data is also discussed and cited in two EPA documents that BASF admitted into evidence at trial. No evidence suggests that the data is unreliable, and the probative value of the data outweighed any prejudicial effect. Although BASF suggests it could not challenge the data, it had ample opportunity to (and did in fact) cross examine Dr. Baldwin on his reliance on the data. This Court also gave a limiting instruction on the data. A jury is presumed to follow a court's limiting instruction. *Bradshaw v. FFE Transp. Servs.*, 715 F.3d 1104, 1109 (8th Cir. 2013).

BASF next contends that the exhibits could not have been used for "notice" because the plaintiff failed to show that the circumstances and injuries alleged in the complaints were similar to the circumstances and injuries claimed by plaintiff. *See Lewy v. Remington Arms C*o., 836 F.2d 1104, 1108 (8th Cir. 1988). Plaintiff, BASF explains, did not show the complaints actually involved either the same DT "system" or Engenia or Xtendimax individually that it complains injured its peach trees. But plaintiff was showing that defendants had notice that dicamba was moving off-target in ways it never had before, at times it never had before—that had nothing to do with whether neighboring land was planted with soybeans or peach trees. "[T]here are no hard or fast rules as to what degree of similarity there must be to make the evidence admissible"; rather, "the appropriate focus is on all of the circumstances surrounding . . . the evidence." *Adams v. Toyota Motor Corp.*,

867 F.3d 903, 913 (8th Cir. 2017). The fact that thousands of off-target movement

complaints were reported by soybean farmers is relevant to whether defendants knew

dicamba (including Xtendimax and Engenia) could and did move off-target.

### C.  Instructions

Next, BASF argues that the Court erred in several of its jury instructions. Each is

addressed in turn:

### 1.   Instruction 10 (Negligent Design & Failure to Warn: 2017-Present)

The Court's instruction for Negligent Design & Failure to Warn: 2017-Present

(Instruction 10) instructed the jury to enter a verdict against BASF if the jury found that:

> *First*, [BASF] designed, manufactured, or sold any one or more
> component of the dicamba-tolerant system in 2017-present, and

> *Second*, dicamba-based herbicides have a propensity to move off
> target, and

> *Third*, [BASF] failed to use ordinary care to either (i) design a
> reasonably safe dicamba-tolerant system, or (ii) adequately warn of the risks
> of off-target movement, and

> *Fourth*, such failure...directly caused or directly contributed to cause
> damage to Plaintiff Bader Farms, Inc.

[#554 at 11]. BASF argues that this instruction improperly referred to the "dicamba-

tolerant system," when it is undisputed that BASF did not manufacture or sell "the

dicamba-tolerant system.

BASF again cites *Benjamin Moore* for the proposition that Missouri law requires a

plaintiff to provide evidence identifying the specific product alleged to have caused the

claimed injuries. 226 S.W.3d at 116 ("Absent product identification evidence, [plaintiff]

simply cannot prove actual causation."). BASF argues that Missouri has rejected any lesser

standard because it would risk "exposing . . . defendants to liability greater than their responsibility and may allow the actual wrongdoer to escape liability entirely." *Id*. As a result, it is not enough to show that the defendant's product "may have" caused the injury. *Id*. Instruction 10, BASF says, misstated the causation standard under Missouri law because it allowed the jury to find BASF negligent based on deficiencies in a product it did not manufacture.

This argument appears to be a continuation of BASF's refrain that it did not make Xtend seeds so it cannot be held responsible. BASF manufactured Clarity, an "old formulation" of dicamba, and then its new low-volatility dicamba product, Engenia. It did not manufacture a DT seed, and it did not sell Engenia until 2017. But BASF's focus on Engenia ignores its conduct in the creation and commercialization of the DT system, and it is BASF's conduct that was on trial—not its particular product itself. *See Martin v. Survivair Respirators, Inc*., 298 S.W3d 23, 31 (Mo. Ct. App. 2009) ("The difference between a negligence claim and a strict liability claim is the latter focuses on the product, whereas the former focuses on the conduct of the defendants."). Once again, the DT system reflected in the instructions is not just the seeds: The system is the dicamba-tolerant seeds, plus the low-volatility corresponding herbicides designed and intended to be used with the seeds. *Benjamin Moore* is distinguishable, as it was based on a market share theory of liability, and the plaintiff there could not determine the suppliers of any of the paint products at issue. *See Benjamin Moore*, 226 S.W.3d at 113. Here, the product is the dicamba-tolerant system. That is plaintiff's theory of the case, and that is the case that was submitted to the jury. Sales records, product use maps, and witness testimony identify the sales and use of the Xtend system by farmers throughout Dunklin County, including the area surrounding Bader Farms, beginning in 2015 and continuing to present. The entire

point of the DT system was to allow dicamba to be sprayed over the top during the growing season, which is something that could not have happened previously. Defendants' actions in ushering in this change, and the resulting harm to neighboring farms, not the specific type of dicamba that was actually sprayed, is the basis for liability.

BASF also relies upon *Sperry v. Bauermeister, Inc*., 804 F. Supp. 1134, 1139 (E.D. Mo. 1992), *aff'd*, 4 F.3d 596 (8th Cir. 1993). There, the evidence "clearly shows that the defendant was not the designer, manufacturer, or installer of the entire mill system." *Id*. But here, plaintiff alleged that BASF and Monsanto were joint venturers and co-conspirators in the development and launch of the entire dicamba-tolerant system. Moreover, not only did BASF design and promote the Xtend seeds, but it also sold its own product as part of the system. The instruction accurately embraced the law and facts of the case, and it was properly submitted to the jury.

### 2.   Instruction 11 (Actual Damages)

Instruction 11, regarding actual damages, instructed the jury to award Bader Farms "such sum as you believe will fairly justly compensate Plaintiff Bader Farms, Inc. for any damages you believe it sustained and is reasonably certain to sustain in the future which the occurrence in the evidence directly caused or directly contributed to cause." [#554 at 12.] BASF argues that this instruction misstates the proper measure of damages under Missouri law and uses the wrong Missouri Approved Instruction (MAI).

BASF argues that the instruction wrongly allowed the jury to award damages for future crop losses. The Court addressed BASF's argument above in Section I.D. as part of BASF's argument for its renewed motion for judgment as a matter of law.

### 3.     Instruction 16 (Joint Venture)

The Court's instruction for Joint Venture (Instruction 16) instructed the jury to enter

a verdict against BASF if the jury found that:

> 1. "[T]here was an implied agreement among the defendants to
> commercialize the dicamba-tolerant system,"
>
> 2. "[T]he acts were performed to serve that common purpose,"
>
> 3. "[T]he defendants had a shared pecuniary interest in that purpose," and
>
> 4. "[T]he defendants had an equal voice in determining the direction of
> the enterprise."

[#554 at 16.] BASF contends that the instruction was erroneous for several reasons.

First, BASF contends that the instruction failed to instruct the jury on the elements

of a joint venture under New York law. This Court's opinion has not changed. As this

Court stated in the Memorandum and Order on BASF's motion to reconsider its denial of

summary judgment,

> If this case presented an issue between BASF and Monsanto regarding one of
> the pertinent contracts, then it is clear that New York law applies to govern
> the contract. *See Inacom Corp. v. Sears, Roebuck & Co.*, 254 F.3d 683, 688
> (8th Cir. 2001). However, the question here is whether the defendants were
> engaged in an implied joint venture, based on their actions and not
> necessarily on the written agreements alone. *See Jeff-Cole Quarries, Inc. v.
> Bell*, 454 S.W.2d 5, 14-15 (Mo. 1970). The contracts' choice of law
> provision does not apply to third parties whose claims sound in tort. *See
> Inacom Corp.*, 254 F.3d at 688.

[#453 at 3-4.] BASF relies on *Communications Unlimited, Contracting Servs., Inc. v.

Broadband Infrastructure Connection, LLC*, 2018 WL 4952393, at *3 (E.D. Mo. Oct. 12,

2018) and urges its application because there,

> Under similar circumstances, the Eastern District of Missouri held that
> Alabama law governed the question of whether a joint venture existed

> between two parties, because the parties' Master Service Agreement
> contained a choice-of-law provision invoking Alabama law.

[#582 at 58.] That case underscores this Court's ruling: the parties there were both parties to the contract that controlled their dispute. The plaintiff here was not a party to any contract between the defendants.

Second, BASF argues that the instruction's use of the phrase "shared pecuniary interest" was misleading and should have been defined to mean a "right to share profits and a duty to share losses." The instruction, however, is in line with Missouri law. *See Ritter*, 987 S.W.2d at 387 (noting that a joint venture requires a "community of pecuniary interest"). Furthermore, as this Court has already explained, the requirement of "shared losses" with respect to shared pecuniary interest is not a strict one under Missouri law. *Morley*, 2016 WL 1615676, at *8.

Third, BASF says the instruction misstated Missouri law by failing to instruct the jury that a joint venture must be proven by clear and convincing evidence. The Court has already rejected this argument.

Lastly, BASF insists that the instruction improperly asked the jury to decide the joint venture claim based on the "dicamba-tolerant system." BASF invokes the same argument here as it does for Instruction 10, and the Court rejects the argument for the reasons explained above.

### 4.     Instruction 17 (Civil Conspiracy)

The Court's instruction for Civil Conspiracy (Instruction 16) instructed the jury to enter a verdict against BASF if the jury found that:

> First, defendants agreed to develop and commercialize the dicamba-
> tolerant system, and

Second, defendants made said agreement with the expectation that off target movement and damage to third-party farmers would increase sales of their dicamba-based products, and

Third, defendants carried out said agreement, and

Fourth, defendants' acts in furtherance of their agreement caused or directly contributed to cause plaintiffs' [*sic*] damages.

There is a different burden of proof that applies only to Plaintiffs' conspiracy claim. A party seeking to establish a conspiracy among defendants has the burden to cause you to believe that the evidence has clearly and convincingly established the facts necessary to prove a conspiracy.

[#554 at 12.] BASF argues that the instruction misstates the elements of a civil conspiracy under Missouri law and improperly allowed the jury to return a verdict based on lawful conduct.

Under Missouri law, a conspiracy exists when (1) two or more persons; (2) with an unlawful objective; (3) after a meeting of the minds; (4) committed at least one act in furtherance of the conspiracy; and (5) the plaintiff was thereby damaged. *W. Blue Print Co., LLC v. Roberts*, 367 S.W.3d 7, 22 (Mo. *banc* 2012). To establish the second element, a jury must find "an agreement or understanding between two persons to do an unlawful act, or to use unlawful means to do an act which is lawful." *Ritterbusch v. Holt*, 789 S.W.2d 491 (Mo. *banc* 1990). BASF's proposed instruction required that plaintiff prove defendants committed one or more acts in furtherance of an unlawful objective, but BASF argues that the instruction given to the jury did not mention unlawfulness.

BASF appears to ignore that Instruction 17 satisfies the "unlawful objective" element by allowing a finding of civil conspiracy for doing a lawful act by unlawful means. The agreement to develop and commercialize the dicamba-tolerant system was, admittedly, lawful. However, using off-target movement and damage to third-party farmers to increase

45

sales is an unlawful means. *See Enslein v. Di Mase*, 2017 WL 3129812 (W.D. Mo. July 21, 2017) ("A conspiracy to injure or destroy the trade, business or occupation of another is an unlawful conspiracy." (internal quotation omitted).). The instruction thus satisfied the requirement that defendants had agreed to do a lawful act using unlawful means. *See also Haynes v. Hawkeye Security Insurance Co.*, 579 S.W.2d 693, 705 (Mo. App. 1979) (affirming use of instruction that did not mention unlawfulness or illegality).

### D.    Joint liability for punitive damages

BASF's argument regarding joint liability for punitive damages was discussed above at Section I.E..  BASF's motion for new trial is denied on this point.

### E.    Amount of punitive damages

The jury awarded $250,000,000 in punitive damages against Monsanto. However, because the defendants were deemed joint venturers, as discussed above, the punitive damages award was assessed against both Monsanto and BASF. *See Blue*, 786 F.2d at 353; *Blanks*, 450 S.W.3d at 402.

Here, BASF adds that imposition of punitive damages on BASF violates its due process rights in several ways.

### 1.    Imposition of punitive damages

First, BASF argues that the imposition of punitive damages on BASF violates BASF's due process rights because there was no jury finding regarding BASF's individual culpability. The Court has already addressed this argument. Again, Missouri law "recognizes that partners are vicariously liable for punitive damages based on acts of their copartners done in the course of partnership business." *Blanks*, 450 S.W.3d at 402. The cases BASF cites do not support its cause, as they do not address punitive damages

assessed against a joint venturer. *See, e.g.*, *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 20 (1991); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003).

Second, BASF argues that the imposition of punitive damages on BASF violates BASF's due process rights because the jury did not make a finding that punitive damages were justified under Missouri law by either (1) the conduct of BASF itself or (2) conduct by Monsanto in furtherance of any joint venture of which BASF was a member. Again, the Court addressed this in Section I.E, above. The punitive damages instruction was based on Monsanto's conduct in releasing the Xtend seed without a corresponding herbicide in 2015-2016, which was surely an act in furtherance of the joint venture.

Third, BASF argues its BASF due process rights were violated because it says the Court unfairly and unconstitutionally deprived BASF of its right to adequately defend against that claim. BASF contends it had no notice that it would have to defend against a claim of joint liability for punitive damages until it was too late to present any such defense. As discussed in Section I.E above, this Court dismissed plaintiff's joint liability punitive damages claim pursuant to § 537.067.2 RSMo. [#191 at 16.] However, that memorandum did not address the impact of a joint venture finding. Neither defendant submitted a jury instruction on allocation, nor did either defendant object to the verdict form's failure to include an allocation. BASF mounted a vigorous defense to the joint venture claim, and thus its complaints now fall flat. BASF had ample opportunity to defend itself.

Fourth, BASF argues that its due process rights were violated in that the size of the punitive damages award indicates that the jury's liability finding was based on passion or prejudice. *See Auster Oil & Gas, Inc. v. Stream*, 835 F.2d 597, 603-604 (5th Cir. 1988) (explaining that a punitive damages verdict may be so excessive as to indicate that it is the

result of "inherent passion and prejudice"). BASF further argues that a new trial on the

issue of liability is required because the same passion or prejudice could have affected the

jury's decision on the issue of liability as well. *See Dossett v. First State Bank*, 399 F.3d

940, 947 (8th Cir. 2005). Although the Court will reduce the size of the award as discussed

below, the award does not appear based on passion and prejudice, but instead was

apparently based on desire to punish and deter future like conduct based on the wealth of

defendant Monsanto.

### 2.    Size of the award

Next, BASF argues that the size of the $250,000,000 punitive damages award is

unconstitutionally large. The United States Supreme Court has stated that "[f]or rights that

are state created, state law governs the amount properly awarded as punitive damages,

subject to an ultimate federal constitutional check for exorbitancy." *Gasperini v. Center for

Humanities, Inc.*, 518 U.S. 415, 431 n.12 (1996) (citing *BMW of N. Am., Inc. v. Gore*, 517

U.S. 559, 568 (1996)); *Browning-Ferris Industries of Vt., Inc. v. Kelco Disposal, Inc.*, 492

U.S. 257, 278-79 (1989)). Federal law provides three due process "guideposts" that must

be considered when assessing a punitive damages award: "(1) the degree of

reprehensibility of the defendant's misconduct; (2) the disparity between the actual or

potential harm suffered by the plaintiff and the punitive damages award; and (3) the

difference between the punitive damages awarded by the jury and the civil penalties

authorized or imposed in comparable cases." *State Farm Mutual Automobile Ins. Co. v.

Campbell*, 538 U.S. 408, 418 (2003); *see also BMW*, 517 U.S. at 575.

The third guidepost is largely irrelevant here. BASF points out that a violation of the

Pesticide Registration Act, for instance, though not alleged in this case, renders the violator

subject to a maximum fine of $1,000. *See* § 281.310 RSMo. As plaintiff notes, there is no comparable civil penalty for the circumstances present here.

As for the first guidepost, the evidence supporting the jury's award of punitive damage for Monsanto's misconduct is sufficient. Evidence showed Monsanto knew of the risk that off-label spraying would occur over XtendFlex cotton in 2015, and it did occur. Monsanto knew of the risk that off-label spraying "over the top" would be "rampant" in 2016, and still Monsanto proceeded to commercialize Xtend soy in 2016. Further, Monsanto appeared to use this off-label spraying as a way to sell more product. Internal company documents reveal "protection from your neighbor" and "defensive planting" (*i.e.*, the threat and expectation of injury) would drive sales and thus increase profits. On the other hand, as further explained in this Court's analysis of Monsanto's motion, Section IV.B., this case did not involve actual malice, but instead a conscious disregard for the rights of others, which obviously constitutes less egregious conduct.  The fact that this case involved only economic damages as opposed to physical harm, too, supports remittitur. *See Eden Elec., Ltd. v. Amana Co.*, 370 F.3d 824, 828–29 (8th Cir. 2004) (affirming reduction of punitive damages award from 8.1:1 to 4.5:1 where although defendant "was guilty of malice, trickery, and deceit, this is a case of economic rather than physical harm").  This guidepost thus supports a reduction of the punitive damages award.

The second guidepost looks to the relationship between the compensatory damages and punitive damages award. Compensatory damages were $15 million. The ratio between punitive and compensatory damages is 17:1.[2]

---

[2] BASF and Monsanto argue that the ratio is even higher when only the compensatory damages for 2015 and 2016 are considered. Monsanto says those damages are at most $7.5 million, making the ratio more like 34:1. Plaintiff responds that evidence at trial showed the orchard suffered an indivisible injury—numerous exposures over consecutive seasons to the same perennial trees, all

The Supreme Court has concluded that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm*, 60 U.S. at 425. Moreover, "when compensatory damages are substantial, then an even lesser ratio can reach the outermost limit of the due process guarantee." *Id.* Applying this rule in *State Farm*, the Supreme Court found that $1 million in compensatory damages was "substantial," and perhaps justified a 1:1 ratio. *Id.* at 426. BASF thus advocates for remittitur to achieve a 1:1 ratio for punitive to compensatory damages. Plaintiff responds that Missouri courts applying the guideposts have upheld double-digit ratios, including instances of million-dollar verdicts. However, many of those cases involved compensatory damages of well under a million dollars, illustrating *State Farm*'s point. *See, e.g.*, *Ellison v. O'Reilly Automotive Stores, Inc.*, 463 S.W.3d 426, 441-42 (Mo. App. W.D. 2015) (upholding 10:1 ratio on $200,000 in compensatory damages); *Lynn v. TNT Logistics N. Am. Inc.*, 275 S.W.3d 304, 310-12 (Mo. App. W.D. 2008) (increasing the punitive damages award on a $50,000 compensatory award to $3.75 million—a 75:1 ratio); *Mignone v. Missouri Dep't of Corr.*, 546 S.W.3d 23, 45 (Mo. Ct. App. 2018) (upholding 10:1 ratio, $1 million punitive damages and $100,000 compensatory damages); *Lewellen v. Franklin*, 441 S.W.3d 136, 148 (Mo. *banc* 2014) (holding ratios of 40:1 and 22:1 were not grossly excessive on actual damages of $25,000).

BASF's suggested 1:1 ratio, however, does not appear to be sufficiently punitive for a $7.8 billion company like Monsanto.  BASF notes that even if a 1:1 award is unreasonable, that the Eighth Circuit regularly reduces punitive damages awards that

---

causing or contributing to cause Bader Farms' lost profits and lost future profits. The Court need not definitively decide this matter, however, in considering reduction of the punitive damages award.

exceed a 4:1 ratio. *See, e.g*., *Ondrisek v. Hoffman*, 698 F.3d 1020, 1030-31 (8th Cir. 2012) (reducing a punitive damages award 10 times larger than the compensatory damages award to a 4:1 ratio); *Quigley v. Winter*, 598 F.3d 938 (8th Cir. 2010) (reducing a punitive damages award 18 times larger than the compensatory damages to a 4:1 ratio); *Wallace v. DTG Operations, Inc*., 563 F.3d 357, 357 (8th Cir. 2009) (reducing a punitive damages award 16 times larger than the compensatory damages to a 4:1 ratio). *But see Adeli v. Silverstar Auto., Inc*., 960 F.3d 452, 463 (8th Cir. 2020) ("due process does not require a single-digit multiplier in all cases").

As the Eighth Circuit explained, "[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution." *Quigley*, 598 F.3d at 955 (quoting *State Farm*, 60 U.S. at 425).  There exists a "a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish." *Id*. "The Supreme Court has repeatedly intimated that a four-to-one ratio is likely to survive any due process challenges given the historic use of double, treble, and quadruple damages as a punitive remedy."  *Wallace*, 563 F.3d at 363 (citing *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23–24 (1991)).

Because of the lack of actual malice, the presence of economic damages only, and the excessive ratio of punitive to compensatory damage, precedent requires this Court to reduce the punitive damages award to $60 million, a 4:1 ratio.

## F.    Weight of the evidence

Finally, BASF argues that it is entitled to a new trial because the jury's verdict is against the weight of the evidence. Under Rule 59(a)(1)(A), "[a] new trial is appropriate when the first trial, through a verdict against the weight of the evidence … resulted in a

miscarriage of justice." *Gray*, 86 F.3d at 1480. BASF incorporates its arguments from its motion for judgment as a matter of law, which was denied above. As a result, this argument also fails.

BASF's motion for new trial is **denied in part and granted in part** in that the punitive damages award will be reduced to $60 million.

### III.   BASF's Motion To Alter Judgment [#583]

BASF's final motion seeks to alter or amend the judgment pursuant to Federal Rule of Civil Procedure 59(e). BASF seeks to have the judgment amended to reflect that only defendant Monsanto is responsible for punitive damages.  Both Monsanto and plaintiff oppose the motion.

BASF makes four arguments in support. First, BASF says that the instructions on punitive damages and the jury's resulting findings deal only with Monsanto's conduct and liability alone. Second, BASF argues that the Court had already dismissed joint liability for punitive damages well before trial and that the judgment belatedly revives the claim without BASF ever having had a chance to defend against it. Third, BASF argues that the judgment violates its due process rights. Finally, BASF argues that the jury should have allocated fault for punitive damages between BASF and Monsanto.

Each of these issues was discussed as part of BASF's other post-trial motions in Sections I.E and II.E.. The Court will **deny** the motion.

### IV.   Monsanto's renewed motion for judgment as a matter of law or new trial [#587]

Much of Monsanto's motion encompasses many of the arguments made by BASF in the BASF post-trial motions and adds some other arguments as well. Each argument is discussed in turn.

## A.     Causation

Monsanto makes several causation-related arguments.

### 1.     *Benjamin Moore* Causation Requirement

Monsanto contends that, under Missouri law for product liability, plaintiff was required to prove that Monsanto manufactured or sold the dicamba herbicide that caused the alleged harm. Like BASF, Monsanto relies on *Benjamin Moore*, 226 S.W.3d at 115, which states "where a plaintiff claims injury from a product, actual causation can be established only by identifying the defendant who made or sold that product." Monsanto states that for 2015 and 2016, plaintiff could not prove that Monsanto manufactured the dicamba herbicide that allegedly harmed the orchards, because Monsanto did not sell dicamba herbicide in those years. Similarly, Monsanto argues that plaintiff also lacked the required proof that Monsanto's XtendiMax, which became available in 2017, was the dicamba herbicide that allegedly harmed the orchards in later years.

As discussed above, including regarding Instruction 10, *Benjamin Moore* is distinguishable, as it was based on a market share theory of liability, and the plaintiff there could not determine the suppliers of any of the paint products at issue. Monsanto's argument appears to be that because the Xtend seeds themselves didn't directly harm plaintiff's orchard, then Monsanto cannot be liable. But that is not and has never been plaintiff's theory of the case. "As this Court explained, causation could be established if it is proved that Monsanto marketed and sold its dicamba-resistant seed to third-party farmers knowing that they would spray dicamba that may harm nearby, non-resistant crops." *In re Dicamba Herbicides Litig.*, 359 F. Supp. 3d 711, 720 (E.D. Mo. 2019) (the "February MDL Order").  Further, with respect to 2015 and 2016 liability, as this Court held previously,

> The fact that Monsanto did not manufacture, distribute, or sell the old dicamba herbicide that actually caused the [2016] damage is irrelevant—it is not part of the causal link under plaintiffs' theory of the claim.

*In re Dicamba Herbicides Litig.*, 1:16-CV-299-SNLJ, 2018 WL 2117633, at *2 (E.D. Mo. May 8, 2018) (the "*Bader* May 8 Order"). The evidence at trial showed that Monsanto designed, manufactured, and sold the dicamba-tolerant seed in all years relevant to the litigation. Furthermore, Monsanto released the Xtend cotton seed in 2015 and Xtend soybean seed in 2016 without a safe, corresponding dicamba herbicide. The jury determined that release of the Xtend cotton and soybean seed without a safe, corresponding herbicide, knowing that older formulations of dicamba would be used and thereby damage sensitive crops, was in itself negligent. Plaintiff was not required to prove which dicamba landed on plaintiff's orchards. *See Bader* May 8 Order, 2018 WL 2117633, at *2-3; *In re Dicamba Herbicides Litig.*, 359 F. Supp. 3d at 720.

The Court re-affirms its repeated holdings on this matter.

## 2.    Failure to prove causation

Next, Monsanto argues that plaintiff failed to prove that Monsanto's conduct was both a but-for and a proximate cause of the damage to the orchards. At the close of plaintiff's case, Monsanto notes, the Court observed that plaintiff's causation evidence was "thin," but ultimately decided that there was "just barely enough" to submit the claim for 2015-2016. Monsanto argues that, in fact, plaintiff did not offer sufficient evidence to support a finding that the orchards were damaged by a dicamba herbicide applied to an Xtend crop. Monsanto further states that there were many lawful uses of dicamba during all time periods, and there was no evidence that dicamba was applied to an Xtend crop in 2015 or 2016 when it was unlawful for such use.

In Missouri, the test for "but for" causation is merely whether the injuries a plaintiff sustained would have occurred "but for" the defendant's conduct. *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 860-861 (Mo. *banc* 1993). "But for" causation establishes a causal link between a defendant's actions and a plaintiff's harm. *Id.* at 862.

Here, plaintiff argues that, but for the over-the-top use of dicamba in the Bootheel—something that had never been done before 2015—the damage to Bader Farms would not have occurred.  Plaintiff provided evidence that Bader Farms' peach trees were damaged by spraying of dicamba over the top of Xtend seeds. Monsanto counters that in 2015 and 2016, the evidence showed only one illegal application of dicamba in the area near Bader Farms, and that the single, remote application could not have caused all the damage to Bader Farms in those years. However, there was additional evidence of dicamba sprayed over the top in the area near Bader Farms. Although Monsanto asserts farmers had been using dicamba legally for decades and that nothing had changed, evidence showed very few claims of off-target dicamba movement before 2015.  In particular, there were only three in Missouri over the preceding several years, and there was approximately one claim per year in Arkansas over a 10-year period. No one disputes that, after the release of the Xtend technology, the number of complaints in the Bootheel and Arkansas soared. It is also undisputed that the scope and scale of dicamba's use grew exponentially after the release of the Xtend technology, particularly in Southeast Missouri where it had not been widely used before. The evidence also showed that the Bootheel area's high heat and humidity created an environment for dicamba to volatilize and move to neighboring fields.

Bill Bader testified that three neighboring farmers—Chad Fullerton, Jeff Todd, and Gary Murphy—were spraying dicamba over Xtend crops in 2015. Bader also testified that Gary Murphy and Chad Fullerton planted Xtend technology in 2016 and were spraying

dicamba over the top of those crops. Critically, Bader then testified that sometime after the suspected dicamba exposure, the leaves on his peach trees were "kinked up" and "curled up." Bader also related that in 2016, he had dicamba damage to pecan, apple, pear, and soybean, not just peaches.

In addition, Dennis Cravens, who worked for Gary Murphy in 2015 and 2016, testified that he witnessed Murphy's employees putting dicamba in Roundup shuttles and taking it to spray over the top of Xtend cotton and soybeans in 2016. Murphy's farm, a cotton and soybean operation, covers approximately 15,000-16,000 acres near Bader Farms. Plaintiff's weed-scientist expert Dr. Baldwin testified that, due to dicamba's prevalence in the summer of 2016, all non-DT soybean fields and other vegetation in the area were exhibiting dicamba symptomology.

Baldwin also presented maps of Xtend seed sales in the Bootheel showing that many farmers within a 15-mile radius of Bader Farms purchased Xtend seed beginning in 2015. The main benefit to using Xtend seeds was that dicamba (though illegal to use with the seed in 2015 and 2016) could be sprayed over the top to control increasingly pernicious pigweed. In fact, Monsanto's District Sales Manager for the Bootheel, Greg Starling, testified he was aware farmers were spraying dicamba off-label over Xtend crops in 2015 and that he did nothing to investigate. Starling also testified that he saw non-Xtend fields in the area exhibiting dicamba symptomology, including leaf cupping, in 2015 and 2016.

In 2017, Dr. Baldwin spoke with Dr. Kevin Bradley—who had visited Bader Farms in 2016—who shared his observations of damage to Bader Farms' orchards in the summer of 2016. In addition to discussions with Dr. Bradley, Dr. Baldwin attended the July 31, 2016 town hall meeting in Portageville, Missouri and saw Dr. Bradley's dicamba presentation, which included photos of plaintiff's damaged peach trees. Dr. Baldwin also

56

relied on the 2016 EPA Compliance Advisory which included peaches as one of the crops with dicamba injury complaints. Dr. Baldwin also learned from Bill Bader about the symptomology Bader saw on Bader Farms' peach trees in 2015 and 2016.

In February 2017, Dr. Baldwin conducted his first inspection of Bader Farms' orchards and testified that this inspection of the orchards showed evidence of dicamba exposure consistent with what he observed throughout the Bootheel in the summer of 2016, as well as Dr. Bradley's observations.  In addition, Dr. Baldwin testified that in the Bootheel and Northeast Arkansas, in the summer of 2016, every non-Xtend soybean field and many trees he observed had dicamba damage.

Further, Monsanto representative Dr. Carey testified about the July 31, 2016 Portageville townhall meeting. The topic was "The science behind off-target movement of dicamba and facts and experiences with off-site dicamba movement in cotton, rice, melons, fruit trees and gardens, and the general process of making claims, and 2016 Southeast Missouri challenge and question and answer session." The prevalence of the damage reports in the Bootheel were such that Dr. Carey and others from Monsanto personally attended the meeting. There had been well over 100 dicamba complaints in the Bootheel alone.

There was another meeting about the severity of the dicamba issue in Southeast Missouri in late August 2016. Monsanto employees and Dr. Kevin Bradley attended, and presented, at that meeting. And finally, Monsanto sales manager Mr. Starling testified that for all years, including 2015 and 2016, he did not know anyone who bought the Xtend seed who didn't spray dicamba over the top.

The evidence thus easily supported the use of dicamba over Xtend crops in the area of plaintiff's farm in 2015 and 2016. Moreover, defendants' own documents evidence

defendants expected this would occur. In an Innovation Specialist Report, dated July 4, 2016, BASF's field representative, Jason Roberts, wrote,

> The one thing most acres of beans have in common is dicamba damage. There must be a huge cloud of dicamba blanketing the Missouri Bootheel. That ticking time bomb finally exploded! The scope of the damage is on a massive scale and fingers are pointing in all directions from grower to grower. It will be interesting to see how all the complaints are handled.

Roberts also wrote:

> Growers are also concerned with the dicamba volatility issue that has taken over the area… The one good thing that could come is growers now know that the lesser formulations can act in mysterious ways.

The evidence showed Bader Farms was located right in the middle of the dicamba-damaged area.

In sum, the evidence was sufficient for the jury to conclude that plaintiff's orchards were exposed to dicamba sprayed over the top of Xtend crops in 2015 and 2016. Monsanto's own employees, and BASF's too, knew that dicamba was being used over the top of Xtend seeds despite the warnings not to do so. It was not unreasonable for the jury to conclude that plaintiff's farm, as it sat in the middle of the "cloud of dicamba," was damaged as a result of the release of the Xtend crop system. *See Blanks*, 450 S.W.3d at 373; *Poague v. Crane Co*., 523 S.W.3d 496, 510 (Mo. Ct. App. 2017) ("'Generally, the fact that only circumstantial evidence is presented on a material issue is no bar to recovery.'").

As for 2017 and after, when the "new dicamba" products came on the market, Monsanto argues that plaintiff did not prove that it was Monsanto's product that harmed its orchards, nor that it had been applied to an Xtend crop. Again, the precise combination of brands used as part of the DT system was not legally or factually required. The evidence regarding the year 2017 and after was similar to that for 2015 and 2016. And there was

testimony that at least one nearby farmer sprayed both XtendiMax and Engenia over his Xtend crops in 2017.

Dr. Carey also testified that Monsanto predicted the off-target movement as collateral damage and set a plan in place for addressing it. Monsanto's own internal documents showed thousands of claims of off-target movement. Monsanto knew that the new, allegedly low volatility herbicides would be used on the tens of millions of soybean and cotton acres that would be planted. Monsanto makes light of plaintiff's "cloud" theory of atmospheric loading, saying it does not absolve plaintiff from identifying a particular product, but it appears that its own documents confirmed it could and did happen. Notably, although defense counsel cross-examined Dr. Baldwin at length regarding this theory, Monsanto did not call its own expert on this issue.

Dr. Baldwin offered extensive testimony regarding the movement of dicamba:

- He observed that in the summer of 2017, the Bootheel experienced unprecedented landscape damage—damage that blankets an entire area—caused by in-crop use of dicamba.

- He defined and explained the phenomenon of atmospheric loading and offered specific examples of atmospheric loading that have occurred in the past.  Notably, this was consistent with Monsanto employee Dr. Carey's testimony that temperature inversions "absolutely increase the risk of off-target movement," causing the herbicide to move "great distances."

- Dr. Baldwin also testified that, "treating huge acreages at the same time in the same area is one of the things that" causes atmospheric loading;

- He testified during his summer of 2017 inspection of Bader Farms, he

observed landscape damage, which is a hallmark of over-the-top movement of herbicides;

- Dr. Baldwin testified that, of the years he inspected Bader Farms, he observed the worst damage in 2018;

- Dr. Baldwin also testified about temperature inversions and the work that other weed scientists, such as Dr. Norsworthy and Dr. Bradley, have done related to the effect of temperature inversions in the Bootheel and Northeast Arkansas;

- He also noted the XtendiMax label included instructions to avoid use during atmospheric conditions that might result in temperature inversions;

- Dr. Baldwin testified that in the Bootheel and Northeast Arkansas, because farms are so large and Palmer amaranth (pigweed) grows so quickly, it is impossible to follow the label while spraying thousands of acres;

- Dr. Baldwin vehemently disagreed with defendants' claims that academics' volatility studies support defendants' contention that the new, alleged low-volatility dicamba herbicides are not causing volatility problems;

- He testified instead that XtendiMax and Engenia are prone to volatilize, and dicamba can volatilize 72-96 hours after application;

- Dr. Baldwin also testified that the landscape damage at Bader Farms is a combination of volatility and physical drift, but it is mostly volatility;

- In Dr. Baldwin's experience, landscape damage is always associated with temperature inversions and that is what is happening at Bader Farms;

- ▪ It was obvious to Dr. Baldwin that "this wasn't a point source issue; it was an air mass loading issue."

Consistent with the atmospheric loading principle, there was also evidence that XtendiMax and Engenia were in fact applied near Bader Farms. Dr. Baldwin testified he saw the sales logs of Engenia purchasers, and many of those listed are farms neighboring Bader Farms. He also testified he has personal knowledge of some of Bader Farms' neighbors spraying dicamba over Xtend crops. In addition, it is undisputed that Monsanto's sales of Xtend seed increased with each passing year, and that by 2018, in the Bootheel, "almost all of the acres in the Bootheel were in Xtend cotton and Xtend soybean." Although Xtendimax, Engenia, and other low-volatility dicamba products were in full use from 2017 on, volatility and atmospheric loading persisted.

All in all, "but for" causation is established because of the expected unlawful use of old dicamba in 2015-2016 and the lawful but ineffective use of low-volatility dicamba in 2017-2018. The evidence was sufficient to prove that this dicamba use caused Bader Farms' damages.

### 3. Admissibility of Dr. Baldwin's opinions

Monsanto's next argument goes to the admissibility of Dr. Baldwin's opinions. The Court has already addressed these arguments as presented in BASF's motion (Section II.A.I, above) and will not repeat them here.

### 4. Weight of the evidence

Monsanto also argues that the verdict was against the weight of the evidence as to actual causation. It says that Dr. Baldwin's opinions are too tenuous to support a verdict. For the reasons discussed above and in response to BASF's similar arguments, this Court disagrees. Second, Monsanto argues the overwhelming weight of the evidence was that

armillaria root rot was the actual cause of any tree death on Bader Farms. Monsanto points

out that Dr. Baldwin admitted that armillaria root rot was present on Bader Farms, a fact

that was confirmed by genetic testing, and that two plant pathologists with expertise in

peach trees testified that the armillaria root rot found in the peach orchards will kill peach

trees, and entire orchards, independent of any herbicide exposure. Monsanto contends

those experts were further able to confirm from aerial photographs that the root rot had

been present on Bader Farms since long before the sale of Xtend seed.  To the contrary, Dr.

Baldwin testified that—consistent with three credible scientific sources—that in fact

Armillaria root rot is a secondary pathogen that generally attacks trees weakened by other

environmental stressors. In this case, Baldwin testified the trees had been weakened by

repeated exposures to volatilized dicamba. Defendants introduced evidence that there was

no such problem as volatilized dicamba and that it could not have caused Bader's

problems, but again, Bader testified that, suddenly in 2015, he began having problems with

disease, insects, and weather to an extent he never had before. The jury was presented with

ample evidence from both sides and found in favor of plaintiff. The Court does not agree

the verdict was against the weight of the evidence.

### 4.    Proximate causation

Next, Monsanto argues that it is entitled to judgment as a matter of law because the

unlawful application of dicamba to an Xtend crop would be an intervening and superseding

cause of plaintiff's alleged harm. Alternatively, Monsanto says is entitled to a new trial

because the Court refused to instruct the jury on Monsanto's intervening and superseding

cause defense even though there was evidence in the record to support it.

This Court initially ruled that in view of the warnings and prohibitions on the labels

of Xtend seeds, it was not foreseeable the farmers would resort to unlawful use of dicamba.

[#50 at 8-9; *but see* #134 at 6 (the *Bader* May 8 Order, reversing prior rulings).] Monsanto

insists that initial ruling was correct. After additional briefing, this Court later changed its

ruling:

> In its May 8, 2018 Order, the Court recognized that:
>
> [P]laintiffs' claim is that the third parties' foreseeable misconduct was itself
> part of the chain of proximate cause and that there was nothing 'intervening'
> about it. That is why the cases uniformly hold that a third parties' misconduct
> cannot be deemed an intervening and superseding cause if it was foreseeable.

*Bader* May 8 Order, 2018 WL 2117633, at *2. The only test of any of plaintiff's claims is

foreseeability—"all roads in Monsanto's causation arguments lead back to foreseeability."

*Id.* at *3. This Court also rejected this argument in denying defendants' motion for

summary judgment. [#288.] Even though plaintiffs ultimately did not put on evidence that

defendants had told farmers to illegally spray dicamba in 2015 and 2016, there was

evidence that Monsanto expected that farmers would spray older formulations of dicamba

off-label. For example, before release of the Xtend cotton seed, one Monsanto document

records that 50% of the purchasers boasted that they would spray illegally. That same

document listed as one of the risks of early release of the seed was that farmers would

spray illegally. Thus, Monsanto knew that illegal spraying would occur before the 2015

release and that the "pink sticker" warning not to use dicamba would not prevent it.

Evidence even showed that Monsanto relied on a "defensive planting" strategy to drive

adoption of the Xtend system—a 2013 Monsanto Power Point that addressed the question

of how to promote the Xtend system to growers who resisted purchasing Xtend with the

suggested response: "Protection from your neighbor." In addition, a 2010 Monsanto email

stated that the company would be "defending dicamba relative to drift and volatilization to

nearby crops." Monsanto also received warnings from academics and scientists, members

of the agriculture community, and Monsanto's own employees. Third party illegal use of dicamba on the Xtend seeds was therefore not an intervening and superseding cause: it was foreseeable and in fact foreseen by Monsanto.

Next, Monsanto argues that third party farmers who misused dicamba was an "alteration of the system" that "when a third party's modification makes a safe product unsafe, the seller is relieved of liability even if the modification is foreseeable." *Jones v. Ryobi, Ltd.*, 37 F.3d 423, 425 (8th Cir. 1994). Missouri law does not impose a duty on a manufacturer to "warn[] of unreasonable risks and dangers associated with the use of its product in modified condition." *Hill v. Gen. Motors Corp.*, 637 S.W.2d 382, 385-86 (Mo. App. 1982) (internal quotation omitted). Nor is a manufacturer required to ensure the safety of the product in a modified condition, even where the manufacturer has affirmative "'knowledge a modification of a given nature would more than likely occur.' *Id.* The cases relied upon by Monsanto involve situations where someone altered the product in some way to make it dangerous. In *Jones*, the plaintiff sued manufacturers of a press she operated at work alleging the removal of the machine's safety guards had rendered it defective. *Jones*, 37 F.3d at 425.  Here, in contrast, the use of dicamba over the Xtend seed in 2015 and 2016 was not an "alteration" of the product.  The product was not used in a modified condition.  In other words, misuse of a product is not an alteration of a product. Monsanto's cases are inapposite.

In the alternative, Monsanto argues it was error not to instruct the jury on Monsanto's superseding and intervening cause defense, set out in Instruction U, which was tendered and rejected. This instruction, couched as an affirmative converse instruction, was based on Monsanto's defense that third-party farmers' unlawful spraying of dicamba herbicide over-the-top was not foreseeable.  As such, it was a superseding and intervening

cause of plaintiff's damages, though apparently a somewhat different superseding and intervening cause than the third-party farmers' alleged modification or alteration of the dicamba product.

Plaintiff objected that the submission was an impermissible "sole cause" instruction, proscribed in MAI 1.03, which states that, "No instruction shall be given on behalf of the defendant which hypothesizes that the conduct of one other than defendant was the sole cause of the occurrence." This Court rejected the instruction on that ground and for the additional reasons that the instruction was not in proper form and any further submissions would be untimely. In its post-trial briefing, Monsanto, for the first time, invokes Missouri Supreme Court precedent that, "In a negligence case, an affirmative converse instruction presents a hypothetical ultimate issue which, if true, renders it impossible for the jury to find the defendant negligent as a matter of law.... Although not favored, an affirmative converse instruction is appropriate where the verdict director assumes as true or omits a disputed ultimate issue." *Blackstock v. Kohn*, 994 S.W.2d 947, 951 (Mo. *banc* 1999) (citing *Hiers v. Lemley*, 834 S.W.2d 729,734 (Mo. *banc* 1992)).

As this Court understands Monsanto's argument in support of the instruction, the foreseeability of third party farmers' unlawful use of dicamba was an essential part of plaintiff's proof, and yet the issue was omitted from the proof required in plaintiff's verdict directors. Monsanto goes so far to suggest that the lack of a foreseeability requirement in the verdict directors is itself fatal to the plaintiff's case, stating, "The Missouri Supreme court and the MAI have made clear that a defendant 'is not obligated to tender an affirmative converse instruction to cure a plaintiff's verdict director that omits an essential ultimate issue. . . ,'" citing MAI 33.05(1) Notes On Use (2015). Certainly plaintiff agrees that the foreseeability issue permeated the entire case, and that it was argued to the jury at

length by both sides.  But plaintiff correctly maintains that the elements set out in the verdict directors are all that are necessary for a submissible case of negligence as per the MAI, and Monsanto did not contend otherwise.  It appears then, as plaintiff suggests, that the issue of foreseeability—an ultimate requirement for causation—is subsumed in the verdict directing requirement that Monsanto's conduct (or omissions) "directly caused or contributed to cause damage."  But it is a conundrum, nonetheless, whether the seemingly critical issue of foreseeability is a disputed ultimate issue omitted from the verdict director so to warrant an affirmative converse instruction.

Even assuming that an affirmative converse instruction was warranted, the tendered instruction here did not pass muster.  First, Instruction U did not track the form mandated by MAI 33.05(1) that addresses affirmative converse instructions, nor the very instruction Monsanto itself cited from caselaw.  Monsanto's counsel admitted as much.  Nor did Monsanto submit the required "'affirmative defense tail,' which refers the jury directly from the verdict director to the affirmative converse instruction," as also required by the notes on use for MAI 33.05(1).

Second, Instruction U does not adequately satisfy the requirement from MAI 33.05(1) that, "here insert the ultimate issue assumed as true or erroneously omitted from plaintiff's verdict director."  That issue, one supposes, would be the lack of foreseeability that third parties would unlawfully spray dicamba.  Instead, the instruction first "denies that dicamba applied over-the-top of a crop grown from Xtend Seeds was the cause of Plaintiff's alleged crop damage," which is a matter that obviously does not correspond to the issue of foreseeability.  The instruction then sets out Monsanto's "claims" that the actions of third parties "constitute a superseding cause," and then defines superseding cause as "one that is not reasonably foreseeable and may be described as abnormal or

66

extraordinary." The instruction then includes what appears to be a converse within a converse stating it would not be a superseding cause "if Defendant Monsanto marked and sold its Xtend seed reasonably anticipating that third-parties would unlawfully apply off-label dicamba...."

Although counsel for Monsanto acknowledged the deficiencies in Instruction U, and requested to submit additional versions, the request was denied. This was because Instruction U was the twenty-first of many more instructions tendered but rejected during a mammoth late-night, closing-argument-eve instructions conference (the last of several extended instructions conferences held during the last week of trial), with closing argument to begin at 9am, and it was simply not feasible to entertain any more proposed revisions.

What is even more concerning to this Court, though, and which was not even discussed in the instructions conference, is the fact that Instruction U does not limit itself to the years 2015 and 2016, and the verdict director for those years. Only in 2015 and 2016 does the issue of the foreseeability of third-party farmers' unlawful use of dicamba arise. For the years 2017 forward, XtendiMax, Engenia, and other low-volatile dicamba herbicides had entered and dominated the market, thus negating any claim that the unlawful use of old dicamba was still foreseeable.

For the foregoing reasons, this Court again rejects the submission of Instruction U.

### B.    Negligence--Duty

Monsanto next argues that it is entitled to judgment because the duty asserted by plaintiff is not recognized under Missouri law. Whether Monsanto owed a duty to the plaintiff is purely a question of law. *Lopez v. Three Rivers Elec. Coop., Inc*., 26 S.W.3d 151, 155 (Mo. *banc* 2000). Plaintiff's claims for negligent product design and negligent failure to warn were predicated on Monsanto's alleged duty to use ordinary care to "design

a reasonably safe dicamba-tolerant system" and to "adequately warn of the risks of off-target movement" of "dicamba herbicides." [#554 at Instructions No. 9 and 10.] Monsanto argues there was no duty to plaintiff here because it has never sold an integrated product called a "dicamba-tolerant system," it sold no dicamba herbicide in 2015-2016, and from 2017 forward it sold only one of dozens of dicamba herbicides on the market.

This appears to be a repackaging of the argument Monsanto made regarding causation. The answer is the same—all roads lead to foreseeability. "In negligence cases the duty owed is based on the foreseeable or reasonable anticipation that harm or injury is a likely result of acts or omissions." *Blevins v. Cushman Motors*, 551 S.W.2d 602, 607–08 (Mo. *banc* 1977) (internal citations omitted). "The basis of liability is not in contract but arises from a social responsibility to use due care to avoid injuring those persons likely to be injured if such care is not used." *Thompson v. Brown & Williamson Tobacco Corp*., 207 S.W.3d 76, 98 (Mo. App. W.D. 2006) (quoting *Orr v. Shell Oil Co.*, 177 S.W.2d 608, 612 (Mo. 1943).)

Evidenced established that Monsanto did sell the Xtend crop system. Defendants Monsanto and BASF entered into an agreement called the "Dicamba Tolerant Systems Agreement" with the goal of bringing this product to market. Defendants' own marketing materials refer to it as the Xtend "crop system." Monsanto employee Boyd Carey admitted it was a "crop system." That each item is purchased separately does not negate the system's existence.

Second, Monsanto's contention that dicamba herbicides and Xtend seeds are independent of each other is without merit. The purpose of the seed is to plant it to grow a crop. The reason the seed has been genetically modified is to allow that crop to be sprayed with dicamba—something that had never been done over the top of those formerly

68

dicamba-sensitive crops. Although the DT seed could also be sprayed with another herbicide—Roundup—that herbicide was no longer effective against certain weeds that had become widespread in the Bootheel region.

The harm to third-party non-DT-tolerant crop farmers like plaintiff was foreseeable and in fact foreseen by Monsanto. The duty owed is clear.

**C.      Preemption**

**1.      PPA Preemption**

Monsanto again argues that plaintiff's Missouri common law claims are preempted by the Plaint Protection Act ("PPA"). This Court denied Monsanto's summary judgment motion on those grounds. Here, Monsanto makes a few related arguments.  Monsanto says that plaintiff's negligent design theory, in essence, is that Xtend seeds' dicamba-tolerance is a design defect and that that theory of liability is expressly preempted by PPA, 7 U.S.C. §§ 7756(b)(1) & 7756(b)(2)(A). The PPA authorizes the Secretary of Agriculture and the U.S. Department of Agriculture's Animal and Plant Health Inspection Service ("APHIS"), to regulate the dissemination of genetically modified seeds within the United States. *Id.* § 7712(a). To promote its goal of national uniformity, Congress included an express preemption provision in the PPA, which preempts state law when: (1) the state law would "regulate the movement in interstate commerce of an[] article, ... plant, ... [or] plant pest;" (2) the state law is imposed "in order to control ..., eradicate ... or prevent the introduction or dissemination of a … plant pest;" and (3) the Secretary has "issued a regulation or order to prevent the dissemination of the … plant pest … within the United States." *Id*. § 7756(b)(1).

Monsanto argues that any purported state law duty not to sell Xtend seeds in 2015 and 2016 satisfies all three conditions for express preemption. This Court's decision on

Monsanto's summary judgment motion, however, remains apt: Following *Atay v. County of Maui*, 842 F.3d 688, 700 (9th Cir. 2016), one of the very few courts to address this matter, this Court observed that "strict regulation applies to all plant pests…up until the point they are deregulated, at which point they fall outside of the preemption clause and APHIS's jurisdiction under the PPA." *Id.* at 703. That is, because the Xtend seeds are deregulated, preemption no longer applies, and the "regulation of commercialized crops, both of GE and traditional varieties, remains within the authority of state and local governments." *Id.* at 705. Monsanto contends that this Court's "prior decision on the scope of express preemption reads a non-existent requirement into the statute that APHIS asserted jurisdiction over the seed to make a determination regarding whether it could be commercialized and decided not to allow commercialization." [#588 at 59.] That is not what this Court held. This Court held that only currently regulated "plant pests" are within the ambit of the preemption provision. At the time the seeds are deregulated, they no longer subject to the PPA.

Monsanto's implied preemption argument fares no better. The court in *Atay*, for example, rejected implied preemption by observing the PPA's express preemption clause created a reasonable inference that Congress did not intend to preempt state and local laws that did not fall within the clause's scope. 842 F.3d at 704-05.

## 2. FIFRA Preemption

Next, Monsanto argues that the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA") and its implementing regulations preempt plaintiff's failure-to-warn claims. FIFRA sets out federal requirements for herbicide labeling and includes an express preemption provision, which directs that states "shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under

this subchapter." 7 U.S.C. § 136v(b). Monsanto argues that plaintiff's exclusive path to proving a failure to warn claim for a federally-registered pesticide is to establish a violation of the federal labeling requirements set out in FIFRA. *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 454 (2005). Further, Monsanto insists that plaintiff's failure to warn claims directed to XtendiMax are preempted in their entirety because plaintiff failed to introduce any evidence that Monsanto sold XtendiMax without its federally-approved labeling, or that its federally-approved labeling failed to comply with FIFRA. Monsanto points out, too, that the EPA approved the XtendiMax label as meeting the FIFRA labeling requirements. Monsanto makes similar arguments about the Xtend seed labels and failure to warn claims for 2015 and 2016.

This Court has twice held that FIFRA does not preempt plaintiff's common law claims, including failure to warn, as long as plaintiff does not seek to impose any labeling or packaging requirements "in addition to or different than" the FIFRA requirements. The Court declines to alter its rulings.

Monsanto goes on to argue, however, that Instruction 10 is improper and warrants a new trial. Instruction 10 required the jury to find in plaintiff's favor if it found, inter alia, that "*Second*, dicamba-based herbicides have a propensity to move off target, and *Third*, such defendant … failed to use ordinary care to … adequately warn of the risks of off target movement." Monsanto argues that this Court improperly overruled its objection to Instruction 10 on the basis that the instruction was contrary to FIFRA. Although Monsanto cites to Document #540 at 20 in support of its objection, the cited objection was to the failure "to separately instruct on the requirement of proving federal misbranding under FIFRA." The objection does not refer to the imposition of labeling requirements in addition to FIFRA requirement and instead appears to go to proving misbranding under

71

FIFRA. In the absence of a distinct objection, Monsanto must show plain error, which is "narrow and confined to the exceptional case in which error has seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *May v. Nationstar Mortgage, LLC*, 852 F.3d 806, 820 (8th Cir. 2017) (internal quotation omitted). This Court's use of MAI 25.09, the Missouri Approved Instruction for Negligent Design and Failure to Warn claims, cannot be said to meet that "exceptional" standard.

### D.     Negligence—Other arguments

Monsanto makes several other arguments related to plaintiff's negligence claim.

### 1.     Lack of required proof

First, Monsanto argues plaintiff failed to prove the designs of Xtend seeds and Xtendimax were defective. As this Court has stated several times, plaintiff submitted its negligent design and failure to warn claims to the jury on the theory that Monsanto failed to use ordinary care to "design a reasonably safe dicamba-tolerant system." [#554 at Instructions 9-10.] Those instructions were patterned on MAI 25.09. "[P]roving negligent failure to warn—and by analogy negligent design defect—'focuses on what the manufacturer knew rather than on the product.'" *Johnson v. Auto Handling Corp*., 523 S.W.3d 452, 466 (Mo. *banc* 2017), *as modified* (Aug. 22, 2017) (quoting *Moore v. Ford Motor Co*., 332 S.W.3d 749, 764 (Mo. *banc* 2011). MAI 25.09 "requires the jury to consider whether defendant manufactured the product, whether the product had a particular defect, whether 'defendant failed to use ordinary care' to design the product 'to be reasonably safe ... [or] adequately warn of the risk of harm,' and whether 'as a direct result of such failure, [in one or more of the respects submitted in paragraph Third,] plaintiff sustained damage.'" *Id*. at 466 (quoting MAI 25.09). The "particular defect" here was that "dicamba-based herbicides have a propensity to move off target." There was no need for

plaintiff to prove the seeds themselves were defective, and, likewise, an expert on the seeds themselves was unnecessary.

Monsanto cites *Davidson v. Besser Co*., 70 F. Supp. 2d 1020, 1023 (E.D. Mo. 1999), for the proposition that expert testimony is required in every failure to warn case. However, "the *Davidson* decision merely applies the rule—that expert testimony is required—in cases involving complex issues outside the common knowledge of jurors." *Cox v. KLS Martin, L.P*., 2013 WL 4434390, *2 (W.D. Mo. Aug. 14, 2013). Thus, the necessity of expert testimony in a products liability claim "turns on the complexity of the subject matter." *Cox*, 2013 WL 4434390, at *3 (citing *Menz v. New Holland North America, Inc*., 507 F.3d 1107, 1111 (E.D. Mo. 2006) (applying Missouri law)). The Missouri Supreme Court has specifically refused to require expert testimony in every design defect or failure to warn case. *Tune v. Synergy Gas Corp*., 883 S.W.2d 10, 14 (Mo. banc 1994).  Although Dr. Baldwin's testimony certainly supported plaintiff's claims here, expert testimony was not required as to this matter.

### 2.      Failure-to-warn claim

To prevail on negligent design and failure to warn, plaintiffs were required to prove:

*First*, such defendant designed, manufactured, or sold any one or more component of the dicamba-tolerant system in 2015-2016, and

*Second*, dicamba-based herbicides have a propensity to move off target, and

*Third*, such defendant failed to use ordinary care to either:
      (i) design a reasonably safe dicamba-tolerant system, or
      (ii) adequately warn of the risks of off-target movement, and

*Fourth*, such failure, in one or more respects submitted in paragraph Third, directly caused or directly contributed to cause damage to Plaintiff Bader Farms, Inc.

[#554 at Instruction 9.] Monsanto argues that plaintiff failed to make a submissible case on the third and fourth elements and that plaintiff failed to introduce expert testimony in support.

First, Monsanto argues that plaintiff produced no evidence to support a conclusion that the warnings provided by Monsanto were inadequate.

> Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous.

*Restatement (Second) of Torts* §402A cmt. j. All Xtend seed sold in 2015 and 2016 was accompanied by a pink sticker that stated, "DO NOT APPLY DICAMBA HERBICIDE IN-CROP."  Monsanto says, relying on the *Restatement*, that the warning is adequate as a matter of law because, if heeded, it would have prevented the alleged harm. However, that the sticker was not a warning. It said nothing about the "risks of off-target movement." As Monsanto employee Dr. Carey conceded, the pink stickers do not say anything about how spraying dicamba over the top could "devastate your neighbors, it could ruin their crop, it can destroy their yields."

Second, as for causation, Monsanto argues that plaintiff was required to present some evidence that the product-user lacked knowledge of the product's danger. Plaintiff did put on evidence of this. Dr. Baldwin testified that after the dicamba damage started in the summer of 2016, farmers using it did not understand what was wrong and did not expect this to happen. Additional evidence of lack of understanding came from Jason Roberts, BASF Innovation Specialist, who on July 4, 2016, wrote:

> Growers are all concerned with the dicamba volatility issue that has taken over the area. There is a lot of mis-information out in the field. We really need to educate everyone on volatility for the Engenia launch. . . The one

> good thing that could come is growers now know that the lesser formulations
> can act in mysterious ways.

[Trial Ex. Pltf-1371.] This is evidence that the product-user lacked knowledge of the

product danger. In addition, by the time of the new-dicamba product launch, Monsanto and

BASF widely spread the news that Xtendimax and Engenia posed little or no volatility risk.

Plaintiff thus included evidence that the product-user lacked knowledge of the product's

danger. Monsanto also argues that this was an impossible showing for plaintiff because

plaintiff did not identify who exactly sprayed dicamba that reached plaintiff's orchards. As

this Court has already explained, however, this is not a point-source case.

### 3.    Instructions 9 and 10

Alternatively, Monsanto argues that the verdict directors for plaintiff's negligence

claim contained prejudicial errors. First, Monsanto says that the instructions gave the jury a

roving commission. "A 'roving commission' occurs when an instruction assumes a

disputed fact or submits an abstract legal question that allows the jury 'to roam freely

through the evidence and choose any facts which suited its fancy or its perception of logic'

to impose liability." *Seitz v. Lemay Bank & Tr. Co*., 959 S.W.2d 458, 463 (Mo.

*Banc* 1998).

First, Monsanto argues that the reference to the "dicamba-tolerant system" was not

defined and the jury was left to guess which products were components of the system.

Second, Monsanto argues that Instruction 9 assumed there was a dicamba-tolerant system

on the market in 2015-2016 when in fact neither defendant sold a dicamba that was

intended to be used with the Xtend seed. And Monsanto says Instruction 10 improperly

assumed that older formulations of dicamba were part of the "dicamba-tolerant system"

from 2017-present, even though those formulations could not lawfully be used with Xtend

seeds and other formulations that could lawfully be used with the seeds were available. These arguments appear to be just another repackaging of Monsanto's assertion that it did not sell a "dicamba-tolerant system." This Court has already fully addressed these issues and will not repeat itself here. The instructions were discussed and argued at length by the parties, and the Court will not disturb its rulings.

### E.   Joint Venture and Conspiracy

Monsanto first argues that the joint venture and conspiracy findings are inconsistent, that the plaintiff failed to make out a submissible case on its joint venture and conspiracy claims. The Court incorporates its discussion of BASF's similar arguments above and likewise denies the motion on these points.

Monsanto argues that the joint venture instruction was defective because it did not apply the clear and convincing evidence standard, was based on implied joint ventures, did not include the requirement to share profits and losses, did not define which "acts" were within the joint venture, and did not include an intent requirement. Several of these arguments have been discussed with respect to the BASF motion. Monsanto does not explain why any "acts…within the joint venture" needed to be defined, and, even if the "intent requirement" had been spelled out in the instruction, it is unclear how that would have changed the result here. Evidence of the defendants' intent to form a relationship which meets the elements of a joint venture was well-satisfied.

As for the conspiracy instruction, Monsanto again makes similar arguments to those made by BASF. The conspiracy instruction properly reflects Missouri law, and the Court will not disturb its rulings.

### F.    Damages

Monsanto similarly argues that plaintiff's damage evidence was legally insufficient and the damages instruction erroneous for the same reasons BASF cites. The Court denies the motion on those grounds for the same reasons.

Monsanto also argues that use of the word "occurrence" was error. Instruction 11, based on MAI 4.01, states that, if the jury finds in favor of plaintiff, then it must compensate plaintiff "for any damages you believe it sustained and is reasonably certain in the future which the occurrence in evidence directly caused or directly contributed to cause." [#554 at Instruc. 11.]  As the notes state, MAI 4.01 "is short, simple and easily understood. Since no particular items of damage are set out, there is no risk of the jury being improperly instructed on damages not supported by the record." MAI 4.01, Committee Comment (2002 Revision). Read as a whole, the instructions make clear the meaning of "occurrence." *See McGowan v. Hoffman*, 609 S.W.2d 160, 164 (Mo. App. 1980). The Court rejects Monsanto's argument.

### G.    Other errors

Finally, Monsanto argues that the size of the verdict suggests that the admission of certain evidence was prejudicial and requires a new trial. These arguments include admission of evidence of other incidents and complaints and undisclosed expert opinions, and those have already been discussed and rejected above. As for the argument that this Court improperly admitted documents without foundation, a proper foundation was in fact laid for these documents. As for Pltf-282, specifically, Dr. Carey testified that he was "familiar with these types of presentations," and that they were "made by folks at Monsanto," "that's a regular practice of Monsanto to produce these type[s] of presentations and then to show them to [its] seed partners and other groups," and that such activities are

"part of [his] education and training."  Similarly, witnesses had sufficient personal knowledge of other challenged documents.

Monsanto also complains many documents were admitted solely because of the presence of a bates number. But Monsanto stipulated to the authenticity of the documents produced, and the examples Monsanto cites were admitted with additional foundation. The Eighth Circuit has repeatedly confirmed: "[i]t is well settled that stipulations of fact fairly entered into are controlling and conclusive and courts are bound to enforce them." *Consolidated Grain & Barge v. Archway Fleeting & Harbor Serv., Inc*., 712 F.2d 1287, 1289 (8th Cir. 1983).

Monsanto's renewed motion for judgment notwithstanding the verdict or, in the alternative, new trial, is denied.

## V.   Monsanto's Renewed Motion For Judgment As A Matter Of Law On Punitive Damages [#585]

Much of Monsanto's motion encompasses many of the arguments made by BASF in the BASF post-trial motions and adds some other arguments as well. Each argument is discussed in turn.

### A.   Outrageous conduct

Monsanto first argues that the $250 million punitive damages award should be overturned in its entirety because, Monsanto says, plaintiff failed to meet Missouri's high standard for a punitive damages award.

An award of punitive damages requires clear and convincing evidence that "the defendant acted with either an evil motive <u>or</u> a reckless indifference to the plaintiff's rights." *May v. Nationstar Mortg*., LLC, 852 F.3d 806, 814 (8th Cir. 2017) (emphasis in original) (citing *Burnett v. Griffith*, 769 S.W.2d 780, 789 (Mo. *banc* 1989)). Monsanto

relies heavily upon this Court's statement on the record at trial that "I don't see any malice in this case." This Court's full statement was as follows: "I don't see any malice in this case, but they don't have to show malice." [Tr. at 1687.] This Court also advised that "It's not – you don't have to prove evil motive. It's sufficient if you show a complete indifference to or a conscious disregard or words to that effect. So that's a pretty lenient standard, but, on the other hand, it's got to be shown by clear and convincing evidence." [*Id.* at 1682.] Even so, Monsanto insists that plaintiff did not meet that standard. Monsanto says its efforts to bring to market an EPA-approved seed cannot be reckless or show a conscious disregard for anything.

In fact, plaintiff's evidence was ample, clear, and convincing. "Conscious disregard or complete indifference" involves situations where a defendant acts or fails to act while being "conscious from the knowledge of surrounding circumstances and existing conditions, that, although lacking specific intent to injure, the person's conduct or failure to act will naturally and probably result in injury[.]" *Poage v. Crane Co.*, 523 S.W.3d 496, 520 (Mo. App. E.D. 2017). Plaintiff cites numerous examples of evidence that supports a finding for punitive damages.

- *Monsanto was warned that commercialization of a dicamba-tolerant system would result in injury to sensitive-crop farmers like plaintiff here.*

The warnings came from its own employees (John Soteres, Kim Magin), industry stakeholders (the Dicamba Advisory Council, Steve Smith), and academics (a 2014 Academic Survey).

- *Monsanto consciously blocked testing for volatility to avoid evidence of off-target movement that could interfere with regulatory approval.*

Not only did Monsanto block academics from testing its new dicamba formulation in 2015, but it also blocked its own Technical Development employees from spraying dicamba over Xtend seed to avoid bad results. Monsanto's Dr. Tina Bhakta testified that Monsanto leadership blocked testing "to ensure that these formulations keep a clean slate" with EPA. Bhakta ordered Monsanto employees to pull all of the field tests that were planned for 2015 to avoid any "baggage" associated with off-target movement "as we need to stay on this clean page," and she admitted Monsanto had only done tests on small strip plots, "thank God," because "that eliminates some of the risk of off-target movement."

Monsanto's Jeff Travers wrote in a March 2015 email that the "moratorium on testing" was a step taken "to prevent off-site movement of dicamba while the EPA reviewed [our] data submissions."

Also beginning in 2015, Monsanto denied academics' requests to perform volatility testing, telling them that they did not want to compromise the registration process or lying about adequate supplies for testing. Monsanto also asked BASF to limit academics from performing volatility testing of Xtend system products.

- *Monsanto launched the Xtend seeds without a corresponding low-volatility herbicide in 2015 despite knowing that farmers intended to spray dicamba off-label.*

The risks and benefits of this strategy were discussed in a 2014 presentation. The presentation showed that a risk was off-label dicamba spraying, and it noted that growers "are expecting ability to use dicamba" and, in red letters, "50% indicate intent to use [over-the-top]." Despite this, Monsanto proceeded with the launch.

- *Despite knowing that farmers did use old-dicamba over-the-top in 2015, Monsanto continued to sell Xtend seeds in 2016.*

Monsanto knew that off-label dicamba use was widespread in 2015. Then BASF's Dan Westberg warned Monsanto in February 2016, before the a second Xtend seed was released in 2016, that off-label dicamba use was "widespread in cotton [in 2015] and that it will be rampant in 2016." Monsanto's Dr. Carey also notified others at Monsanto that farmers purchasing Xtend seed were going to spray dicamba. Despite this, Monsanto did nothing to either evaluate the "widespread" off-label use in 2015 nor prevent such use in 2016.

- *Monsanto adopted a "protection from your neighbor" sales strategy.*

Monsanto expected that dicamba would be used and that it would affect neighboring farms, so Monsanto used "defensive planting" as a sales strategy. A 2013 Powerpoint Presentation addressed issues concerning the future commercialization of the Xtend system, including "Acceptance by grower who doesn't have [weed] resistance issues," and suggested how to respond to the question "Why should I pay for something I don't need?" The suggested response is: "Protection from your neighbor." Monsanto's response to the problem of off-target dicamba was that "everybody will plant our technology, and there won't be an issue." Monsanto's own market research showed that rapid adoption of Xtend seed in 2016 was driven by this "defensive planting strategy."

- *Monsanto chose not to enforce its grower license to prevent off-label dicamba use over Xtend seeds.*

- *Monsanto refused to investigate complaints of dicamba damage in the Bootheel in 2015 or 2016.*

Indeed, not only did Monsanto decline to investigate widespread reports of dicamba damage, but Monsanto knew four growers were reportedly responsible for the off-target dicamba damage in the Bootheel, but Monsanto did not take any action to stop their off-

label spraying. Monsanto leadership planned to blame non-DT crop growers' problems on disease.

* * *

That is a sample of plaintiff's evidence in support of punitive damages. Clear and convincing evidence established Monsanto's awareness that its release of the incomplete Xtend system in 2015 and 2016 would result in off-target dicamba injury to third-party farmers, its dependence on that very problem to drive its sales, and its aversion to doing anything to fix it. That satisfies the standard for punitive damages.

### B.   Amount of the award

Monsanto next argues that the punitive damages award violates due process and is excessive. This Court has already cited the federal guideposts used to consider due process for punitive damages awards in *State Farm*, 538 U.S. at 418. As discussed above at Section II.E, this Court disagrees with Monsanto in most respects. However, the Court has already determined that a reduction in the punitive damages judgment is required, and the Court will reduce the award from $250,000,000 to $60,000,000.

Monsanto also invokes three factors identified by the Missouri Supreme Court in assessing punitive damages: (1) "the defendant did not knowingly violate a statute, regulation, or clear industry standard designed to prevent the type of injury that occurred"; (2) "prior similar occurrences known to the defendant have been infrequent"; and (3) "the injurious event was unlikely to have occurred absent negligence on the part of someone other than the defendant." *Lopez v. Three Rivers Elec. Co-op., Inc*., 26 S.W.3d 151, 160 (Mo. *banc* 2000). These factors do not come out in Monsanto's favor. As already exhaustively discussed, Monsanto actively avoided testing of dicamba volatility, and testimony established that Monsanto's actions were unusual by industry standards.

Monsanto was well aware that growers were likely to spray off-label and that injuries to third parties would result, and Monsanto launched the Xtend seeds anyway. Monsanto counted on "defensive planting" as a sales strategy with plans to blame disease for problems with non-DT crops. If Monsanto had not released the Xtend seed without its purportedly low-volatility herbicide, then no one would have sprayed the old dicamba over-the-top of seed during relevant years.

The Court also addresses Monsanto's argument that the jury's award was based on passion and prejudice and therefore requires a new trial. This Court disagrees. Although Monsanto argues that plaintiff's counsel improperly compared defendants to criminals who expressed apologies to the judge at sentencing while keeping masks and guns at the ready in their car, defendants did not object until after the conclusion of closing arguments when it was too late to cure any problem. Defendants' remedy was to seek a curative instruction at the time the objection should have been made and not move for a mistrial after the fact; without a contemporaneous objection, the review is for plain error, and there was none. *See Lawrey v. Good Samaritan Hosp.*, 751 F.3d 947, 954 (8th Cir. 2014). The same is true for Monsanto's other complaints about closing arguments. Arguments regarding the reprehensibility of Monsanto's conduct was necessarily connected to the award of punitive damages, as already discussed. Further, Instruction 20 directs the jury not to include damages for harm to others who are not parties, and the Court presumes the jury follows the instructions. *Poague*, 523 S.W.3d at 521. There was no plain error.

Monsanto also argues that plaintiff's counsel's emphasis on Monsanto's wealth caused the jury to be biased against it. Indeed, "the wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award." *State Farm*, 538 U.S. at 427. At the same time, the Supreme Court noted that "that does not make its use unlawful or

inappropriate; it simply means that this factor cannot make up for the failure of other factors, such as reprehensibility, to constrain significantly an award that purports to punish a defendant's conduct." *Id.* (quoting Gore, 517 U.S. at 591 (Breyer, J. concurring)). The purpose of punitive damages is to punish and to deter future like conduct, and Monsanto's wealth was relevant. *See Poague*, 523 S.W.3d at 523-24 (noting evidence of financial status is admissible as an indication of the amount of damages necessary to punish the defendant.").

Monsanto also argues that Instructions 9, 14, and 20 were confusing, contradictory, and legally misleading. First, Monsanto says that the instructions did not distinguish between the 2015-16 and 2017-present time frames. It is true that punitive damages were only authorized on the 2015-16 period, but, contrary to Monsanto's arguments, the instructions reflected this. Instruction 9 was entirely and specifically about 2015-2016. Verdict Form A (part 3) instructed the jury, if it found Monsanto liable for the 2015-2016 claim, to decide whether Monsanto was liable for punitive damages pursuant to Instruction 14. [#550.]  Instruction 14 specifically instructed the jury to consider only the 2015-2016 claim, not 2017-present claims. This argument is without merit.

Next, Monsanto suggests the jury was permitted to consider "harm to others" in assessing its damages. This is patently untrue. Instruction 20, consistent with MAI 35.19 and 10.04, instructed that

> You may consider harm to others in determining whether defendant's conduct showed complete indifference to or conscious disregard for the rights of others. However, in determining the amount of any punitive damage award, you must not include damages for harm to others who are not parties to this case.

[#559 at Instruc. 20.] This Court even advised Monsanto it was free to explain in its closing argument that harm to other should not be included in any award, and Monsanto's attorney did so.

Next, Monsanto says that Instruction 9 failed to include the "necessary element of knowledge." Monsanto does not appear to have raised this objection on the record, and the transcript pages it cites in support do not appear to discuss the issue at all. To the extent one of Monsanto's myriad proposed instructions included the language it now says the absence of which constitutes reversible error, a proposed instruction does not constitute an objection. "The mere submission of an instruction by a party will not be considered an objection raising any differences between the instruction requested and the one given." *Rolscreen Co. v. Pella Prod. of St. Louis, Inc.*, 64 F.3d 1202, 1211 (8th Cir. 1995).

## VI.    Other Pending Motions

There are several other pending motions that will be addressed now.

First, BASF's and Monsanto's motions for hearing [#621, #624] will be denied.

Second, BASF's motion for joinder to Monsanto's supplemental brief [#643] will be granted.

Third, Bader filed a motion to strike Monsanto's supplemental brief in support of its post-trial motions [#641]. Monsanto's supplemental brief was filed on July 29, 2020, nearly two months after the final brief was filed on June 1. The gist of the brief is that although plaintiff's damages expert assumed plaintiff would be out of business by 2019, the 2020 season for plaintiff appeared to be booming. Monsanto cited market advertisements and the report of a private investigator in support. Plaintiff argues that the motion should be stricken because a party may not offer new evidence in support of a post-trial renewed motion. 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice and*

*Procedure* § 2537 (2d ed. 2006) (explaining that the moving party may not introduce new evidence post-trial as support for a renewed motion for judgment as a matter of law). Such new evidence may, however, be grounds for a motion for new trial. *See Rosebud Sioux Tribe v. A&P Steel, Inc.*, 733 F.2d 509, 515 (8th Cir. 1984) (newly discovered evidence may be considered even after entry of final judgment to meet "the incessant command of a court's conscience that justice be done in light of all the facts") (quotations omitted); Fed. R. Civ. P. 59(a)(1)(A). Plaintiff also argues that the evidence is hearsay, but it appears to easily fall into the hearsay exceptions. Notably, plaintiff did not file a reply brief to refute Monsanto's arguments, and it appears they would not be well-taken. The motion will thus be denied.

That said, the information set out in the supplemental briefing does not change the result. Defendants introduced evidence at trial establishing that plaintiff continued to plant trees, to try to mitigate problems as they arise, and that there was a likelihood that the operation would continue on successfully. Defendants do not claim that any fraud on the Court has been committed, but rather that the "new" evidence further underscores the speculative nature of plaintiff's damages. Evidence of presumed sales and advertisements are not counter to the evidence at trial, however. Ultimately, this Court has already addressed these matters, *e.g.*, Section I.D., and denies the relevant motion.

Also pending are plaintiff's bill of costs [#574] and Monsanto's motion to seal [#631]. Both are disputed and will be addressed at a later date.

## VII.   Conclusion

This case has straddled four years, a multi-district litigation, a trial that lasted over three weeks, and post-trial briefing in which memoranda alone totaled hundreds of pages. Numerous issues have been raised and re-raised with the Court, and, at trial, the Court and

over a dozen counsel tackled hundreds of additional discreet issues—many of which were raised during the press of trial. Despite this, this Court is convinced that no legal error infected the case before, during, or after trial. The jury's punitive damages award will be reduced to a Constitutionally-appropriate amount. Otherwise, the judgment will not be disturbed.

Accordingly,

IT IS HEREBY ORDERED that the BASF's renewed motion for judgment as a matter of law [#579] is DENIED.

IT IS FURTHER ORDERED that BASF's alternative motion for a new trial [#581] is DENIED in part and GRANTED in part.

IT IS FURTHER ORDERED that BASF's motion to alter judgment [#583] is DENIED.

IT IS FURTHER ORDERED that Monsanto's renewed motion for judgment as a matter of law on punitive damages or motion for new trial or remittitur [#585] is DENIED in part and GRANTED in part.

IT IS FURTHER ORDERED that Monsanto's renewed motion for judgment as a matter of law or new trial [#587] is DENIED.

IT IS FURTHER ORDERED that Monsanto and BASF's motions for hearing [#621, #624] are DENIED.

IT IS FURTHER ORDERED that plaintiff's motion to strike [#642] is DENIED;

IT IS FURTHER ORDERED that BASF's motion for joinder [#643] is GRANTED;

IT IS FINALLY ORDERED the Punitive Damages award is reduced to

$60,000,000.00 and an amended judgment will issue.

So ordered this 25th day of November, 2020.

_____
STEPHEN N. LIMBAUGH, JR.
SENIOR UNITED STATES DISTRICT JUDGE